UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ALEKSEY RUDERMAN, ARTURO SALDIVAR,
and CHRIS POCKNELL on behalf of themselves
and all others similarly situated,

     Plaintiffs,       CASE NO. 23-CV-1336

v.

KENOSHA COUNTY, KENOSHA COUNTY
SHERIFF'S DEPARTMENT, DAVID G. BETH,
ROBERT HALLISY, LARRY APKER, MARC
LEVIN, JUSTIN MILLER, and BILL BETH

    Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## MOTION TO DISMISS

---

 Kenosha County, Kenosha County Sheriff's Department, David G. Beth, Larry Apker, Marc Levin, Justin Miller, and Bill Beth, by their attorneys, Municipal Law & Litigation Group, S.C., and with respect to Defendant Robert Hallisy making a Special Appearance as set forth in the accompanying Motion, submit this Brief in Support of their Motion to Dismiss.

## INTRODUCTION

 Civilly detained immigrants who are being detained by federal immigration authorities in a county jail do not get a "free pass" to be excused from jail rules that govern everybody else, including cleaning their living areas, no matter how hard they try to misapply the federal Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1589 and 1595. Nor does the TVPA let them make an end-around settled legal norms governing conditions of confinement under the Constitution and the Prison Litigation Reform Act (PLRA), which required them to grieve their

conditions at the time and not try to shoehorn them into the TVPA's longer ten year statute of limitations.

Congress' declared intent of the TVPA was "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children to ensure just and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106-386 § 102(a), 114 Stat. 1464 (2000). Congress supported this purpose with twenty-four findings focused on the evils of "trafficking of persons" into the United States, mostly women and children, through false promises. *Id*. at 114 Stat. 1488.

These three Plaintiffs were not trafficked across international lines into "forced labor." By their own allegations, they were civilly detained by United States Immigration and Naturalization Service (INS), an agency of the Department of Homeland Security (DHS). The Kenosha County Jail is not a labor recruiter of trafficked persons, nor is it profiting from forced labor, nor has the Jail, or any such jail, been the target of Congressional efforts to eradicate the scourge of international sex and human labor trafficking. They do not allege, but incorporate by reference, documents revealing ALL detainees/inmates had to follow jail rules and ALL detainees/inmates were subject to the Jail Rulebook, not just them (or not just civilly detained immigrants). Even their allegations about when they cleaned – such as Ruderman cleaning once every two weeks, Salvidar two to three times a week, and Pocknell two times a week, all over the course of months of detention – reveal the ordinary incidents of penological life, if not everyday life of all Americans. And, of those three, Ruderman – who is a plaintiff in other TVPA cases – clearly looked to game the system; his grievances bear out that his objection to cleaning was his legal interpretation of the TVPA's applicability, not that he objected to cleaning because he was being punished. Indeed, despite trying to allege they faced solitary confinement for cleaning, which is

permissible as discussed in many federal authorities discussed below, it is notable that Plaintiffs' plead only Pocknell faced such solitary confinement – one time in a two year stretch of detention. Dkt. 1, Compl. ¶ 44, 47.

Notably, Plaintiffs' theory – the application of § 1589 to a government-run jail – is novel. It does not appear there is a completed, successful lawsuit anywhere in this country under such theory. Even more eye-opening, while the TVPA is a primarily a *criminal statute*, Defendants have not uncovered any criminal investigations or prosecutions against any local jail for requiring detainees to participate in cleaning/housekeeping chores such as those asserted here. Thus, to now apply § 1589 against a Wisconsin county jail, particularly in the face of decades of established PLRA law and civil rights law (§ 1983) that expressly governs conditions of confinement claims and the timely presentation of the same – including holding that cleaning requirements under threat of punishment in a jail setting do not offend the Thirteenth Amendment – would lead to absurd results.

## FACTUAL ALLEGATIONS IN COMPLAINT

The allegations in the Complaint will be discussed throughout this Brief, but in overview Plaintiffs allege they were "civilly detained immigrants" who were "detained" at the Kenosha County Detention Center (hereinafter "the Jail") in Kenosha, Wisconsin. Dkt. 1, Compl. ¶ 2. In 2000, Kenosha County entered into an Intergovernmental Service Agreement with the U.S. Marshals Service and the Immigration and Naturalization Service (INS) to house civil immigration detainees for U.S. Immigration and Customs Enforcement (ICE). *Id*. at ¶ 17.[1]

---

[1] Congress has directed that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal, 8 U.S.C. § 1231(g)(1), and it has instructed that Immigration and Customs Enforcement ("ICE") "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility" that would be suitable for such detention. *Id*. § 1231(g)(2).

Plaintiffs allege that, when they were detainees at the Jail, they were required to clean the common areas of the facility, including the dayrooms, the showers, the rec areas, and the hallways. *Id*. ¶ 21. The Kenosha County Sheriff's Department Inmate/Detainee Handbook states that "[t]he housing units will be cleaned after breakfast movement as directed by Jail staff, with the cells, dayrooms, and sleeping areas cleaned by the inmate/detainee occupying those areas." *Id*. ¶ 24. As explained in a grievance response, "[t]he cleaning responsibilities are given to different inmate/detainees every day, to ensure all cleaning responsibilities are distributed evenly." *Id*. ¶ 34; Ex. A p. 2, Grievances. Plaintiffs allege that when detainees refused to clean they were either punished or threatened with punishment including being put on lockdown or placed in segregation. *Id*. ¶ 3.

Plaintiffs assert claims on behalf of themselves as well as proposing a class action under the TVPA. Plaintiffs assert that they were victims of forced labor by:

- o means of physical restrain or threats of physical restraint to Plaintiffs in violation of 18 U.S.C. § 1589(a)(1);

- o means of serious harm or threats of serious harm to Plaintiffs in violation of 18 U.S.C. § 1589(a)(2); and

- o means of a scheme, plan, or pattern intended to cause the Plaintiffs to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

*Id*. at ¶ ¶ 72-74. Plaintiffs also allege claims under Wisconsin's trafficking statute, unjust enrichment, and indemnification.[2] *Id*. at ¶¶ 78-94.

---

[2] Plaintiffs do not have a private cause of action for indemnification. "Section 895.46 of the Wisconsin Statutes does not provide a private cause of action for indemnification [and] … does *not* allow a plaintiff [] to sue the state for damages." *Jackson v. Graves*, 2015 WL 5577527, *4 (E.D. Wis. 2015) (emphasis in original). "The intent of the statute is to enable an official of a political subdivision to bring an action against the political subdivision to obtain reimbursement for an obligation of the political subdivision he or she has borne." *Chiroff v. Milwaukee Cty.*, 2000 WI App 233, 239 Wis. 2d 232, 619 N.W.2d 307.

Plaintiffs in this case do not have a private cause of action for indemnification, and the indemnification provisions under Section 895.46 will be triggered without any such claim being brought against Kenosha County should the

## STANDARD OF REVIEW

Under Rule 12(b)(6), the court may dismiss a claim if the allegations in the complaint are insufficient to state a claim. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To state a claim, a Complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the…claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (internal citation omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (internal citations omitted).

In reviewing the complaint, the court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (internal citations and quotations omitted). A complaint that offers "'labels and conclusions' " or "'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. 544, 555 (2007)).  Finally, in evaluating a Rule 12(b)(6) motion, "courts are free to consider . . . exhibits attached to the complaint, Fed. R. Civ. P. 10(c), or documents referenced in the pleadings if they are central to the claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

---

individual defendants be found liable. The indemnification claim alleged here should therefore be dismissed. *See Williams v. Michalsen*, 2020 WL 1939136 (E.D. Wis. 2020) (dismissing indemnification claim against county and explaining that "if the individual officers are found liable, the indemnity mandated by § 895.46 will be triggered; the plaintiffs do not need to sue the county for that to happen.").

<u>**ARGUMENT**</u>

## I. THE TVPA DOES NOT EXTEND TO MUNICIPAL JAILS WHOSE RULES REQUIRE DETAINEES TO CONDUCT CLEANING OF THEIR LIVING SPACES.

The TVPA was enacted under Congress' power to enforce the Thirteenth Amendment. *See United States v. Kozminski*, 487 U.S. 931, 939-40 (1988); *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014); *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), as amended (Mar. 3, 2017). The Thirteenth Amendment's prohibition on involuntary servitude extends "to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Butler v. Perry,* 240 U.S. 328, 332 (1916).

As noted by the Congressional findings in the Introduction above, "[t]he statute focuses on those (usually men) who make money out of selling the sexual services of human beings (usually women) they control and treat as their profit-producing property." *United States v. Todd*, 627 F.3d 319, 330-31 (9th Cir. 2010). Claims under the TVPA usually "involve circumstances such as squalid or otherwise intolerable living conditions," "threats of legal process such as arrest or deportation," and "exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent [vulnerable] victims from leaving and to keep them bound to their captors." *Muchira v. Al-Rawaf*, 850 F.3d 605, 618-19 (4th Cir. 2017) (citations omitted).

Further, the TPVA was not enacted in a vacuum. "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midatlantic Nat'l Bank v. N.J. Dep't of Entl. Prot*., 474 U.S. 494 (1986). Thus, it is assumed that, at the time Congress enacted the TVPA, it was aware of both the Dictionary Act, the remedies available to detainees through Section 1983, and the civic duty exception.

Given the statute's purpose, text, and the statutory and judicial history surrounding the statute, it is clear that the TVPA was not intended to criminalize county jails whose customary rules require detainee participation in general housekeeping and cleaning.

**a. The TVPA Does Not Apply to Local Governments Under Both its Plain Language and Because Allowing Detainees to Bring Claims Regarding Their Confinement Under the TVPA Would Usurp Longstanding Law Under § 1983.**

The claims here are brought under Section 1589(a), commonly known as the forced labor provision of the TVPA, whose opening clause states: "Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of…"

Several statutory rules of construction govern the analysis here, starting with courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184 (1988). Further, courts have an "obligation to construe federal statutes so that they are consistent with each other." *Get Oil Out! Inc. v. Exxon Corp.*, 586 F.2d 726, 729 (9th Cir. 1978).

Congressional acts are also analyzed against the Dictionary Act, which sets forth for courts "the meaning of any Act of Congress." The Dictionary Act provides the following definition for "whoever": "The words "person" and "whoever" includes corporations, companies, associations, firms, partnerships, societies, and companies, as well as individuals." 1 USCA § 1. *See e.g. Barrientos v. CoreCivic, Inc*., 951 F.3d 1269, 1277 (11th Cir. 2020) (evaluating TVPA by reference to the Dictionary Act); *see also, Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd*., Case No. 10-1172, 2011 WL 13153190 (C.D. Cal. May 12, 2011) (holding that neither the term "perpetrator" nor "whoever" extend to governmental entities under the TVPA).

A third rule is also important here. When the plain language of a criminal statute would create "extreme or absurd results, and where the legislative purpose gathered from the whole act

would be satisfied by a more limited interpretation, the general terms description of a class of persons made subject to a criminal statute may and should be limited." *United States v. Katz*, 271 U.S. 354, 362 (1926) (citations omitted); *see also, United States v. Gordon,* 64 F.3d 281, 283-84 (7th Cir. 1995) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

As applied here, noticeably absent from Section 1589(a)'s definition of "whoever" is the inclusion of political subdivisions or local governments law. Under a plain reading of the text, therefore, the TVPA does not apply to a county jail.

This determination makes sense in light of the fact that, long before the TVPA's enactment, Congress had already provided legal mechanisms of redress against local governments acting under color of law to cause constitutional or federal rights deprivations – namely, 42 U.S.C. § 1983. Section 1983 creates liability for any "person who, under color of any statute, ordinance, regulation, custom, or usage of any State" deprives or causes any person within the jurisdiction of the United States to be deprived of "any rights, privileges, or immunities secured by the Constitution and [federal] laws." In a landmark decision, the Supreme Court extended the reach of § 1983 beyond *persons* acting under color of law to include local governments under certain theories of liability. *Monell v. Department of Social Services*, 426 U.S. 658 (1978). Section 1983 is the principal statute governing private remedies for federal civil rights violations including challenges to conditions of confinement in county jails. *See Mitchum v. Foster*, 407 U.S. 225, 239 (1972) (section 1983 provides "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and the laws of the Nation."); *see also, Estell v. Gamble*, 429 U.S. 97 (1976); *Hardeman v. Curren*, 933 F.3d 816, 821-22 (7th Cir.

2019) (applying standards from *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015) to Fourteenth Amendment conditions of confinement cases).

Nothing in the legislative history or the language of §1589 suggests Congress intended to extend the TVPA to detainees in a municipal jail or to override § 1983 law regarding the conditions in which such detainees may be detained. Indeed, that Congress did not include municipal governments or employees in the definition of "whoever," further supports that Congress intended § 1983 to remain the principle vehicle for addressing alleged violations of federal law in municipal jails. Nor has the Supreme Court issued any decision akin to *Monell* that would extend the reach of § 1589 to municipalities or their employees.

Finally, to interpret § 1589 as applying to detainees in municipal jails would lead to absurd results because such detainees have a long-standing means of redress for violations of federal law under § 1983, which Congress already addressed through the PLRA whose principal features including timely grieving in order to correct perceived violations. *See e.g. Woodford v. Ngo*, 548 U.S. 81 (2016) (holding that the Prison Litigation Reform Act requires prisoners to exhaust any available administrative remedy before filing suit.).

As set forth below, there are decades of case law analyzing detainees' complaints of their conditions of confinement – including cleaning and work requirements – in the jail setting under § 1983. To hold now that inmates and detainees cannot be required to participate in cleaning procedures would be in direct conflict with all of the below-mentioned case law, the workings of the PLRA and the above rules of statutory construction.

### b. Plaintiffs' Complaint Must be Dismissed Because it Merely Alleges Conduct Expressly Allowed Under the Civic Duty Exception.

Even assuming § 1589 applies to municipalities and their employees, the civic duty exception expressly precludes criminal and civil liability for requiring inmates in local jails to participate in general housing-keeping and cleaning responsibilities.

The Supreme Court recognizes the long-standing "civic duty" exception to the Thirteenth Amendment's prohibition on involuntary servitude whereby state or federal governments can compel individuals, by threat of sanction, to perform certain civic duties. *See United States v. Kozminksi*, 487 U.S. 931, 943-44 (1988). The theory behind such civic duties is that duties which are owed to the state are entirely insulated from the Thirteenth Amendment. *See Butler v. Perry*, 240 U.S. 328, 333 (1916); *Barrientos v. CoreCivic*, Inc., 951 F.3d 1269, 1278 (11th Cir. 2020) (recognizing the longstanding requirement that detainees or inmates be required to perform basic housekeeping tasks); *Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997) (government entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks); *Haas v. Wisconsin*, 241 F. Supp. 2d 922, 935 (E.D. Wis. 2003) ("[c]omplying with court orders and judgments is a civic duty. Thus, forced labor or incarceration to compel compliance with these orders when one has not demonstrated that he or she is unable to comply is not prohibited by the Thirteenth Amendment.").

District Courts have held that the civic duty exception applies to § 1589. *See Owino v. CoreCivic*, Inc., No. 17-CV-1112 JLS (NLS), 2018 WL 2193644, at *8 (S.D. Cal. May 14, 2018) ("it is logical to apply the civic duty exception to section 1589. The Court reads the civic duty exception as deriving from the Thirteenth Amendment, regardless of whether Congress uses the phrase "involuntary servitude.") *See also Novoa v. GEO Grp., Inc*., No. 17-2514, 2018 WL 3343494, at *13 (C.D. Cal. June 21, 2018).

Further, many courts, including the Seventh Circuit, have applied the civic duty exception to Thirteenth Amendment claims – the basis for the TVPA – in regard to mandatory duties for pretrial detainees. For example, in *Bijeol v. Nelson*, 579 F.2d 423 (7th Cir. 1978), a pretrial detainee alleged a violation of the Thirteenth Amendment when he was required to perform general housekeeping duties without pay and placed in segregation when he refused to do so. *Id*. at 424. There, the plaintiff was required to dust, vacuum, empty ashtrays, set up and clean tables after meals, vacuum general purpose areas after each meal and clean windows. *Id*. The approximate daily time required for the assigned housekeeping chores ranged between 45 minutes and two hours. *Id*. The assignments were rotated weekly, but inmates were required to clean up areas which became unusually messy prior to the regularly scheduled cleaning, similar to the allegations in the present case. *Id*.

The Seventh Circuit found that the cleaning requirements listed above – for which detainees were not paid and were placed in segregation if they refused to participate – did not offend the Thirteenth Amendment. The court explained that daily general housekeeping responsibilities are not punitive in nature and for health and safety must be routinely observed in any multiple living unit. *Id*. "The arrangement seems as fair and equitable as is possible when you have groups of people living together, some of whom may tend to be neater than others." The court also concluded that "pretrial detention centers must maintain some stability and discipline." *Id*.

Of many federal court examples, guidance can also be found in *Channer v. Hall*, 112 F.3d 214, 215 (5th Cir. 1997), where the Fifth Circuit considered INS detainee's Thirteenth Amendment claim for being "compell[ed] [ ] to work in the Food Services Department." This included eight-hour shifts in which INS detainees were intimidated and threated with solitary confinement if they failed to work and comply. *Id*. 218-19. In dismissing plaintiff's Thirteenth Amendment claim, the

Fifth Circuit explained the government "is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks" and that the plaintiff's kitchen service did not violate the Thirteenth Amendment's prohibition on involuntary servitude. *Id*. at 219. The court held that the detainee was not subjected to "involuntary servitude" because the civic duty exception applied and government [was] entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks. *Id*. at 218–19).[3]

Under these legal authorities, general housekeeping chores in a jail do not violate the Thirteenth Amendment, including but not limited to, fixing and distributing meals, scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning communal bathrooms and shower stalls, removing trash from common areas, and sweeping, mopping, and vacuuming general-use hallways and rooms. Indeed, consistent with that precedent, the Federal Bureau of Prisons' (BOP) regulations provide "[a] pretrial inmate may not be required to work in any assignment or area other than housekeeping tasks in the inmate's own cell and in the community living area, unless the pretrial inmate has signed a waiver of his or her right not to work." 28 C.F.R. § 545.23(b).

The allegations in the Complaint are no different than the above cited cases, as tolerated by even the BOP. Plaintiffs allege that they were forced to clean common areas, which included

---

[3] Other district and appellate courts have also held compelling pretrial and civil detainees to perform general housekeeping duties, both in their own cells and in common areas of their housing units is not prohibited. *See Martinez v. Turner*, 977 F.2d 421,423 (8th Cir. 1992)(explaining that pretrial detainees may be compelled, under threat of administrative segregation, "to perform general housekeeping chores"); *Hause v. Vaught*, 993 F.2d 1079, 1081, 1085 (4th Cir.1993) (holding that pretrial detainees may be required to "assist in cleaning the common areas of their cell-block"); *Jobson v. Henne*, 355 F.2d 129, 130–32 (2d Cir.1966) (chores of a normal housekeeping type may be required of lawfully committed mental health inmate); *Jackson v. Siringas*, No. 12–15474, 2013 WL 3810301, at *10 (E.D.Mich. July 23, 2013) ("[R]equiring a pretrial detainee to help clean his living unit, including common areas, does not amount to involuntary servitude as prohibited by the Thirteenth Amendment."); *Butler v. Perry*, 240 U.S. 328 (1916)(mandatory work on public roads permitted); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind.1991) (mental hospital patients who were involuntarily confined performed a variety of work activities such as fixing meals, cleaning and doing laundry fit within civic duty exception); *See also Mendez v. Haugen*, No. CV 14-4792 ADM/BRT, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015), aff'd (Feb. 22, 2016).

janitorial services such as sweeping, disinfecting, and cleaning. These are exactly the types of basic services that courts around the country have held to fall within the civic duty exception, including the Seventh Circuit's *Bijeol* decision. Given that this type of required cleaning does not violate the Thirteenth Amendment, it follows such cleaning also does not violate the TVPA – which was enacted to safeguard the very same protections as those in the Thirteenth Amendment.

       **c.    Declining to Extend § 1589 to Detainee Cleaning Requirements in Government-Run Jails Would be Consistent with Case Law Limiting the Application of the TVPA.**

A finding that §1589 is inapplicable to routine housekeeping tasks by lawfully detained individuals would be consistent with the Supreme Court's holding in *United States v. Kozminksi*, 487 U.S. 931 (1988) and the Sixth Circuit's decision in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014). *Kozminski* required the Court to interpret the meaning of "involuntary servitude" in 18 U.S.C. § 1584.[4] As with § 1589, § 1584 was enacted pursuant to Congress' power to enforce the Thirteenth Amendment. *Id*. at 939. In *Kozminski*, the Government argued that the language of the Thirteenth Amendment, and that of § 1984 as to the definition of "involuntary servitude" should be broadly construed. *Id*. at 940. However, in rejecting this argument, the Supreme Court explained:

> The Government has argued that we should adopt a broad construction of 'involuntary servitude,' which would prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice. Under this interpretation, involuntary servitude would include … almost any other type of speech or conduct intentionally employed to persuade a reluctant person to work.

---

[4] Section 1584 prohibited "[w]hoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude any other person for any term."

*Id.* at 949. The Supreme Court cautioned that a contrary conclusion would "criminalize a broad range of day-to-day activity" and "would also subject individuals to the risk of arbitrary or discriminatory prosecution and conviction." *Id.*

Similarly, the Sixth Circuit's opening line *United States v. Toviave* cuts to the core of the analysis: "Forced labor is a federal crime, 18 U.S.C. § 1589, but the statute obviously does not extend to requiring one's children to do their homework, babysit on occasion, and do household chores. Only by bootstrapping can this combination of two actions that are not federal crimes — child abuse and requiring children to do household chores — be read as a federal crime." *Toviave*, 761 F.3d at 623-624. The court held §1589 is not applicable to children being forced to do household chores who experienced threat of beatings by family members. *Id.* at 623-25. There, the defendant brought four young relatives from Togo to live with him in Michigan and then made them cook, clean, do laundry, and babysit. *Id.* The defendant beat the children with various instruments when they failed to follow his rules. *Id.* However, he also provided for the children, put them in school, took them on an occasional vacation and was otherwise concerned with their well-being. *Id.* In declining to apply §1589, the Sixth Circuit explained that "treating household chores and required homework as forced labor because the conduct was enforced by abuse … renders the requirement of household chores a federal crime." *Id.* at 625.

Here, §1589 is similarly inapplicable. As discussed above, detainees have long had the ability to bring their claims under § 1983. For decades – and beginning long before the enactment of the TVPA – courts have denied claims by detainees for being required to participate in a jail's cleaning procedures. These cases are in line with the civic duty exception and with *Kozminksi*, *Toviave,* and subsequent cases that draw a distinction between circumstances truly stemming from the Thirteenth Amendment and those that would simply criminalize normal day-to-day activities

and subject defendants – such as jail administrators – to a federal law designed to stop sex traffickers and trafficking labor for financial advantage.

## II. EVEN IF THE TVPA APPLIES TO GOVERNMENT-RUN JAILS, THE STATUTE IS UNCONSTITUTIONAL AS APPLIED TO THE FACTS OF THIS CASE.

Even if the TVPA is inapplicable at its very first word ("whoever") and for the other reasons explained above, the balance of its terms either do not apply or are unconstitutionally vague. Plaintiffs allege violations of Section 1589 which makes it a crime to:

> knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means –
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or the legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

"Abuse or threatened abuse of law or legal process" is defined as the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take action or refrain from taking some action. § 1589 (c)(1). The term "serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or continue performing labor or services in order to avoid incurring that harm." § 1589 (c)(2).

Congress explained the purpose of the TVPA in 22 U.S.C. § 7101(a): "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Congressional findings included that trafficking was not solely limited to the sex industry, but to forced labor involving "significant violations of labor, public health, and human rights standards worldwide," § 7101(b)(3), buying children for placement into "bonded labor," § 7101(b)(4), and "physical violence" like rape, sexual abuse, torture, starvation, imprisonment, threats, psychological abuse and coercion, all in order to engage in "slavery-like labor." § 7101(b)(6).

### a. The Plain Language of the Forced Labor Provisions of the TVPA Were Not Violated Here.

Statutory Interpretation begins with the language of the statute itself. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) The first step is to determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 648-49 (7th Cir. 2011). When interpreting statutory language, the meaning attributed to a phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis. *Id*. When a statute is ambiguous, various doctrines of statutory interpretation are applied to determine its meaning such as look at legislative intent to clarify the statute's ambiguity. *United States v. Mills*, 186 F. Supp. 2d 965, 968 (E.D. Wis. 2002).

The TVPA does not supply definitions for "labor or services," "force," or "threats of force" or the other operative words in Section 1589. No settled Supreme Court or Seventh Circuit law defines those terms. Compounding the lack of defined terms, Congress enhanced § 1589 over the years in response to the Supreme Court's decision in *United States v. Kozminski*, 487 U.S. 931

(1988), which interpreted § 1584 to require the use or threatened use of physical or legal coercion. *Kozminski* thus held that "involuntary servitude" should be defined narrowly. After the *Kozminski* decision, § 1589 was drafted more broadly than the court's interpretation of § 1584. Section 1589 broadens the definition of the kinds of coercion that might result in forced labor. But, that does not mean its scope is permissibly so broad as to apply here.

Guidance can be found elsewhere. For example, Uniform Code of Military Justice (UCMJ) defines "force" to mean: (a) the use of a weapon; (b) the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or (c) inflicting physical harm sufficient to coerce or compel submission by the victim. 10 U.S.C. § 920. Guidance can also be found in the summary from the U.S. Department of Defense about the definitions and the purpose and history of the TVPA, whose illustrative examples follow that definition and reveal the horrific human crimes involved in sex trafficking and forced labor.[5] Additional guidance can be found from the U.S. State Department, which has authority over the TVPA. Its guidance also does not define the TVPA to cover county jails whose rules require all inmates to clean living spaces.[6] The guidance instead says:

> The "acts" element of forced labor is met when the trafficker recruits, harbors, transports, provides, or obtains a person for labor or services.
>
> The "means" element of forced labor includes a trafficker's use of force, fraud, or coercion. The coercive scheme can include threats of force, debt manipulation, withholding of pay, confiscation of identity documents, psychological coercion, reputational harm, manipulation of the use of addictive substances, threats to other people, or other forms of coercion.
>
> The "purpose" element focuses on the perpetrator's goal to exploit a person's labor or services. There is no limit on the location or type of industry. Traffickers can commit this crime in any sector or setting, whether legal or illicit, including but not limited to agricultural fields, factories, restaurants, hotels, massage parlors, retail stores, fishing vessels, mines, private homes, or drug trafficking operations.

---

[5] *See* https://ctip.defense.gov/portals/12/Trafficking_in_Persons_101_Fact_Sheet_2020.pdf
[6] *See* https://www.state.gov/what-is-trafficking-in-persons/

All three elements are essential to constitute the crime of forced labor.

Here, the situation does not fit the plain language of the statute. A county jail is part of the criminal justice system, not providing labor or services, let alone labor or service involving trafficked persons for a profit or other exploitation. There is no labor trafficking involving involuntary servitude, peonage, debt bondage, and slavery. There is no use of weapons, physical force or infliction of physical harm in the jail to detainees for purposes of compelling cleaning services. Additionally, Section 1589(a)(2) & (4) require "serious harm," which is not met here because – as the weight of federal law above points out – being in jail inclusive of following custodial rules liking cleaning living spaces is not "…*sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances* to perform or continue performing labor or services in order to avoid incurring that harm." § 1589 (c)(2).

**b. Even if the Forced Labor Provision the TVPA Could Apply in the Jail Setting, the TVPA is Void for Vagueness as Applied to the Facts of this Case.**

Even assuming the TVPA applies, Section 1589 should be declared void for vagueness as applied here. The void for vagueness doctrine stems from "the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). A statute is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier,* 520 U.S. 259, 266 (1997). Vague statutes create two problems: (1) they fail to provide due notice so that ordinary people understand what conduct is prohibited; and (2) they encourage arbitrary and discriminatory enforcement. *United States v. Cherry*, 938 F.2d 748, 753 (7th Cir. 1991). The degree of statutory imprecision that due process will tolerate "varies with the nature of the enactment and the

Case 2:23-cv-01336-BHL   Filed 11/06/23   Page 18 of 37   Document 23

correlative needs for notice and protection from unequal enforcement. See *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498 (1982).

In an as-applied challenge, the court may "leav[e] aside any concerns about facial invalidity" and ask only whether the statute was impermissibly vague with respect to the conduct at hand. *F.C.C. v. Fox Television Stations, Inc*., 567 U.S. 239, 254 (2012) A statute is unconstitutionally vague if it (1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited; or (2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute. *U.S. v. Lim*, 444 F.3d 910, 914 (7th Cir. 2006).

The TVPA suffers from this fatal defect as applied here. Officers in a correctional setting have no way of knowing if common jail rules, such as general cleaning procedures, trigger Section 1589's "labor or services." Jail officials have, for decades, legally required inmates to clean the living and communal areas of a jail or be subject to punishment. Nothing in the plain language of the text, its context or its history points to civil or criminal liability of a jailer – whose subjects come to him by way of the judicial process' involuntary detainment (court order, INS, probable cause to arrest, etc.), not by international trafficking.

Further, the statute is vague with respect to the terms "force" "threats of force" and "serious harm." These terms are not defined in the statute and the federal agencies who implement the legislation do not view these terms as even being applicable here. Nor would they, given the unique characteristics of a correctional setting. Officers in a correctional setting are permitted to use some force, the threat of force, and forms of discipline such as disciplinary segregation in order to maintain order and control in a jail:

> When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance,

such as a chemical agent or physical force. While ... it was suggested that rather than seek to enforce order, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

Discipline in a [] correctional institution no doubt is difficult, but it is essential if the prison is to function and provide care, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control. One can quickly reason what would happen in a maximum-security prison without proper discipline.

*Soto v. Dickey,* 744 F.2d 1260, 1267 (7th Cir. 1984).

Given that some force is constitutionally permissible in a correctional setting based on *Soto* and all the other federal authorities above, the TVPA is thus void for vagueness as applied here because it does not define the limits or guardrails where circumstances involving a jail cleaning policy fall under the TVPA. In other words, it is impossible for officers to determine whether any threat or use of force – even if determined to be *constitutionally permissible* like in *Soto* and the other federal cases noted above – was a violation of the TVPA. "This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause." *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

Additionally, the statute is subject to arbitrary enforcement. The Constitution "does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citations omitted).

Section 1589 allows for arbitrary enforcement of local governments and public employees operating jails because it allows for prosecutors, plaintiffs' attorneys, and juries to define what is considered "forced labor" in the jail context and what amount of "force" "threat of force" or "discipline" may be used to effectuate a cleaning order. Thus, individual juries may ultimately

determine jail policies. On an individual basis, juries would determine what areas of a jail, if any, inmates are required to clean, how often inmates are required to clean, to what extent inmates are required to clean, what punishments inmates may receive for failing to abide by said policies, and whether an individual jail is required to contract with a cleaning service.

Thus, correctional facilities in Wisconsin would be forced to guess how or to what extent inmates may be required to participate in keeping their living quarters clean and would be subject to punishment under the TVPA if they step too far. Given the lack of plain text, context, Congressional findings and purpose in the TVPA, Section 1589 is void for vagueness as applied here.

## III. PLAINTIFFS HAVE NOT PLED THE REQUIREMENTS OF A *MONELL* CLAIM IN ORDER TO SUSTAIN THE FEDERAL CLAIMS.

Courts in this jurisdiction have never held a municipality liable under the TVPA for requiring detainees to clean their cells or the common areas of a jail, or for allowing detainees to be placed in segregation if they refuse to do the same. To the contrary, courts have routinely analyzed cases involving such allegations under the Thirteenth Amendment (as applied under § 1983). As set forth in the case law above, couts have also repeatedly held that detainees may lawfully be required to perform cleaning tasks similar to those alleged in this lawsuit, that detainees may lawfully be placed in segregation if they refuse to perform such cleaning tasks, and that such cleaning tasks and disciplinary measures do not violate a detainee's civil liberty interests as a matter of law.

The issues presented here are similar to those addressed in the cases cited above; that is, whether detainees may lawfully be required to clean their individual cells and common areas at the jail, and whether detainees may lawfully be placed in segregation if they refuse to do the same.

The civil liberty interests at issue here are also similar to those addressed in the cases cited above; that is, the right not to be forced into slavery, involuntary servitude, and/or sex trafficking.

Because the issues and civil liberty interests at issue here are similar to those addressed in the cases cited above, the framework routinely applied in those cases should also guide the inquiry here irrespective of whether the allegations are presented under the Thirteenth Amendment, Fourteenth Amendment, or TVPA. In other words, Plaintiffs cannot circumvent the framework applied in the numerous cases cited above or evade the established *Monell* framework that applies to claims brought against municipalities (discussed below) by simply presenting their allegations under the TVPA, rather than under the Thirteenth or Fourteenth Amendment (which has regularly been done). *See McGovern v. City of Philadelphia*, 2008 WL 269498, at *3 (E.D. Pa. 2008) ("Plaintiff contends that because *Monell* applies only to § 1983 claims, it does not apply to the instant case. Thus, in Plaintiff's view, because he has proceeded under § 1981 alone, he can prevail against the City on a theory of *repondeat superior*, and need not meet the *Monell* custom and policy causation requirements. If Plaintiff is correct, it would effectively overturn *Monell*, whose requirements could be evaded simply by proceeding under § 1981 rather than § 1983. It is highly implausible that Congress would 'repeal' both *Jett* and *Monell* without an explicit statement to this effect.").

When, as in this case, a claim alleging a deprivation of a civil liberty interest is brought directly against a municipality, the framework in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 659 (1978) must be applied. Under *Monell*, a municipality cannot be held vicariously liable based on *respondeat superior*. *Id.* at 693. Municipal liability can only be found if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

This can occur only if: (1) the violation was caused by an unconstitutional written policy of the municipality; (2) the violation was caused by a "wide-spread practice" that, although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) the violation was caused by a decision of a municipal policymaking official with "final decision policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). A plaintiff must also prove that municipal policymakers "were deliberately indifferent as to the known or obvious consequence." *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2009). Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). There must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

As a threshold matter, Kenosha County cannot be held liable because Plaintiffs have not alleged a deprivation of a civil liberty interest in the first place. As explained above, courts have repeatedly held that detainees may lawfully be required to perform cleaning tasks similar to those alleged in this lawsuit, that detainees may lawfully be placed in segregation if they refuse to perform such cleaning tasks, and that such cleaning tasks and disciplinary measures do not violate a detainee's civil liberty interests as a matter of law. Because no deprivation occurred in the first place, Kenosha County cannot be held liable as a matter of law. *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a violation of a civil liberty did not occur in the first place, a municipality cannot be held liable for the same).

Even assuming *arguendo* that Plaintiffs allege a violation of a civil liberty interest, the Complaint nevertheless fails to state a claim against Kenosha County because any such deprivation was not caused by an official municipal policy.

The Complaint does not reference any written policy of Kenosha County encouraging or condoning forced labor. Plaintiffs cannot rely on boilerplate allegations to support a municipal liability claim. *See McCauley v. City of Chicago*, 671 F.3d 611, 615-16 (7th Cir. 2011) ("Legal conclusions and conclusory allegations" receive no presumption of truth, are insufficient to state a claim, and should be disregarded; this includes unsupported allegations that a municipality had an unconstitutional "custom, practice and policy…."); *Annan v. Vill. of Romeoville*, 2013 WL 673484, at *6 (N.D. Ill. Feb. 25, 2013) (boilerplate allegation that defendant "maintains a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such" is insufficient to state claim against municipality).

Plaintiffs' focus on the Inmate Handbook creates misdirection because the handbook is not, and was not, an official written policy of Kenosha County. The jail provided the handbook to detainees with rules that would allow for a safe, secure and orderly custodial institution; it is not, and was not, a governmental expression of the County Board of Supervisors seeking to effectuate a contemporary manifestation of slavery or involuntary servitude. The fact that the jail, like every other jail in America, requires inmates to clean is not tantamount to a policy passed by the County Board that calls for detainees to perform forced labor or otherwise expresses a manifestation of slavery or involuntary servitude. Kenosha County cannot be vicariously liable for mundane cleaning tasks under the TVPA, whether directed and/or assigned by staff or implemented by the Sheriff in his role of running the jail, because Kenosha County has not implemented a written policy that effectuates forced labor.

Furthermore, the handbook only indicates that "housing units … dayrooms, and sleeping areas [must be] cleaned by the inmate/detainee occupying those areas." It does not indicate that detainees are required to clean outdoor recreation areas, hallways, showers, indoor recreation areas, or the gym. And, nothing in the handbook indicates that detainees may – let alone must – be placed in segregation if they refuse to perform the alleged cleaning tasks, or any other tasks. The handbook only indicates that "[i]f the housing units are not in proper order by 9:00 a.m., dayroom, T.V., and phone privileges will not be allowed." (Dkt. 1-1, p. 1.) The handbook thus cannot be considered a written policy, let alone a written policy that caused the violation alleged in this case.

Nor do Plaintiffs allege that any cleaning tasks were assigned to detainees by an official policymaker, or that detainees were placed in segregation by an official policymaker. The Complaint instead alleges that "*jail staff* order[ed] detainees to perform janitorial labor," that "*a []  corrections officer* [told Plaintiff] he would be subject to punishment should he refuse his cleaning duties," that "cleaning jobs [were] assigned *by officers*," and that "*sergeants*" responded to detainee grievances. (Dkt. 1., ¶ 31-33, 35, 38.) Jail staff, corrections officers, officers, and sergeants are not final policymakers and do not have final policymaking authority for Kenosha County.

Nor do Plaintiffs allege that Kenosha County had widespread practice of requiring detainees to perform unlawful cleaning tasks. Tellingly, the Complaint only references three detainees during a period of 23 years, and courts have held that three instances cannot be considered a widespread practice for purposes of municipal liability. *See Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Although this court has not adopted any 'bright-line rules' defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary

to impose *Monell* liability must be more than three."); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("evidence of four incidents that he alone experienced fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law").

Finally, Kenosha County policymakers could not have been on notice that the jail had an unlawful practice regarding detainee cleaning tasks, let alone that policymakers were deliberately indifferent to the same. As explained above, courts have repeatedly held that detainees may lawfully be required to perform cleaning tasks similar to those alleged in this lawsuit, that detainees may lawfully be placed in segregation if they refuse to perform such cleaning tasks, and that such cleaning tasks and disciplinary measures do not violate a detainee's civil liberty interests as a matter of law. No legal precedent would have placed policymakers on notice of a deficient or unlawful cleaning practice.

## IV. THE COUNTY AND INDIVIIDUAL DEFENDANTS ARE PROTECTED BY DERIVATIVE SOVEREIGN IMMUNITY AND QUALIFIED IMMUNITY

### a. Derivative Sovereign Immunity Protects All County Defendants.

The TVPA claims alleged in this case should also be dismissed because Kenosha County acted as an arm of the federal government when it housed federal immigration detainees, and because the doctrine of derivative sovereign immunity therefore applies.

In *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), the Supreme Court recognized derivative sovereign immunity for contractors who perform governmental functions pursuant to a federal contract. There, a contractor hired by the federal government to build dikes along the Missouri River asserted immunity from claims that the construction caused the erosion of local property. *Id.* at 19. The Court held that the contractor was immune from liability because the work leading to the erosion "was all authorized and directed by the Government of the United States."

*Id.* at 20. The Court concluded that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.* at 20-21.

Plaintiffs in this case allege that Kenosha County contracted with the federal government – through an Intergovernmental Service Agreement (IGSA) with the U.S. Marshals Service and the Immigration and Naturalization Service – to house federal detainees at the jail beginning on August 1, 2000. Notably, the federal government specified that all detainees who were being housed at a state or local government facility through an IGSA were required to "keep areas that you use clean, including your living area **and** any general-use areas that you use. If you do not keep your areas clean, you may be disciplined." (Reginato Aff., Ex. 1, 2016 ICE Handbook, p. 12.)[7] Because such cleaning requirements and threat of discipline are the unlawful acts alleged in this lawsuit, and because Kenosha County was acting as an arm of the federal government by implementing these requirements, Kenosha County is protected under the doctrine of derivative sovereign immunity. The applicable IGSA further shows that Kenosha County's activities were being directed by the federal government, and that the federal government was inspecting the jail to ensure that Kenosha County complied with the federal objectives and directives. (Reginato Aff., Ex. 3, IGSA, pp. 1-9.)

---

[7] The cleaning requirements imposed by the federal government were different when the detainees were housed in Service Processing Centers (SPCs) and/or Contract Detention Facilities (CDFs). With respect to those facilities, the federal government imposed the following less burdensome requirements: "detainees are required to maintain their immediate living areas in a neat and orderly manner. This involves making their bunk beds daily, stacking loose papers, keeping the floor free of debris and dividers free of clutter, and hanging/draping no articles of clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture."). (Reginato Aff., Ex. 2, Ice Detention Standard, p. 2.)

**b. Qualified Immunity Protects the Individually Named Defendants.**

With respect to the TVPA claims alleged against the individual defendants, they should also be dismissed because they are barred by qualified immunity.

Government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This "qualified immunity" defense allows for reasonable errors "because officials should not err always on the side of caution [for the] fear of being sued." *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998). To overcome immunity, a plaintiff must offer "controlling authority" or "a robust consensus of cases of persuasive authority" barring such conduct as of the date of the incident. *Id.* at 2023.

In *White v. Pauly*, 137 S.Ct. 548 (2017), the Supreme Court emphasized the "longstanding principle" that "clearly established law' should not be defined at a high level of generality," that "existing precedent must have placed the [] question beyond debate" and that qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 555 ("This Court has issued a number of opinions reversing federal courts in qualified immunity cases" because they defined the right too broadly); *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (overturning denial of immunity because "[u]nder our precedents, the Court of Appeals' formulation of the clearly established right was far too general."); *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015).

The Seventh Circuit has also reiterated the same:

> Over and over, the Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.' [citing 12 Supreme Court decisions] These decisions, and more, tell us that a high level of generality won't do.

*Weiland v. Loomis*, 938 F.3d 917 (7th Cir. 2019).

The individual capacity TVPA claims alleged here are barred under the first prong of qualified immunity because Plaintiffs cannot establish an underlying TVPA violation for the reasons explained above. Furthermore, such claims are barred under the second prong of qualified immunity because there is no case law – let alone clearly established law with the requisite level of specificity decided prior to the alleged violations in this case – holding jailers liable based on circumstances similar to those alleged here. Again, the case law cited above – including, but not limited to *Bijeol*, *Mendez, Martinez*, *Channer*, *Hause*, *Jobson*, *Jackson*, *Magoon*, *Loving*, *Ford*, and *Bayh* – indicates that detainees may lawfully be required to perform cleaning tasks similar to those alleged in this lawsuit, that detainees may lawfully be placed in segregation for refusing to do the same, and that such requirements and discipline do not violate a detainee's civil liberty interests as a matter of law.

V.   **PLAINTIFFS HAVE NOT PLED ANY PERSONAL INVOLVEMENT OF THE INDIVIDUAL DEFENDANTS, AND THE SHERIFF'S DEPARTMENT IS A NONSUABLE ENTITY, SUCH THAT THEY SHOULD BE DISMISSED.**

Plaintiffs name David Beth, Robert Hallisy, Larry Apker, Marc Levin, Justin Miller, and Bill Beth as individual defendants without any factual allegations relating to each individual's involvement. Plaintiffs do not allege any instances where these Individual Defendants required them, or any other detainee, to perform the alleged cleaning duties or forced labor, where these Individual Defendants observed them, or any other detainee, perform the alleged cleaning duties or the alleged forced labor, or where these Individual Defendants disciplined them, or any other detainee, for refusing to perform the alleged cleaning duties or the alleged forced labor. Plaintiffs do not even allege these Individual Defendants were present at the Jail when any of the alleged actions/conduct occurred. Nor do Plaintiffs allege these Individual Defendants received, reviewed,

or responded to any of their grievances, or any grievances from other detainees, regarding the alleged cleaning duties or the alleged forced labor. Nor do Plaintiffs allege these Individual Defendants – who have absolutely no financial stake in the Jail, and who did not receive any type funds or other benefits from the federal government stemming from the housing of immigration detainees – derived any benefit from the alleged cleaning duties or the alleged forced labor.

The Complaint instead only includes the following boilerplate language and unsupported legal conclusions: "Defendant Beth set policy for the Kenosha County Jail and obtained Plaintiffs' forced labor," and "Defendants Robert Hallisy, Larry Apker, Marc Levin, Justin Miller, and Bill Beth were individuals who oversaw the Kenosha County Jail [and] enforced rules requiring Plaintiffs to engage in forced labor." (Dkt. 1, ¶¶ 11-12.) This is insufficient to state a TVPA claim against the Individual Defendants. *Tyra v. Geraets*, 2023 WL 3080488, at *3 (E.D. Wis. 2023) ("Instead of providing the additional information the court told him to provide in an amended complaint, the plaintiff simply has added a legal conclusion—that John Doe's actions were reckless. But it is facts—not legal conclusions or assertions—that determine whether a complaint states a claim."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) ("Legal conclusions or bare and conclusory allegations … are insufficient to state a claim.").

Plaintiffs also name Kenosha County Sheriff's Department as a defendant in this lawsuit. However, the Sheriff's Department is not a suable entity and all claims alleged against it should therefore be dismissed as a matter of law. See *Tate v. Milwaukee Cnty. Sheriff's Dep't,* 2008 WL 5423984, at *3 (E.D. Wis. 2008) ("action against the Sheriff's Department and the Corporation Counsel's Office is dismissed because they are not suable entities").

## VI. THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS AND DETERMINE THEY ARE BARRED AS A MATTER OF LAW.

Finally, Plaintiffs allege two state law claims – unjust enrichment and a cause of action under Wis. Stat. § 940.302 – but the Court should exercise supplemental jurisdiction and dismiss these claims as they are untimely under the statute of limitations, Defendants enjoy statutory immunity, Plaintiffs failed to comply with the State's Notice of Claim Statute, the civic duty doctrine bars such claims, and Plaintiffs fail to properly plead these claims.

### a. The Court Should Exercise Supplemental Jurisdiction.

A district court's decision to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(c) is reviewed for abuse of discretion. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499 (7th Cir. 1999). Accompanying state claims fall within a district court's supplemental jurisdiction if they are "so related to the federal claims … that they form part of the same case or controversy. This supplemental jurisdictional statute codifies the principle that "the federal courts original jurisdiction over federal questions carries with it jurisdiction over state law claims that derive from a common nucleus of operative fact, such that the relationship between the federal claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." *Id*. (citations omitted.) Here, Plaintiffs' claim under the TVPA and state law claims all derive from the same controversy, which are the allegations that the Jail required Plaintiffs to perform housekeeping tasks. Accordingly, supplemental jurisdiction is appropriate.

### b. Plaintiffs' State Law Claims Fail Because they are Barred Under the Applicable Statute of Limitations.

Plaintiffs' State law Claims are barred under the applicable statute of limitations. "If the allegations of the complaint show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Limestone Dev. Corp. v. Vill. of*

Case 2:23-cv-01336-BHL   Filed 11/06/23   Page 31 of 37   Document 23

*Lemont, Ill.*, 520 F.3d 797, 802 (7th Cir. 2008)). A cause of action accrues and the statute of limitations begins to run when an injury occurs. *Watts v. Watts*, 152 Wis. 2d 370, 384, 448 N.W.2d 292, 298 (Ct. App. 1989).

Plaintiffs' Complaint alleges that Ruderman was housed in the Jail in or around 2020 and submitted a formal grievance asserting that the Jail violated the TVPA in February of 2020 (See compl., para 31-33). Additionally, the Complaint alleges that Pocknell and Saldivar were detained at the Jail between the years 2014 and 2016. (*Id*. at 40-45).

   i. **Wis. Stat. § 940.302 is an Intentional Tort that Requires a Cause of Action be Brought Within Three Years of the Accrual Date or be Barred.**

All claims under Wis. Stat. § 940.302 must be dismissed as the statue of limitations expired before the Complaint was filed. Wis. Stat. § 940.302 is a criminal statute that allows for a civil cause of action *See* § 940.302(3). Additionally, Wis. Stat. § 940.302(3) is an intentional tort as the statute requires that a person "knowingly engage in trafficking." *See* Wis. Stat. § 939.23 (explaining that when criminal intent is an element of a crime in chs. 939 to 951, such intent is indicated by the term "intentionally", the phrase "with intent to", the phrase "with intent that", or some form of **the verbs "know**" or "believe" (emphasis added)). Under Wisconsin Law, an intentional tort shall be brought within 3 years after the cause of action accrues or be barred. *See* Wis. Stat. § 893.57. Accordingly, because this lawsuit was filed in October of 2023, any cause of action prior to October of 2020 would be time-barred. However, the allegations of the Complaint do not even place Pocknell and Saldivar in the Jail past the year 2016. Additionally, the Complaint alleges that Ruderman submitted a grievance to the jail in February of 2020 asserting that the Jail was violating the TVPA (*See* paras. 31-33). Because all alleged claims began accruing before

October of 2020, based off the allegations in the complaint, any claim under Wis. Stat. § 940.302 must be dismissed as the applicable statute of limitations has run.

### ii. A Claim for Unjust Enrichment Must be Brought Within Six years of the Accrual Date or be Barred.

Pocknell and Saldivar's claims for unjust enrichment also fail as the statute of limitations for such a claim expired before the Complaint was filed. A claim for unjust enrichment in Wisconsin has a statute of limitations of six years. *See* Wis. Stat. § 893.43; *Smith v. RecordQuest, LLC*, 989 F.3d 513 (7th Cir. 2021); *Boldt v. State*, 101 Wis.2d 566, 578, 305 N.W.2d 133 (1981) (discussing Wis. Stat. § 893.19(3) (1977), which is now § 893.43). A cause of action accrues for an unjust enrichment claim when the injury occurs. *CLL Associates v. Arrowhead Pacific Corp.*, 174 Wis. 2d 604, 497 N.W.2d 115 (1993); *Watts*, 152 Wis. 2d 370, 384.

Because the lawsuit was filed in October of 2023, any cause of action related to unjust enrichment would have had to begin accruing in or after October of 2017. Again, the Complaint alleges that Pocknell and Salvidar were detained at the Jail only between the years 2014 to 2016. Accordingly, Pocknell and Saldivar's claims for unjust enrichment must be dismissed as they were not even detained in the Jail in or after October of 2017.

### c. Plaintiffs' Failed to Comply with Both Parts of the Notice of Claim Statute.

Plaintiffs have not alleged that their state law claims satisfy the twin necessary conditions precedent involving Wisconsin's notice of claim statute for claims against municipalities. Before filing a lawsuit against a municipality, a plaintiff has 120 days after the happening of the event giving rise to his or her claim to serve the proper official with a written notice of the circumstances, and with a written notice of the claim which contains an itemized statement of the relief sought. See Wis. Stat. § 893.80(1d)(a) and (b). Both must be met in under to properly commence a legal action. *See Snopek v. Lakeland Med. Ctr.*, 223 Wis. 2d 288, 301, 588 N.W.2d 19 (1999) ("The

notice of injury [or circumstances] and notice of claim provisions of § 893.80[ ] are unambiguously stated in the conjunctive; therefore, both provisions must be satisfied before the claimant may commence the action against a governmental agency.") Compliance with these notice requirements is mandatory to avoid dismissal of a lawsuit. *Vanstone v. Town of Delafield*, 191 Wis. 2d 586, 530 N.W.2d 16 (Ct. App. 1995) ("Failure to comply with this statute constitutes grounds for dismissal of the action."). The noncompliance deprives the court of competency to proceed over a claimant and her claims. *See Casteel v. Vaade*, 167 Wis. 2d 1, 10, 481 N.W.2d 712 (1998).

The statute serves two governmental interests: first, the notice of injury serves to notify the governmental entity of a potential claim such that it may investigate and evaluate the claim; second, the notice of claim serves to provide the governmental entity with the opportunity to negotiate with the claimant and to budge for settlement or litigation. *E-Z Roll Off LLC v. County of Oneida*, 2011 WI 71 ¶ 38, 335 Wis.2d 720, 800 N.W.2d 421.

Here, Plaintiffs have not pled they satisfied either provision of the notice of claim statute. While they made a point to attach one document for one plaintiff purporting to show he exercised his grievance rights under the PLRA, such grievance does not constitute a notice of claim nor did the Plaintiffs attach a notice of claim for anyone. Without having satisfied all aspects of Section 893.80, the Plaintiffs have not acquired the competency of the courts.

### d. Plaintiffs' State Law Claims are Barred Under Wis. Stat. § 893.80's Discretionary Immunity and the Intentional Tort Bar.

Under Wis. Stat. § 893.80(4), a municipality and its actors are immune from "any suit" for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions," synonymous with discretionary acts. *See, e.g. Willow Creek Ranch, LLC v. Town of Shelby*, 235 Wis.2d 409, 424-425, 611 N.W.2d 693 (2000). Discretionary immunity under Wis. Stat. § 893.80(4) provides "broad immunity" to municipalities for "acts done in the exercise of

legislative, quasi-legislative, judicial or quasi-judicial functions." *Bicknese v. Sutula*, 260 Wis. 2d 713, 727, 600 N.W.2d 289 (2003). This has been "interpreted to include any act that involves the exercise of discretion and judgment." *Willow Creek*, ¶ 25. "For over 40 years, this court has consistently interpreted this particular statutory language to include any acts that involve the exercise of discretion." *Engelhardt v. City of New Berlin*, 2019 WI 2, ¶ 22, 385 Wis. 2d 86, 95, 921 N.W.2d 714. Immunity for discretionary acts is "based largely upon public policy considerations that spring from the interest in protecting the public purse and a preference for political rather than judicial redress for the actions of public officers." *Lodl v. Progressive N. Ins. Co*., 2002 WI 71, ¶23, 253 Wis. 2d 323, 646 N.W.2d 314. Discretionary immunity also serves separation of powers principles by ensuring that courts do not use tort law to pass judgment on policy decisions in the province of coordinate branches of government. *See League v. City of Racine*, 2014 WI 92, ¶40, 357 Wis. 2d 250, 849 N.W.2d 837.

Here, the allegations in this case confront discretionary decision-making such as entering into the contract with the federal government to allow the INS to detain immigrants at the jail, jail penological policy-making on issues of safety and security, and orderliness within in the Jail as reflected in the abundant federal legal authorities above (including by having all inmates follow orders, routines and cleaning of their living areas). It is within the discretion of the Sheriff as a constitutional officer involving jail operations and the County Board as to funding and managing a jail, agreeing to accept detainees from the courts or from INS, and the rules to be followed by inmates, including the governmental interest in keeping and maintaining a stable and clean jail operation.

In addition, intentional tort claims are also barred by § 893.80(4). *See Baranowski v. City of Milwaukee*, 70 Wis.2d 684, 691, 235 N.W.2d 279 (1975) (holding that a municipality cannot be

held liable for the intentional torts of its officers or agents). Plaintiff's state law statutory claims is an intentional tort, as discussed further above.

> **e. Plaintiffs' Claim for Unjust Enrichment Fails as a Matter of Law as no Inequities have Occurred Under the Civic Duty Doctrine.**

In Wisconsin the "quasi-contractual theories of quantum meruit and unjust enrichment are legal causes of action grounded in equitable principles and can be invoked only in the absence of an enforceable contract." *Carroll v. Stryker Corp*., 658 F.3d 675, 682 (7th Cir. 2011) In Wisconsin unjust enrichment is a legal cause of action governed by equitable principles. *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 476–77 (7th Cir.2009). "The action is 'grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Id.* at 477.

However, as argued in the civic duty section of this brief, it is a long-standing principle in this country that detainees and inmates be required to perform housekeeping tasks (*See* civic duty *supra*; *see also Barrientos v. CoreCivic*, Inc., 951 F.3d 1269, 1278 (11th Cir. 2020)). Additionally, not only is this a longstanding requirement, but the Court in *Bijeol v. Nelson*, 579 F.2d 423 (7th Cir. 1978) held that the civic duty exception allows a government facility to require such work from its detainees without any pay. Accordingly, no inequities have taken place under Plaintiffs' allegations and, as a matter of law, this claim must be dismissed.

> **f. Plaintiffs' Claim under Wis. Stat. § 940.302 Also Fails as a Matter of Law**.

Plaintiffs' state law claim under Wis. Stat. § 940.302 also fails because of the civic duty doctrine and because Plaintiff's allegations do not meet the requirements of such a claim. First and foremost, as briefed prior, the civic duty doctrine allows a jail to require pretrial detainees to perform the tasks alleged in the Complaint and accordingly, any allegations that Plaintiff is "trafficking" by use of threat or force fail as a matter of law.

Additionally, Plaintiff has not made allegations that meet the requirements to state a claim for relief under Wis. Stat. § 940.302. The statute describes "trafficking" as "recruiting, enticing, harboring, transporting, providing, or obtaining, or attempting to recruit, entice, harbor, transport, provide, or obtain, an individual." *See* Wis. Stat. § 940.302(1)(d). The statute then states that to be liable under the statute, the "trafficking" must be for the purposes of (1) labor or services; or (2) commercial sex acts. However, Plaintiff makes no such allegation that the Jail is "trafficking" (recruiting, enticing, harboring, transporting, providing, or obtaining, or attempting to recruit, entice, harbor, transport, provide, or obtain, an individual") for the <u>purposes of labor or service, or for commercial sex acts</u>. Nor can it prove such an allegation under the law. Rather, Congress has directed that these plaintiffs may be placed under the arrangements here as set forth in Footnote 1 of this Brief.

## CONCLUSION

For the reasons explained above, Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss all claims against them.

Dated this 6th day of November, 2023.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**

Attorneys for Kenosha County, Kenosha County Sheriff's Department, David G. Beth, Robert Hallisy (Special Appearance), Larry Apker, Marc Levin, Justin Miller, and Bill Beth.

By: *<u>/s/ Electronically signed by Remzy D. Bitar</u>*
    REMZY D. BITAR
    State Bar No: 1038340
    MATTEO REGINATO
    State Bar No: 1089724
    SAMANTHA R. SCHMID
    State Bar No. 1096315
    ADAM J. MEYERS
    State Bar No. 1112804

730 N. Grand Avenue
Waukesha, WI 53186
O: (262) 548-1340
F: (262) 548-9211
E: rbitar@ammr.net
   mreginato@ammr.net
   sschmid@ammr.net
   ameyers@ammr.net