## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN

ALEKSEY RUDERMAN, ARTURO SALDIVAR, and CHRIS POCKNELL on behalf of themselves and all others similarly situated,

                    Plaintiffs,

against

KENOSHA COUNTY, KENOSHA COUNTY SHERIFF'S DEPARTMENT, DAVID G. BETH, ROBERT HALLISY, LARRY APKER, MARC LEVIN, JUSTIN MILLER, and BILL BETH

                    Defendants.

Docket No. 2:23-cv-01336-BHL

Judge Brett H. Ludwig

Magistrate Judge Stephen C. Dries

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 1

STANDARD OF REVIEW ................................................................................... 3

ARGUMENT ........................................................................................................ 3

    I.    The TVPA Unambiguously Applies To This Case.................................. 3

        A.    The TVPA's Plain Language Controls ....................................... 4

        B.    The Term "Whoever" Unambiguously Applies To The Defendant ........... 5

        C.    Plaintiffs' Allegations Make Out A TVPA Claim. ..................................... 8

        D.    Neither Section 1983 Nor The PLRA Preclude Plaintiffs' TVPA Claim..13

        E.    The "Civic Duty Exception" to the Thirteenth Amendment Is Not a Basis For Dismissal……...…………………………………………………..15

            1.    The Civic Duty Exception Does Not Apply To The TVPA ......... 15

            2.    The Civic Duty Exception Does Not Apply To Government Contractor .................................................................................. 19

            3.    Even If The Civic Duty Exception Applied To The TVPA, The Janitorial Labor Alleged Exceeds "Housekeeping Tasks" And Fact Issues Preclude Dismissal. ........................................................... 19

        F.    The TVPA Is Not Void For Vagueness .................................... 22

            1.    Legal Standard For As-Applied Constitutional Challenge .......... 22

            2.    Defendants' Arguments Fail ........................................................ 23

                 a.    Serious Harm. .................................................... 24

Case 2:23-cv-01336-BHL   Filed 12/18/23   Page 2 of 45   Document 38

b.    Force and Threats of Force ................................................ 24

c.    TVPA Is Not Vague As Applied To This Case ............... 25

d.    Defendants' Proffered Government Websites Carry No Weight ............................................................................ 26

II.    Defendants Are Not Immune ................................................................. 27

A.    Derivative Immunity Does Not Apply ....................................... 27

1.    Defendants' Extrinsic Materials Must Be Disregarded Or The Motion Must Be Converted Into A Motion For Summary Judgment. ..................................................................... 28

2.    Defendants Are Not Entitled To Dismissal Based On Derivative Immunity Because Neither Yearsley Element Is Satisfied ........... 29

B.    The Individual Defendants Are Not Entitled To Qualified Immunity ...... 32

III.    Plaintiffs Have Adequately Pled Claims Against The Individual Defendants ..... 34

CONCLUSION ....................................................................................................... 36

Case 2:23-cv-01336-BHL   Filed 12/18/23   Page 3 of 45   Document 38

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alvarado v. Litscher*,
  267 F.3d 648 (7th Cir. 2001)....................................................................................... 34

*Antonelli v. Sheahan*,
  81 F. 3d 1422 (7th Cir. 1996)....................................................................................... 35

*Barrientos v. CoreCivic, Inc.*,
  951 F.3d 1269 (11th Cir. 2020).............................................................. 6, 7, 11, 21

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
  531 U.S. 356 (2001)....................................................................................................... 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................... 3

*Berry v. Funk*,
  146 F.3d 1003 (D.C. Cir. 1998)................................................................................. 32

*Bijeol v. Nelson*,
  579 F.2d 423 (7th Cir. 1978)...................................................................................... 20

*Burrell v. Staff*,
  60 F.4th 25 (3d Cir.)....................................................................................................... 17

*Butler v. Perry*,
  240 U.S. 328 (1916)....................................................................................................... 16

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016).............................................................................................. 27, 31

*Channer v. Hall*,
  112 F.3d 214 (5th Cir. 1997)...................................................................................... 20

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)....................................................................................................... 26

*City of Arlington, Tex. v. F.C.C.*,
  569 U.S. 290 (2013)....................................................................................................... 26

*Connecticut Nat. Bank v. Germain*,
  503 U.S. 249 (1992)......................................................................................................... 4

*Cont'l W. Ins. Co. v. Cheese Merchants of Am., LLC*,
  631 F. Supp. 3d 503 (N.D. Ill. 2022) ....................................................................... 7

*Cook Cnty., Ill. v. U.S. ex rel. Chandler*,
  538 U.S. 119 (2003)......................................................................................................... 6

*Craftwood II, Inc. v. Generac Power Sys., Inc.*,
  920 F.3d 479 (7th Cir. 2019)........................................................................................ 9

*Davis v. Scherer*,
  468 U.S. 183 (1984)....................................................................................................... 33

*Dinsay v. RN Staff Inc.*,
  No. 1:19-cv-00907-TWP-DML, 2022 WL 581033 (S.D. Ind. Feb. 25, 2022) ................... 10

*Figgs v. GEO Grp., Inc.*,
  No. 1:18-cv-00089-TWP-MPB, 2019 WL 1428084 (S.D. Ind. Mar. 29, 2019)................ 11, 19

iii

*Garcia v. San Antonio Metro. Transit Auth.*,
   469 U.S. 528 (1985) ............................................................................................... 6
*Geinosky v. City of Chicago*,
   675 F.3d 743 (7th Cir. 2012) ......................................................................... 21, 36
*Gonzalez v. CoreCivic, Inc.*,
   986 F.3d 536 (5th Cir. 2021) ............................................................................. 11
*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) ............................................................................................. 17
*Hegwood v. City of Eau Claire*,
   676 F.3d 600 (7th Cir. 2012) ............................................................................. 22
*INTL FCStone Fin. Inc. v. Jacobson*,
   950 F.3d 491 (7th Cir. 2020) .......................................................................... 4, 16
*Jacobs v. City of Chicago*,
   215 F.3d 758 (7th Cir. 2000) ............................................................................. 34
*Jaskolski v. Daniels*,
   427 F.3d 456 (7th Cir. 2005) ............................................................................. 14
*Jones v. Alfred H. Mayer Co.*,
   392 U.S. 409 (1968) ........................................................................................... 17
*Jones v. City of Chicago*,
   856 F.2d 985 (7th Cir. 1988) ............................................................................. 35
*Kerr v. Puckett*,
   138 F.3d 321 (7th Cir. 1998) ........................................................................... 4, 15
*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) ........................................................................................... 25
*Kiwanuka v. Bakilana*,
   844 F. Supp. 2d 107 (D.D.C. 2012) .................................................................. 12
*Kolender v. Lawson*,
   461 U.S. 352 (1983) ........................................................................................... 22
*Lacy v. Cook Cnty., Illinois*,
   897 F.3d 847 (7th Cir. 2018) ............................................................................. 13
*Lafayette v. Louisiana Power & Light Co.*,
   435 U.S. 389 (1978) ............................................................................................. 6
*Levenstein v. Salafsky*,
   164 F.3d 345 (7th Cir. 1998) ............................................................................. 28
*Los Angeles Cnty., Cal. v. Humphries*,
   562 U.S. 29 (2010) ............................................................................................. 14
*Marcure v. Lynn*,
   992 F.3d 625 (7th Cir. 2021) ............................................................................... 3
*Marshall v. Chicago Hous. Auth.*,
   No. 89 C 4964, 1991 WL 66069 (N.D. Ill. Apr. 22, 1991) ............................... 33
*Maynard v. Cartwright*,
   486 U.S. 356 (1988) ........................................................................................... 22
*McGovern v. City of Philadelphia*,
   No. CIV. A. 07-3817, 2008 WL 269498 (E.D. Pa. Jan. 30, 2008) .................... 15
*Menocal v. GEO Grp., Inc.*,
   113 F.Supp.3d 1125 (D. Colo. 2015) ................................................... 11, 17, 19

iv

*Menocal v. GEO Grp., Inc.*,
    635 F. Supp. 3d 1151 (D. Colo. 2022) .................................................................. 31

*Midlantic Nat'l Bank v. N.J. Dep't of Entl. Prot.*,
    474 U.S. 494 (1986) ....................................................................................... 16

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978) .......................................................................................... 6

*Novoa v. GEO Group, Inc.*,
    No. EDCV 17–2514 JGB (SHKx), 2018 WL 3343494 (C.D. Cal. June 21, 2018) ...... 18, 19, 22

*Novoa v. GEO Grp., Inc.*,
    No. EDCV172514JGBSHKX, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018) ................. 23, 32

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
    Case No. 10-1172, 2011 WL 13153190 (C.D. Cal. May 12, 2011) .......................... 8

*Owino v. CoreCivic, Inc.*,
    No. 17-CV-1112 JLS (NLS), 2018 WL 2193644, (S.D. Cal. May 14, 2018) .................. 11, 18

*Portis v. Folk Const. Co., Inc.*,
    694 F.2d 520 (8th Cir. 1982) .............................................................................. 27

*Pozo v. Schmidt*,
    No. 18-CV-1486, 2020 WL 2129567 (E.D. Wis. May 5, 2020) ............................... 15

*Reger Dev., LLC v. Nat'l City Bank*,
    592 F.3d 759 (7th Cir. 2010) ............................................................................. 30

*Reuter v. Skipper*,
    4 F.3d 716 (9th Cir. 1993) .................................................................................. 6

*Ruderman v. McHenry County*,
    No. 3:22-CV-50115, 2023 WL 130496 (N.D. Ill. Jan. 9, 2023) ............................. 7, 11, 22, 34

*Ruelas v. County of Alameda*,
    519 F.Supp.3d 636 (N.D. Cal. 2021) .................................................................. 7, 11

*Samuel v. Holmes*,
    138 F.3d 173 (5th Cir. 1998) ............................................................................. 33

*Schlemm v. Wall*,
    784 F.3d 362 (7th Cir. 2015) ............................................................................. 13

*Screws v. United States*,
    325 U.S. 91 (1945) .......................................................................................... 23

*Smith v. Dart*,
    803 F.3d 304 (7th Cir. 2015) ............................................................................. 36

*Soto v. Dickey*,
    744 F.2d 1260 (7th Cir. 1984) ........................................................................... 25

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    580 U.S. 405 (2017) ........................................................................................ 10

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) .......................................................................................... 4

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
    566 U.S. 560 (2012) .......................................................................................... 5

*Terry v. Cook Cnty. Dep't of Corr.*,
    No. 09-CV-3093, 2010 WL 331720 (N.D. Ill. Jan. 22, 2010) ............................... 36

*Thompson v. Cope*,
    900 F.3d 414 (7th Cir. 2018) ............................................................................. 33

v

*United States v. Calimlim*,
  538 F.3d 706 (7th Cir. 2008)..........................................................12, 17, 23, 25
*United States v. Cherry*,
  938 F.2d 748 (7th Cir. 1991)..........................................................................22
*United States v. Collins*,
  272 F.3d 984 (7th Cir. 2001)..........................................................................23
*United States v. Garcia*,
  No. 02-CR-110S-01, 2003 WL 22956917 (W.D.N.Y. Dec. 2, 2003) ......................23
*United States v. Harriss*,
  347 U.S. 612 (1954)......................................................................................24
*United States v. Kaufman*,
  546 F.3d 1242 (10th Cir. 2008)..................................................................12, 17
*United States v. Kozminski*,
  487 U.S. 931 (1988)..........................................................................11, 12, 19
*United States v. Logan*,
  453 F.3d 804 (7th Cir. 2006)..........................................................................14
*United States v. Marcotte*,
  835 F.3d 652 (7th Cir. 2016)......................................................................4, 16
*United States v. Mead Corp.*,
  533 U.S. 218 (2001)......................................................................................26
*United States v. Toviave*,
  761 F.3d 623 (6th Cir. 2014)..................................................................11, 12, 18
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982)......................................................................................23
*Vinyard v. Wilson*,
  311 F.3d 1340 (11th Cir. 2002)......................................................................33
*Walker v. Snyder*,
  213 F.3d 344 (7th Cir. 2000)..........................................................................32
*Wyatt v. Cole*,
  504 U.S. 158 (1992)......................................................................................33
*Yearsley v. W.A. Ross Construction Co.*,
  309 U.S. 18 (1940)..........................................................................27, 28, 31

Statutes and Constitutional Provisions

1 U.S.C. § 1..........................................................................................................5
18 U.S.C. § 1584....................................................................................................11
18 U.S.C. § 1589............................................................................................passim
18 U.S.C. § 1595................................................................................................9, 30
22 U.S.C. § 7101....................................................................................................33
42 U.S.C. § 1983............................................................................................32, 35
42 U.S.C. § 1997e(h)..............................................................................................15
42 U.S.C § 1981....................................................................................................15
U.S. Const. amend. XIII..........................................................................................16
Wis. Stat. § 895.46................................................................................................37

Rules

vi

Federal Rule of Civil Procedure 12(d) ........................................................................... 28

 Civil L.R. 56 ................................................................................................................... 28

Regulations

28 C.F.R. § 545.23 ........................................................................................................... 20

# INTRODUCTION

Defendants' motion to dismiss asks this Court to disregard the plain language of the Trafficking Victims Protection Act (the "TVPA"), a statute that unambiguously prohibits their conduct. Defendants paint the Plaintiffs as schemers out to "game the system" and get a "free pass," Mot. at 1, 2. But, in reality, Defendants are the ones who seek a "free pass" for violating the TVPA. Plaintiffs are former civilly-detained immigrants at the Kenosha County Jail whom Defendants forced to clean their facility under threat of punishment. It was Defendants who executed a forced janitorial labor scheme that saved them the cost of hiring janitorial staff and thus maximized Kenosha County's profits from its contract with the federal government.

Contrary to Defendants' urging, the TVPA is not limited to what Defendants conceive as the prototypical forced labor case: a man who forces a foreign woman who does not speak English to engage in sexual services and live in squalid conditions. *See* Mot. at 6.[1] Courts across the country recognize that the TVPA's protections apply to civilly-detained immigrants who are forced to perform labor under threat of serious harm. In an attempt to evade application of this statute, Defendants seek to distract the Court with lengthy arguments about Section 1983, the Prison Litigation Reform Act ("PLRA"), the Thirteenth Amendment, and nebulous canons of statutory construction, none of which apply. The Court should deny Defendants' motion to dismiss.

# BACKGROUND

Defendants operate the Kenosha County Detention Center (referred to herein as the "Kenosha County Jail" or "Jail") in Kenosha, Wisconsin. Compl. ¶ 16. In 2000, Kenosha County

---

[1] Defendants' Brief in Support of Their Motion to Dismiss, Dkt. No. 23, is cited herein as "Mot." and the Complaint, Dkt. No. 1, is cited as "Compl."

1

entered into an Intergovernmental Service Agreement with the U.S. Marshals Service and the Immigration and Naturalization Service ("INS") to house civil immigration detainees for U.S. Immigration and Customs Enforcement ("ICE"). *Id.* ¶ 17. Under this Agreement, Kenosha County received $70 per day for each civil immigration detainee housed at the Kenosha County Jail, generating for Kenosha County tens of millions of dollars in revenue. *Id.* ¶¶ 18–19. The Kenosha County Jail housed over 100 civil immigration detainees at any given time, and in exchange for housing these individuals, Kenosha County received more than $2.6 million each year. *Id.*

To cut costs and maximize profit, Defendants forced civilly-detained immigrants, including Plaintiffs, to perform janitorial services without compensation. *Id.* ¶ 87. These forced janitorial tasks (hereafter "janitorial labor") extended far beyond simply requiring detainees to keep their individual areas clean. Immigrants were forced to, *inter alia*, scrub the showers, clean and disinfect dining tables, disinfect phones, clean floors in the indoor recreational area and multi-purpose room, and clean the Jail's outdoor recreation area, hallways, and gym. *Id.* ¶¶ 21, 38, 41, 45.

The Kenosha County Sheriff's Department Inmate/Detainee Handbook (the "Handbook")—which was disseminated to all civilly-detained immigrants upon arrival at the Kenosha County Jail—requires immigrants to clean the Jail's common areas or face punishment. *Id.* ¶ 24. The Handbook threatens a series of punishments for detainees who fail to follow forced labor rules, ranging from loss of privileges and being required to perform additional forced labor to being held for up to 10 days in solitary confinement. *Id.* ¶ 25.

All Plaintiffs performed uncompensated janitorial labor against their will because of Defendants' threats of punishment and, in some cases, actual punishments carried out against

them. *Id.* ¶¶ 27, 39, 43, 46. For example, Defendants punished Plaintiff Pocknell several times for not performing janitorial labor including by sending him to solitary confinement and locking him down in his cell for three days at a time. *Id.* ¶ 47. Plaintiff Ruderman submitted a grievance and appeal of its denial stating, "I am forced to clean the dayroom for no pay and under threat of solitary confinement." *Id.* ¶ 36. His appeal was denied on the basis that this was Jail policy, as outlined in the Handbook. *Id.* ¶ 37.

Plaintiffs brought claims on behalf of a proposed class against the Defendants for forced labor in violation of the TVPA, 18 U.S.C. § 1589, and Defendants moved to dismiss their Complaint in its entirety.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a Rule 12(b)(6) motion, the court accepts plaintiff's allegations as true and draws all reasonable inferences in plaintiff's favor. *Id.* Defendant bears the burden of establishing the legal insufficiency of plaintiff's factual allegations. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

## ARGUMENT

I.    **The TVPA Unambiguously Applies To This Case.**

Defendants ask the Court to dismiss Plaintiffs' Complaint because they do not believe the TVPA should apply to them. Defendants advance several arguments in support of this request, for example, that they do not fall within the TVPA's plain text, that other statutes preclude application of the TVPA to them, that the court should read exceptions into the TVPA statute that do not exist, and that application of the TVPA to them would violate their constitutional rights. As described in further detail below, none of these arguments have merit. The Court

3

should decline Defendants' requests to ignore the statute's plain text and rewrite it to exempt them from its reach.

A.    The TVPA's Plain Language Controls.

Defendants ask this Court to look beyond the statutory language and to speculate that Congress did not intend to "extend" the TVPA to detainees in county jails, *see* Mot. at 6–9, but the Court should decline this invitation. *INTL FCStone Fin. Inc. v. Jacobson*, 950 F.3d 491, 499 (7th Cir. 2020) ("[W]e do not speculate upon congressional motives . . . . [and] we assume that the ordinary meaning of that [text] accurately expresses the legislative purpose.") (citations and quotations omitted); *cf. Tafflin v. Levitt*, 493 U.S. 455, 461–62 (1990) ("[E]ven if we could reliably discern what Congress' intent might have been had it considered the question, we are not at liberty to so speculate"). As the Seventh Circuit has made clear: "When addressing questions of statutory interpretation, we begin with the text of the statute. When a statute is unambiguous, our inquiry starts and stops with the text." *United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016) (internal citations and quotations omitted); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) ("[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"); *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998) ("'Common sense' is a treacherous guide to statutory interpretation. One person's 'common sense' is another's bête noire. Statutes are compromises among legislators who may hold incompatible conceptions of the public weal. . . . Instead of relying on 'common sense', which is an invitation to treat the law as if one side or the other had its way, a court should implement the language actually enacted—provided the statute is not internally inconsistent or otherwise absurd."). There is nothing ambiguous about the TVPA, and the Court should not look to common sense or policy principles to rewrite it.

4

## B. The Term "Whoever" Unambiguously Applies To The Defendants.

Section 1589 applies broadly to "whoever" violates its mandates. Defendants nonetheless argue that governments may not be sued under the TVPA based on its reading of § 1589(a) and the Dictionary Act. Mot. at 7 (citing 1 U.S.C. § 1). This argument misreads the plain text of both statutory provisions.

The relevant portion of the Dictionary Act states as follows:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

1 U.S.C. § 1. Read in context, the Dictionary Act obviously does not purport to exclude governments (nor any entity) from the term "whoever." It contains no limiting principle for the word "whoever." To the contrary, the Dictionary Act explains that the term "whoever" is not confined to natural persons but should be read expansively to include a broad range of entities and organizations. Defendants' characterization of the Dictionary Act as somehow excluding governments from the definition of "whoever" has no basis.

Next, Defendants argue that "the TVPA does not apply to a county jail" because "noticeably absent from Section 1589(a)'s definition of 'whoever' is the inclusion of political subdivisions or local governments law [sic]." Mot. at 8. Defendants are grossly mistaken on both counts. Neither 1589(a) nor the surrounding provisions supply a definition of "whoever," and thus, this Court must give it its plain and ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). That "whoever" applies to governments is consistent with the plain meaning of the word. For instance, Merriam-Webster.com defines "whoever" as "whatever

person" or "no matter who." This plain language definition of the word "whoever" logically applies to local governments.

Furthermore, that "whoever" includes local governments is consistent with well settled caselaw establishing that municipalities are not beyond the reach of individual constitutional and statutory protections. *See Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 126–27 (2003) ("[M]unicipal corporations, like private ones, 'should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.'") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 687–88 (1978)); *Reuter v. Skipper*, 4 F.3d 716, 719–20 (9th Cir. 1993) (explaining that "the history of the Dictionary Act" demonstrates that a county is a 'person' and observing that "the Supreme Court has held that the requirements of federal statutes are to be imposed on the states, as well as their subdivisions, unless the states or their subdivisions are specifically exempted from the Congressional mandate") (citing *Monell*, 436 U.S. at 688, and citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552–53 (1985)); *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 128 (2003) ("[I]t has not been regarded as anomalous to require compliance by municipalities with the substantive standards of federal laws which impose both civil and criminal sanctions upon 'persons.'") (alterations omitted) (quoting *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 400 (1978)).

Defendants cite *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1276–77 (11th Cir. 2020), Mot. at 7, but, contrary to Defendants' position, that decision solidly supports a broad reading of "whoever" in the TVPA that would include municipalities. *Barrientos*, similar to this case, involved janitorial labor by civilly-detained immigrants. The court concluded that the TVPA's use of the term "whoever" in the TVPA was "plain and unambiguous" and thus should be given its expansive ordinary definition and not be read to exclude anyone. *Id.* The court reasoned:

6

The use of the general terms '[w]hoever' and 'person' evinces no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims. Instead, the clear and unambiguous language of the statute limits liability only by reference to the actions taken by a would-be violator.

*Id.* at 1276.

The *Barrientos* court went on to consider the Dictionary Act's reference to the term "whoever," and again found no limiting principle that would put the defendant outside of the TVPA's reach. *Id.* at 1277. "The presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions," the court reasoned. *Id.*

Following similar logic, earlier this year in *Ruderman v. McHenry County*, No. 3:22-CV-50115, 2023 WL 130496, at *4 (N.D. Ill. Jan. 9, 2023), the court held that the term "whoever" in § 1589 of the TVPA encompasses county governments. *McHenry County* involved a near identical fact pattern to this case—with civilly-detained immigrants forced to perform janitorial labor in the county jail where they were housed. *Id.* at *1–*2. The court ruled that "the plain statutory language of the TVPA extends liability to county governments" and rejected defendants' suggestion that The Dictionary Act changed the interpretation, reasoning that the list of entities following "'whoever' include[s]" is "illustrative, not exhaustive." *Id.* at *3–*4 (quoting *Cont'l W. Ins. Co. v. Cheese Merchants of Am., LLC*, 631 F. Supp. 3d 503, 511 (N.D. Ill. 2022)). The court also pointed out that The Dictionary Act's list includes "corporations," and "a county is a public corporation." *See Id.* at *4, n.2. Furthermore, the court explained that its interpretation of "whoever" in § 1589(a) is "consistent with the plain reading of section 1595(a), which allows a victim to hold the ubiquitously broad class of 'perpetrator[s]' liable for their actions." *Id.* Other courts have found that similar TVPA claims can be brought against local governments. *See Ruelas v. County of Alameda*, 519 F.Supp.3d 636, 646–47 (N.D. Cal. 2021)

(TVPA extends to county defendant).[2] In sum, municipal governments are not beyond the TVPA's reach.

### C. Plaintiffs' Allegations Make Out A TVPA Claim.

Defendants also argue at various points that Plaintiffs allegations do not make out a claim under the TVPA, but these arguments are all misplaced. In advancing these arguments, Defendants ignore the plain language of the statute and write additional requirements into the statute that do not exist.

To be sure, the plain language of the TVPA creates a civil cause of action against:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Plaintiffs allege that Defendants violated the TVPA by knowingly obtaining their "labor or services" (i) by means of "physical restraint, or threats of physical restraint," (ii) by means of "serious harm or threats of serious harm," and (iii) by means of a "scheme, plan, or pattern intended to cause the [Plaintiffs] to believe that if [they] did not perform such labor or services, [they] would suffer serious harm or physical restraint." *Id.*; Compl. ¶¶ 72–74. Plaintiffs further allege that Defendants Kenosha County and Kenosha County

---

[2] To the extent that the unpublished, out-of-circuit case Defendants cite—*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, Case No. 10-1172, 2011 WL 13153190 (C.D. Cal. May 12, 2011)—holds otherwise, it conflicts with the plain language of the TVPA and the weight of authority.

8

Sheriff's Department "knowingly benefit[ted] . . . financially" from these TVPA violations. 18 U.S.C. § 1595(b); Compl. ¶ 76.

Defendants argue that jail officials are not proper defendants under the TVPA because a jail does not "provid[e] . . . labor or service involving trafficked persons for a profit or other exploitation." Mot. at 18; *see also id.* at 2 (asserting that Plaintiffs were not "trafficked across international lines" and that Kenosha County Jail is not a "labor recruiter of trafficked persons"). Yet the TVPA does not contain any requirement that the defendant be a "labor recruiter." Nor is it required that the defendant *provide* labor or services. It is enough that a TVPA defendant "*obtains* the labor or services of a person," 18 U.S.C. § 1589(a) (emphasis added), which Plaintiffs clearly allege. *See, e.g.,* Compl. ¶¶ 3, 24, 38, 41, 45. The person whose labor is obtained need not be a "*trafficked* person"—across international borders or otherwise—though Defendants attempt to insert that non-existent requirement into the TVPA without any statutory basis. Mot. at 2, 18. Moreover, Plaintiffs have adequately alleged that Defendants Kenosha County and Kenosha County Sheriff's Department profited from their TVPA violations "by having areas of the Kenosha County Jail cleaned, for free, without having to hire or contract the labor of custodians," *see* Compl. ¶¶ 9, 10, 76, 86, and Defendants' denial of the same is a fact question that cannot be resolved at the pleading stage. *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 482 (7th Cir. 2019).

Defendants further argue that Plaintiffs' allegations do not fit within the TVPA because Defendants do not engage in "involuntary servitude, peonage, debt bondage, and slavery." Mot. at 18. Importantly, these terms appear nowhere in § 1589—the provision that Plaintiffs allege Defendants violated in this case. Defendants cannot insert additional elements into Plaintiffs'

TVPA claim that do not appear in the statutory text. *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017).

In addition, Defendants lament that the TVPA fails to supply definitions for the terms "force" and "threats of force" found in § 1589(a)(1), and in a misguided attempt to interpret the term "force," Defendants direct this Court to the definition of "force" in the Uniform Code of Military Justice and a U.S. State Department Fact Sheet titled "Understanding Human Trafficking." *See* Mot. at 16–17. This is a mere distraction because Plaintiffs do not even allege that Defendants engage in "force" or "threats of force." Their argument that they do not compel cleaning services through the "use of weapons, physical force or infliction of physical harm" falls flat for the same reason. *Id.* at 18.

Lastly, Defendants wrongly contend that Plaintiffs do not satisfy the "serious harm" requirement of § 1589 of the TVPA because "being in jail inclusive of following custodial rules liking [sic] cleaning living spaces" does not amount to serious harm. Mot. at 18. But cleaning is not the "serious harm"; cleaning is the labor obtained. The "serious harm or threats of serious harm" that Plaintiffs allege include being punished with and threatened with the punishment of cell lockdown and solitary confinement for up to ten days. *See* Compl. ¶¶ 3, 24–25. Plaintiffs further allege that "[s]olitary confinement causes severe mental pain and suffering and can even bring on new psychiatric syndromes due to the effects of isolation." *Id.* ¶ 4. As courts recognize, the TVPA's definition of "serious harm" is "extremely broad." *Dinsay v. RN Staff Inc.*, No. 1:19-cv-00907-TWP-DML, 2022 WL 581033, at *5 (S.D. Ind. Feb. 25, 2022) (citing 18 U.S.C. § 1589(c)(2)). It covers:

> [A]ny harm, **whether physical or nonphysical**, **including psychological, financial, or reputational harm**, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

10

18 U.S.C. § 1589(c)(2) (emphasis added). Threatening to send (and actually sending) immigrants to solitary confinement easily satisfies this definition. *See Figgs v. GEO Grp., Inc.*, No. 1:18-cv-00089-TWP-MPB, 2019 WL 1428084, at *5 (S.D. Ind. Mar. 29, 2019) (holding that allegations of threats of "long hours of solitary confinement" met the TVPA's definition of "serious harm"); *McHenry Cnty.*, 2023 WL 130496, at *4 (finding that placing civilly-detained immigrants in solitary confinement amounts to "serious harm" under § 1589). In any event, the seriousness of the punishment of cell lockdown and solitary confinement that Plaintiffs endured (or with which they were threatened) is a fact question not appropriate for resolution on a motion to dismiss.

In sum, Plaintiffs have amply alleged specific facts that show Defendants engaged in conduct that falls within the plain text of § 1589. Like many courts have concluded in similar circumstances, Plaintiffs have stated their claim. *See McHenry Cnty.*, 2023 WL 130496, at *7 (denying motion to dismiss immigration detainees' TVPA claims against county for forced labor performed in county detention center); *See Ruelas*, 519 F.Supp.3d at 648 (same); *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2018 WL 2193644 at *11, (S.D. Cal. May 14, 2018) (denying motion to dismiss immigration detainees' TVPA claims for forced labor performed in detention center); *Menocal v. GEO Grp., Inc.*, 113 F.Supp.3d 1125, 1132 (D. Colo. 2015) (same); *Barrientos*, 951 F.3d 1269 (affirming denial of motion to dismiss immigration detainees' TVPA claims for forced labor performed in detention center); *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 539 (5th Cir. 2021) (same).

The cases Defendants cite, *United States v. Kozminski*, 487 U.S. 931 (1988), and *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), do nothing to change this analysis. In *Kozminski*, the Court narrowly construed "involuntary servitude" under 18 U.S.C. § 1584—a federal criminal law that preceded the TVPA—to include only forced labor by means of physical harm

or abuse of the legal process. 487 U.S. at 952. In response, Congress enacted the TVPA to broaden the scope of federal protections to "combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." *United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008) (quoting H.R. Conf. Rep. No. 106-939, at 101, as reprinted in 2000 U.S.C.C.A.N. 1380, 1393); *see also United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("Congress believed *Kozminski* 'mistakenly narrowed the definition of involuntary servitude by limiting it to physical coercion.'"); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 114–15 (D.D.C. 2012) ("*Kozminski* is not controlling, as Congress has specifically addressed the *Kozminski* decision and rejected it as too narrow."). By Defendants' own admission, Congress enacted § 1589 to cast off the limitations imposed by *Kozminski*'s narrow interpretation of § 1584 and "broaden[] the definition of the kinds of coercion that might result in forced labor," Mot. at 16–17—a move which underscores the breadth of the TVPA's intended reach.

Moreover, in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), the defendant was federally criminally prosecuted under § 1589 for child abuse. The abuse at issue involved the defendant's requirement that the children do household chores. *Id*. at 623–24. The Sixth Circuit reversed the conviction on the basis that "[c]hild abuse is a state crime, but not a federal crime." *Id.* at 623. The court observed that "household child abuse is quintessential local criminal activity" and stated that it wanted to avoid "the federalization of state law." *Id.* at 627–28. Nothing in *Toviave's* narrow holding supports the sweeping exemption from the TVPA that Defendants urge, nor does it make the TVPA inapplicable here. As noted above, Courts have consistently found that the TVPA applies in the context of civilly detained immigrants. *See supra* p. 11. Neither *Kozmiski* nor *Toviave* justifies a reading of the TVPA that would exclude Defendants' conduct in this case.

### D. Neither Section 1983 Nor The PLRA Preclude Plaintiffs' TVPA Claims.

Defendants next try to avoid application of the TVPA by arguing that other federal statutes, namely Section 1983 and the PLRA somehow preclude Plaintiffs from asserting TVPA claims in this case. Mot. at 7–9, 21–25. This argument lacks merit.

As an initial matter, Plaintiffs do not assert Section 1983 claims in this case. Their federal claims are brought under the TVPA only.

Contrary to Defendants' assertion, there is nothing about Plaintiffs' assertion of a TVPA claim that is "in direct conflict with" or "overrides" Section 1983. *See* Mot. at 9. Section 1983 provides a civil cause of action against government actors who violate rights conferred under the U.S. Constitution. Many suits brought by detained persons allege the violation of constitutional rights by detained persons and are brought under Section 1983, but the Constitution is not the only source of rights for detained persons. Congress can and does confer statutory rights to individuals—including detained persons—beyond those guaranteed by the Constitution.

For example, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") gives detained persons rights to religious freedom above and beyond those required by the First Amendment. *See Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015) (Wisconsin detainee asserting a claim against prison officials under RLUIPA concerning prison rules that burden his religious expression). Likewise, the Americans with Disabilities Act ("ADA") gives detained persons rights to not be discriminated against based on disability. *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 861 (7th Cir. 2018) (detainee wheelchair users asserting ADA claims against county jail officials for maintaining structural barriers). So too with the TVPA. The Constitution is not the only source of rights, and there is simply no basis for the conclusion that statutes like RLUIPA, ADA, or TVPA are "in direct conflict with" or "override" Section 1983. *See* Mot. at 9.

In this same vein, defendants argue that a literal reading of § 1589 would "lead to absurd results" because detainees in municipal jails have a means of redress for constitutional violations under Section 1983. Mot. at 9. But that is simply their opinion of the statute, and certainly not license for the court to rewrite it. *United States v. Logan*, 453 F.3d 804, 806 (7th Cir. 2006), *aff'd*, 552 U.S. 23 (2007) ("The Supreme Court insists that statutes be enforced as written even when they seem mistaken or pointless—for it is exactly then that the temptation to substitute one's judgment for the legislature's is strongest."); *Jaskolski v. Daniels*, 427 F.3d 456, 462 (7th Cir. 2005) ("[T]he anti-absurdity canon . . . deals with texts that don't scan as written and thus need repair work, rather than with statutes that seem poor fits for the task at hand."). No court has rejected the ADA's or RLUIPA's application to detained persons on grounds of absurdity. Rewriting the TVPA on this basis is similarly inappropriate.

Defendants also advance the position that Plaintiffs claims *must* be brought as Section 1983 claims alleging violations of the Thirteenth Amendment, *see* Mot. at 22, but there is no authority for that proposition. Defendants take this unsupported argument a step further, devoting five full pages of their brief to an argument that Plaintiffs must also satisfy *Monell* pleading requirements. *See id.* at 21–25. Again, there is no support for that position. A *Monell* claim is a Section 1983 claim brought against a municipality, *see Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 30–31 (2010), but there is no Section 1983 claim in this case at all. The Court cannot dismiss a claim for failure to satisfy pleading requirements of an entirely different cause of action. As described in Part I.B. above, the TVPA authorizes suits directly against corporate and municipal entities. In fact, the TVPA expressly extends liability *beyond* those who obtain

false labor to those who knowingly benefit from it. *See* 18 U.S.C. §§ 1589(b), 1595(a).[3] Section 1983 pleading requirements have no bearing on a cause of action brought under the TVPA.

Defendants' reliance on the PLRA, *see* Mot. at 9, is likewise misplaced. While it is true that the PLRA imposes an exhaustion requirement on some suits brought by some detained persons, it does not apply here. The PLRA applies only to suits brought by "prisoners," a term defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The PLRA does not apply to claims brought when a person is no longer in custody. *Kerr v. Puckett*, 138 F.3d 321, 323–24 (7th Cir. 1998). It also does not apply to civilly detained immigrants. *See Pozo v. Schmidt*, No. 18-CV-1486, 2020 WL 2129567, at *4–5 (E.D. Wis. May 5, 2020) (collecting cases and concluding that civilly detained immigrants are not "prisoners" subject to the PLRA). The PLRA has no application here.

### E. The "Civic Duty Exception" to the Thirteenth Amendment Is Not a Basis For Dismissal.

Defendants' next effort to evade application of the TVPA is to urge the Court to read a "civic duty exception" into the statute. Mot. at 10. But Defendants can point to no valid justification to ignore the TVPA's plain language and import this judicially-created exception to the Thirteenth Amendment into the TVPA. Moreover, even if it did apply (it does not), fact issues preclude dismissal on grounds of the civic duty exception.

#### 1. The Civic Duty Exception Does Not Apply To The TVPA.

---

[3] Defendants' reliance on dicta in *McGovern v. City of Philadelphia*, No. CIV. A. 07-3817, 2008 WL 269498, at *3 (E.D. Pa. Jan. 30, 2008), is clearly misplaced. This unpublished and out-of-circuit case dealt with claims brought under 42 U.S.C § 1981, a statute closely related to Section 1983, whereas this case is brought under the TVPA, a statute that expressly provides a private right of action against "whoever" violates it.

15

This Court should decline Defendant's invitation to transpose the civic duty exception to the Thirteenth Amendment onto the TVPA. The Thirteenth Amendment states:

> Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

> Section 2: Congress shall have power to enforce this article by appropriate legislation.

U.S. Const. amend. XIII. In explaining the rationale of the civic duty exception, the Supreme Court stated:

> [T]he 13th Amendment declares that neither slavery nor involuntary servitude shall exist . . . It . . . certainly was not intended to interdict enforcement of those duties which individuals owe to the state, such as services in the army, militia, on the jury, etc.

*Butler v. Perry*, 240 U.S. 328, 332–333 (1916).

Defendants cannot justify importing this judicially created exception to the Thirteenth Amendment into the TVPA when it appears nowhere in the plain language of the Act. As the Seventh Circuit has clearly stated, "we do not speculate upon congressional motives . . . . [and] we assume that the ordinary meaning of that [text] accurately expresses the legislative purpose." *INTL FCStone Fin. Inc.*, 950 F.3d at 499 (citations and quotations omitted); *see also Marcotte*, 835 F.3d at 656. Defendants do not even attempt to argue that any language in the TVPA expresses an intent to incorporate the civic-duty exception. And no such language exists.

Finding no support in the TVPA's plain language, Defendants cite *Midlantic Nat'l Bank v. N.J. Dept't of Entl. Prot.*, 474 U.S. 494, 501 (1986), to argue that Congress was aware of the civic duty exception to the Thirteenth Amendment when it enacted the TVPA and thus was required to expressly disavow that exception to avoid its incorporation into the Act. Mot. at 6. But *Midlantic* dealt with a statutory provision that "codif[ed]" a "judicially developed rule." 474 U.S. at 501. By contrast, here, Defendants do not even attempt to argue that the TVPA is a

16

*codification* of the Thirteenth Amendment, let alone the civic duty exception itself. Congress had no way of predicting that a court might infer into the TVPA a judicially created exception to a completely separate constitutional amendment. Thus, its silence cannot be read as acquiescence.

Next Defendants argue that the civic duty exception to the Thirteenth Amendment should be read into the TVPA because the TVPA "was enacted to safeguard the very same protections as those in the Thirteenth Amendment" Mot. at 13. On the contrary, the TVPA expands on the protections of the Thirteenth Amendment. Congress has broad power to determine "what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968)). Indeed "the varieties of private conduct that [Congress] may make . . . civilly remediable extend far beyond the actual imposition of slavery or involuntary servitude." *Id.* Congress was therefore free to enact the TVPA without including the judicially created civic duty exception to the Thirteenth Amendment. It did just that by prohibiting a category of forced labor that is significantly broader than the "involuntary servitude" prohibited in the Thirteenth Amendment. *See Burrell v. Staff*, 60 F.4th 25, 36 (3d Cir.), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell*, 143 S. Ct. 2662 (2023) (stating that the TVPA's definition of forced labor is "broader" that the definition of involuntary servitude in the Thirteenth Amendment); *Kaufman*, 546 F.3d at 1261; *Calimlim*, 538 F.3d at 714. In line with these precepts, in *Menocal*, the court refused to dismiss Plaintiffs' claims on the basis of the civic duty exception, reasoning that the language of § 1589 is "broader" than the language of the Thirteenth Amendment and finding "no authority for reading a civic duty exception into § 1589." 113 F. Supp. 3d at 1132–33.

Contrary to Defendants' assertion, neither *Owino*, 2018 WL 2193644, at *8, nor *Novoa v. GEO Group, Inc.*, No. EDCV 17–2514 JGB (SHKx), 2018 WL 3343494, at *13 (C.D. Cal. June 21, 2018), "held" that the civil duty exception applies to § 1589. Mot. at 10. In *Owino*, the court in dicta merely accepted Defendants' "premise" that the civic duty exemption applied, but ultimately held that the defendant, a private detention facility, could not avail itself of the exception. *Owino*, 2018 WL 2193644, at *8–*10 (emphasis added). Moreover, Defendants' quotation to *Owino* ("it is logical to apply the civic duty exception to section 1589") is taken out of context. *See* Mot. at 10. Notably, the full quote is "**If** the *Toviave* court applied the exceptional case exception to section 1589 then it is logical to apply the civic duty exception to section 1589." *Owino*, 2019 WL 2193644, at *8 (emphasis added). Importantly, however, the *Toviave* court did not apply the exceptional case exception to section 1589; it merely alluded to it as an exception *to the Thirteenth Amendment* and rested its holding on the principle that "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." 761 F.3d at 626, 627. Put simply, though *Owino* includes a wide-ranging discussion of the parties' various arguments as to the reach of the civic duty exception, the court merely assumed without deciding that the civic duty exception applies to § 1589 because ultimately this was irrelevant to its holding. Moreover, even if the *Owino* court had concluded that the civic duty exception was imported into §1589, such a conclusion would warrant no persuasive weight because it violates the precepts articulated above.

Defendants' reliance on *Novoa* is even more misguided. *Novoa* rejected the application of the civic duty exception to a "private corporation contracting with the federal government to run an immigration detention facility." 2018 WL 3343494, at *13. It decidedly did *not* reach the

question of whether the civic duty exception could ever apply to a TVPA claim. *Id.* Defendants cite no case where a court has created a civic duty exception to § 1589.

### 2. The Civic Duty Exception Does Not Apply To Government Contractors.

What is more, even if this Court imported the civic duty exception into § 1589, it would not apply to Kenosha County because it was acting as a private government contractor, which courts have held do not enjoy the protections of the civic duty exception. Kenosha County detained Plaintiffs not as a function of its own government, but rather to raise revenue. Compl. ¶¶ 18–19. Like private detention contractors CoreCivic and GeoGroup, Kenosha County sold its services to the federal government because it was in its financial interest to do so. As Defendants admit, the civic duty exception to the Thirteenth Amendment's prohibition on involuntary servitude is limited to compulsion to perform civic duties by "state or federal governments." Mot. at 10 (citing *Kozminski*, 487 U.S. at 943–44). Indeed, in *Kozminski*, the Supreme Court defined the civic duty exception as limited to compulsion by "State or Federal Governments." 487 U.S. at 943–44. On this basis, courts have held that the civic-duty exception does not apply to government contractors paid by the federal government to house civilly-detained immigrants. *See, e.g.*, *Figgs*, 2019 WL 1428084, at *5; *Menocal*, 113 F. Supp. 3d at 1132–33; *Novoa*, 2018 WL 3343494, at *13. There is no reason for the Court to treat Kenosha County differently.

### 3. Even If The Civic Duty Exception Applied To The TVPA, The Janitorial Labor Alleged Exceeds "Housekeeping Tasks" And Fact Issues Preclude Dismissal.

Finally, Defendants' "civic duty" argument hinges on the factual premise that Plaintiffs were compelled to perform only "housekeeping tasks." Mot. at 12. But Plaintiffs' allegations of forced janitorial labor—scrubbing the showers, cleaning and disinfecting dining tables, disinfecting phones, cleaning the floor in the indoor recreational area and multi-purpose room,

and cleaning the Jail's outdoor recreation area, hallways, and gym—extend beyond mere "housekeeping tasks," particularly when drawing all inferences in Plaintiffs' favor. Compl. ¶¶ 21, 38, 41, 45. The Court should decline Defendants' invitation to draw inferences in their favor by characterizing the allegations in Plaintiffs' complaint as mere housekeeping.

Defendants' reliance on *Bijeol v. Nelson*, 579 F.2d 423 (7th Cir. 1978), and *Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997), is misplaced. *Bijeol* held that it was not a Thirteenth Amendment violation to require a pretrial detainee to perform certain "simple housekeeping tasks" in his own cell and community areas. 579 F.2d at 425. Likewise, in *Channer*, the court found no Thirteenth Amendment violation where an individual who was a convicted federal prisoner and INS detainee was paid to perform required "housekeeping tasks," *i.e.*, working in the detention center's food services department. 112 F.3d at 215, 218–19. Setting aside that the import of these cases is limited to claims under the Thirteenth Amendment (not the TVPA), their holdings are further limited to "housekeeping tasks." Neither encompasses the janitorial labor alleged here. Moreover, these cases can be distinguished on the additional grounds that *Bijeol* applies the civic duty exception to a pretrial detainee facing criminal charges, and *Channer* dealt with paid tasks. Nothing in *Bijeol* or *Channer* suggests that the civic duty exception as applied to a civilly-detained immigrant would encompass the same "housekeeping tasks" that a pretrial detainee or convicted prisoner can be compelled to perform, or an INS detainee can be paid to perform, without running afoul of the Thirteenth Amendment.

Defendants' reliance on the Federal Bureau of Prisons' ("BOP") regulations also misses the mark. These regulations provide that "[a] pretrial inmate may not be required to work in any assignment or area other than *housekeeping tasks* in the inmate's own cell and in the community living area." 28 C.F.R. § 545.23(b) (emphasis added). To risk stating the obvious, these BOP

regulations apply to pretrial detainees—not civilly-detained immigrants. What is more, it is entirely unclear on the current factual record how the phrase "housekeeping tasks" is interpreted and applied in federal prisons. Nothing in the regulation suggests that it covers the type of janitorial labor alleged in this case. Notably the BOP's Inmate Admission & Orientation Handbook (which is extrinsic to the Complaint and not part of the record) states that "Everyone is responsible for *cleaning up after themselves*," and "Each inmate is responsible for the cleaning and sanitation *of her room*."[4] It says nothing about requiring prisoners to clean or sanitize any other part of the detention facility. Indeed, as Defendants themselves note, the BOP regulations reflect the agency's belief that detainees have a right to be free from forced labor. *See* Mot. at 12 (pretrial inmate must sign a waiver of "his or her right not to work" before being required to perform work beyond housekeeping). If Defendants aim to establish that the BOP requirements for pretrial detainees are commensurate with the janitorial labor requirements they imposed on Plaintiffs, Mot. at 12, they will need to prove it.

Last, Defendants cite *Barrientos* to support their civic duty argument but this decision does not address the civic duty exception. *Barrientos* acknowledged long-standing requirements that detainees perform "basic housekeeping tasks" in reference to tasks outlined in ICE's Performance-Based National Detention Standards ("PBNDS"), which, as discussed below, are limited to "basic personal housekeeping tasks" far different from the janitorial labor alleged here. 951 F.3d at 1278 & n. 5; *see infra* p. 31.

---

[4] BOP, Inmate Admission & Orientation Handbook (Jan. 20, 2023), at 6, 8, https://www.bop.gov/locations/institutions/bry/bry_ao_handbook.pdf?v=1.0.0 (emphasis added). By including references to extrinsic materials, Plaintiffs do not seek to convert Defendants' motion to dismiss into a motion for summary judgment. They only seek to demonstrate that the extrinsic materials Defendants rely upon are not determinative. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove" without converting the motion to summary judgment).

In any event, dismissal on the basis of the civic duty exception is not appropriate because "[r]egardless of whether the 'civic duty' exception applies, 'what duties and tasks the detainees were compelled to undertake and whether these assignments amounted to more than general housekeeping tasks are factual issues,'" which are "not to be determined on a motion to dismiss." *McHenry County*, 2023 WL 130496, at *5 (quoting *Novoa*, 2018 WL 3343494, at *14).

**F.    The TVPA Is Not Void For Vagueness.**

Unable to escape the TVPA's plain language, Defendants next argue that application of the statute to them violates their constitutional rights. Mot. at 18–21. Though Defendants argument is styled as a constitutional challenge, the substance simply echoes their opinion that jail officials should have been carved out of the TVPA. They advance no serious argument that the TVPA is unconstitutionally vague.

### 1.    *Legal Standard For As-Applied Constitutional Challenge*

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "Unconstitutionally vague statutes pose two primary difficulties: (1) they fail to provide due notice so that 'ordinary people can understand what conduct is prohibited,' and (2) 'they encourage arbitrary and discriminatory enforcement.'" *United States v. Cherry*, 938 F.2d 748, 753 (7th Cir. 1991) (quoting *Kolender*, 461 U.S. at 357).

Where, as here, a statute does not threaten any First Amendment rights, a vagueness challenge must be "examined in light of the facts of the case at hand." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012)

("When we are confronted with an as-applied challenge, we examine the facts of the case before us exclusively, and not any set of hypothetical facts under which the statute might be unconstitutional."). Thus, the only question here is whether the TVPA's language provides notice that the conduct alleged in Plaintiffs' Complaint is unlawful.

The degree of vagueness tolerated depends in part on the nature of the enactment. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Courts have "greater tolerance of enactments with civil rather than criminal penalties." *Id.* at 498–99.

Additionally, the existence of a scienter or *mens rea* requirement in a statute mitigates vagueness concerns. *Calimlim*, 538 F.3d at 711 ("The presence of a *scienter* element to the offense makes the [defendants'] burden very difficult to carry.") (citing *Screws v. United States*, 325 U.S. 91 (1945) (rejecting vagueness challenge to federal criminal statute because it had a scienter requirement)); *see also United States v. Collins*, 272 F.3d 984, 989 (7th Cir. 2001) (defendant challenging the constitutionality of a statute with a scienter requirement "bears an especially heavy burden in raising his vagueness challenge").

### 2. Defendants' Arguments Fail.

Despite having an "especially heavy burden" to carry, *Collins*, 272 F.3d at 989, Defendants cite no case where a court has found a similar statute void for vagueness. Likewise, Defendants fail to address the cases where Courts have rejected the same vagueness argument that Defendants advance here. *See Calimlim*, 538 F.3d at 711; *Novoa v. GEO Grp., Inc.*, No. EDCV172514JGBSHKX, 2018 WL 4057814, at *7 (C.D. Cal. Aug. 22, 2018); *United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22956917, at *1 (W.D.N.Y. Dec. 2, 2003). Instead, Defendants' argument consists of unsupported assertions about undefined terms and policy arguments that they should have been carved out of the TVPA.

23

### a) Serious Harm

For example, Defendants assert that the TVPA does not define the term "serious harm." *See* Mot. at 19. But Defendants are wrong as a factual matter. The statute expressly defines this term. *See* 18 U.S.C.A. § 1589(c)(2) ("The term 'serious harm' means any harm, whether physical or nonphysical, including . . . ."). Furthermore, there can be no debate that the type of harm at issue here falls within the plain meaning of "serious harm" as the term is ordinarily understood. *United States v. Harriss*, 347 U.S. 612, 618 (1954) ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise.").

Here, Plaintiffs allege that they were threatened with being placed in solitary confinement if they did not perform free janitorial work for Defendants. *See* Compl. ¶¶ 25, 36, 42, 71. Placement in solitary confinement easily falls within the definition of serious harm set forth in the statute. 18 U.S.C. § 1589(c)(2); *see supra* at 10–11.

### b) Force and Threats of Force

Defendants also complain that the terms "force" and "threats of force" are undefined, but this argument is also misplaced. Although the TVPA allows suits where labor is obtained "by means of force" or "threats of force," *see* ¶ 1589(a)(1), that is not the basis for Plaintiffs' claims. Rather, Plaintiffs allege that Defendants obtained labor by means of "physical restraint, or threats of physical restraint" and by means of "serious harm or threats of serious harm." *See* Compl. ¶¶ 72–74. The "by means of force" provision of the TVPA is not applicable and has no bearing on Defendants' as-applied challenge.

Furthermore, even if the "by means of force" provision were at issue in this case, Defendants offer no serious argument that the term is impermissibly vague. Defendants'

argument rests solely on dicta from *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984), which dealt with the use chemical agents in prisons. The use of force in prisons is analyzed under the Eighth Amendment prohibition against cruel and unusual punishment, but, as the Supreme Court has made clear, jail officials' use of force is analyzed by the same "objective reasonableness" standard that applies in the community. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Reasonableness depends on a variety of factors, including "the severity of the security problem at issue." *Id.*

Contrary to Defendants' suggestion, cases like *Soto* and *Kinglsey* do not give jail officials unfettered discretion to use force (or restraint for that matter)—rather, these cases make clear that lawfulness is determined case-by-case, based on the particular security threat posed. By contrast, the TVPA sets forth a simple rule that jail officials may not use force to obtain free labor from detainees. In other words, there is nothing about *Soto* or *Kingsley* that makes the TVPA difficult for Defendants to understand. Defendants may use force that is reasonably necessary to maintain safety and security, but not to save money on janitorial services.

### c)  TVPA Is Not Vague As Applied To This Case.

The TVPA is neither vague nor unclear when applied here. As explained above, the TVPA's plain text unambiguously applies to these Defendants. *See supra* Part I.A.–I.B. The TVPA prohibits the use of restraint, threats of restraint, serious harm, and threats of serious harm to obtain free labor from detainees. None of those terms is ambiguous in this context. Furthermore, the Seventh Circuit has already rejected a constitutional challenge to § 1589 because it contains a scienter requirement, which is also applicable in this civil suit. *See Calimlim*, 538 F.3d at 711.

Although Defendants do not specifically argue that the phrase "labor or services" is vague, the term is not vague in this context. Plaintiffs allege that they were forced to perform free "janitorial labor" including cleaning the facility's dayrooms, showers, tables, phones, multi-purpose room, recreation areas, hallways, and gym. Compl. ¶¶ 2, 21, 38, 41, 45. Work of this nature squarely falls within any reasonable interpretation of the term "labor or services."

Defendants also assert, without explanation or support, that the TVPA allows for "arbitrary enforcement" because it allows "prosecutors, plaintiffs' attorneys, and juries" to define various terms. Mot. at 20. This argument does not make sense. TVPA is not ambiguous. Defendants cite no case where a court has been unable to apply the TVPA to cases brought by prosecutors or plaintiffs' attorneys, nor any case where a court could not properly instruct a jury.

### d) Defendants' Proffered Government Websites Carry No Weight.

Finally, Defendants cite two government websites for the proposition that TVPA does not apply to civilly detained immigrants, *see* Mot. at 17, but these materials offer no support for Defendants' position.

First, it is well-established that where, as here, the plain text of a statute is unambiguous, Courts do not defer to federal agency interpretation of statutes. *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). Furthermore, even where deference to agency interpretation of a statute is warranted, courts do not defer to the types of materials proffered by Defendants, which are best described as public information factsheets. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (administrative interpretation qualifies for *Chevron* deference when Congress delegated authority to the agency generally to make rules carrying the force of law and agency interpretation was promulgated in the exercise of that authority).

26

Second, neither of Defendants' proffered factsheets purport to dictate who may bring a lawsuit under § 1589. In other words, these materials have no bearing on whether Plaintiffs may bring a civil cause of action here. As to that question, Plaintiffs note that in 2019 the United States submitted an amicus brief to the Eleventh Circuit Court of Appeals in *Ahmed v. CoreCivic*, No. 18-15081. In that case, the United States unequivocally expressed the view that the TVPA applies to federal government contractors running ICE detention facilities. *See* Exhibit A at pp. 6-8 (amicus brief of United States).

## II. <u>Defendants Are Not Immune.</u>

### A. Derivative Immunity Does Not Apply.

Defendants argue that they are entitled to derivative immunity based on the *Yearsley* defense, but Defendants cannot meet either element required for the defense. To be immune from suit under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), a federal government contractor bears the burden of demonstrating that the federal government both: (1) "authorized and directed" the challenged conduct, and (2) "validly conferred" such authorization. *Id.* at 20–21; *accord Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) (derivative immunity is available to a federal contractor who "simply performed as the Government directed"); *Portis v. Folk Const. Co., Inc.*, 694 F.2d 520, 524 (8th Cir. 1982) (*Yearsley* makes a contractor free from liability for "injuries necessarily involved in the performance of the contract," but not "for acts done for [the contractor's] own convenience or not as an essential part of the contract.").

Plaintiffs allege that, on August 1, 2000, Kenosha County entered into an Intergovernmental Service Agreement with the U.S. Marshals Service and INS to house civil immigration detainees for ICE. Compl. ¶ 17. While Defendants were therefore authorized to house civil immigration detainees, they were in no way "authorized" (let alone "directed") to

force those detainees to clean the common areas of the Jail under threat of lockdown and solitary confinement. *Yearsley*, 309 U.S. at 20–21. Defendants do not even attempt to argue that the allegations in the Complaint establish that the federal government "authorized and directed" the challenged conduct. Instead, they rely exclusively on the three exhibits appended to their motion to dismiss. As discussed below, the Court should not consider these exhibits at this stage, but even if it did, they do not establish Defendants' entitlement to immunity.

> **1.** **Defendants' Extrinsic Materials Must Be Disregarded Or The Motion Must Be Converted Into A Motion For Summary Judgment.**

Defendants argument rests on three exhibits—all extrinsic to the Complaint—that they appended to their motion to dismiss: (1) a document that purports to be ICE's National Detainee Handbook dated April 2016; (2) a document titled "INS Detention Standard Voluntary Work Program" dated September 20, 2000[5]; and (3) a document that purports to be the Intergovernmental Service Agreement between Kenosha County and the federal government dated September 5, 2000. Mot. at 27; Dkt. No. 19, 19-1, 19-2, and 19-3.

Under Federal Rule of Civil Procedure 12(d), the Court must either exclude these extrinsic materials or treat Defendants' motion as one for summary judgment. Either way, Defendants cannot prevail at this stage. As an initial matter, Defendants motion fails to satisfy the Court's local rules for presentation of dispositive motions, which is grounds to deny the motion. *See* Civil L.R. 56(b)(1). Furthermore, without discovery, Plaintiffs have not been afforded an opportunity to "present all material pertinent to the motion" as required under Rule 12(d). *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (refusing to consider documents attached to motion to dismiss).

---

[5] Defendants inaccurately state that the document they append as Exhibit 2 is dated September 2020. Dkt. No. 19, ¶ 4. But on its face, it is dated September 20, 2000.

### 2. Defendants Are Not Entitled To Dismissal Based On Derivative Immunity Because Neither Yearsley Element Is Satisfied.

To be sure, even if the Court were to consider Defendants' extrinsic materials, Defendants have fallen short of establishing that they are entitled to this defense as a matter of law. Defendants are wrong to equate the personal housekeeping outlined in Exhibit 1 with the janitorial labor alleged in the Complaint. Mot. at 27. Exhibit 1, ICE's National Detention Handbook dated April 2016, provides: "You must keep areas that *you use* clean, including *your living area* and any general-use areas that *you use*. If you do not keep *your areas* clean, you may be disciplined." Dkt No. 19-1, at 12 (emphases added). The principle conveyed is that detainees must clean up *after themselves*—not that they must clean up after other detainees. This principle is underscored in the very next section of Exhibit 1, which outlines in greater detail the tasks detainees are expected to perform to "keep the facility clean": "make your bed every day"; "[i]f you brush your hair over the sink, remove any fallen hairs from the sink"; "[t]hrow trash into the garbage cans, not onto the floor"; "[t]hrow all used hygiene products into the trash"; and "[d]o not leave crumbs from food in your housing area." Dkt. No. 19-1, at 14. Defendants also cite Exhibit 2, which appears to be the section of the 2000 National Detention Standards for Non-Dedicated Facilities titled "Voluntary Work Program."[6] It emphasizes that work assignments for civil immigration detainees must be "voluntary," with the sole exception that "detainees are responsible for *personal housekeeping*." Dkt. No. 19-2, at 2 (emphasis added).

The cleaning requirements and discipline outlined in these exhibits are not the same as the conduct alleged to violate the TVPA in this case. As alleged in the Complaint, immigrants were forced to, *inter alia*, scrub the showers, clean and disinfect dining tables, disinfect phones,

---

[6] ICE, 2000 National Detention Standards for Non-Dedicated Facilities, https://www.ice.gov/detain/detention-management/2000.

sweep the floor in the indoor recreational area and multi-purpose room, and clean the Jail's outdoor recreation area, hallways, and gym. Compl. ¶¶ 21, 38, 41, 45. Accepting well-pleaded facts as true and drawing all inferences in Plaintiffs' favor, as the Court must at this stage, the janitorial labor alleged extends far beyond the personal housekeeping tasks outlined in Exhibits 1 and 2. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010), *as amended* (Dec. 16, 2010). And even though Exhibit 1 states that "you may be disciplined" for failing to clean up after yourself, it certainly does not *require* the Jail to impose punishments as severe as cell lockdowns or solitary confinement for not cleaning. Dkt. No. 19-1.

Moreover, though Defendants' Exhibit 1 purports to be a document authored by ICE, the record contains no evidence that Exhibit 1 was binding on Defendants and thus tantamount to *authorization and direction* from the federal government during the full class period. First off, this document is dated April 2016, but the TVPA has a ten-year statute of limitations that extends back to October 10, 2013—nearly three years before Exhibit 1 existed. 18 U.S.C. § 1595(c). Notably, an earlier version of ICE's National Detainee Handbook (which is extrinsic to the Complaint) uses different language that specifically limits uncompensated labor to "maintaining your personal area" or "*cleaning up after yourself* in general use areas." *See* Exhibit B, ICE National Detainee Handbook, eff. Feb. 2009 (emphasis added). Defendants— whether strategically or not—did not append that earlier version to their motion to dismiss. Likewise, nothing in the record establishes that Exhibit 1 was somehow incorporated into the Intergovernmental Service Agreement between Kenosha County and the federal government, which was executed on August 1, 2000—nearly sixteen years before Exhibit 1 existed.

What is more, other policies authored by ICE (which are also extrinsic to the Complaint) expressly provide that detainees "shall not be required to work, except to do personal

housekeeping," which is narrowly limited to "maintaining their immediate living areas in a neat and orderly manner by: 1. making their bunk beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." *See* ICE's Performance-Based National Detention Standards 2011 ("PBNDS"), at 406, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. Recently, in *Menocal v. GEO Grp., Inc.*, 635 F. Supp. 3d 1151, 1173–75 (D. Colo. 2022), the court held that "[t]he PBNDS did not mandate that detainees clean the common areas or clean up after others." Because the detention center that contracted with the federal government had developed its own cleaning policies that required detainees to clean up after others, the court determined that it was *not* "simply performing as the Government directed" and thus was not entitled to derivative immunity. *Id.* (quoting *Campbell-Ewald Co.*, 577 U.S. at 167) (alteration omitted). The same is true here.

In addition, Defendants cite their Exhibit 3—the Intergovernmental Service Agreement—for the proposition that "Kenosha County's activities were being directed by the federal government." Mot. at 27; Dkt. No. 19-3. While the federal government contracted with Defendants to house civil immigration detainees, Defendants fail to show that the federal government authorized and directed Defendants to force detainees to perform janitorial labor under threat of serious harm so that Defendants could reduce operating costs and generate more profit.

Defendants' invocation of *Yearsley* immunity also fails for the independent reason that Defendants cannot satisfy the second element of the *Yearsley* defense: that the government "*validly* conferred" on the contractor the authority to engage in the challenged conduct. 309 U.S.

at 20 (emphasis added). ICE could not have validly conferred on Kenosha County the authority to violate the TVPA. The agency had no power to do so. Defendants make no attempt to explain how such authority could have been "validly conferred," and any such attempt would be futile.

In summary, Defendants have fallen far short of showing that they are entitled to dismissal on *Yearsley* immunity. At best, the factual disputes surrounding precisely what the federal government authorized and directed Kenosha County to do and how that compared to Defendants' policy of forced janitorial labor demonstrate that a motion to dismiss is not the proper vehicle to litigate this issue. *See, e.g.*, *Novoa*, 2018 WL 4057814, at *3 (denying defendants' motion to dismiss on grounds of derivative immunity under *Yearsley* because the parties had not commenced discovery and the factual record was therefore inadequate).

### B. The Individual Defendants Are Not Entitled To Qualified Immunity.

The Individual Defendants' invocation of qualified immunity, without citing a single authority applying this doctrine to the TVPA, fails.

*First*, qualified immunity is "typically invoked" in constitutional tort cases under Section 1983 (enacted in 1871) and *Bivens*—causes of action "largely 'devised by the Supreme Court without any legislative . . . guidance.'" *Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998). Indeed, the Seventh Circuit has expressly questioned, as a general matter, "whether it is sound to extend immunity principles from litigation under 42 U.S.C. § 1983 to suits under more recent, and more detailed, laws." *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000), as revised (July 12, 2000), *overruled on other grounds by Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 n.9 (2001). Accordingly, this Court should be wary of grafting qualified immunity onto modern statutes like the TVPA when the statute's text does not provide for it.

*Second*, there is no historical basis to apply this immunity to the TVPA. Courts look to "the most closely analogous torts" to "determin[e] whether there was an immunity at common law that Congress intended to incorporate." *Wyatt v. Cole*, 504 U.S. 158, 164 (1992). But even if an immunity would have been available at common law, courts decline to apply it if doing so would be contrary to the cause of action's "history or purpose." *Id.*; *see, e.g., Samuel v. Holmes*, 138 F.3d 173, 178 (5th Cir. 1998) (declining to apply qualified immunity to the False Claims Act because "[t]he statute is silent on the existence of qualified immunity," and it would not further "the goals of the FCA"). Defendants have not even attempted to identify any closely analogous torts where immunity was available at common law. None exist. Moreover, qualified immunity would stymie the TVPA's "history or purpose," which included creating broad civil liability for *anyone* obtaining involuntary labor through coercion. 22 U.S.C. § 7101(b)(3), (12), (13).

*Third*, even if qualified immunity were an available defense under the TVPA (it is not), it does not apply here because the TVPA's plain language clearly establishes Plaintiffs' rights. *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("[I]f a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity . . . with respect to damages caused by that violation."). Defendants argue that Plaintiffs' rights are not clearly established because "there is no case law . . . holding jailers liable based on circumstances similar to those alleged here." Mot. at 29. But that argument wrongly ignores that "the words of the pertinent federal statute," like the TVPA, can be "specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity even in the *total absence of case law*." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002); *see Thompson v. Cope*, 900 F.3d 414, 422 (7th Cir. 2018) (citing *Vinyard*, 311 F.3d at 1350–54); *see, e.g., Marshall v. Chicago Hous. Auth.*, No. 89 C 4964, 1991 WL 66069, at *4

(N.D. Ill. Apr. 22, 1991), *aff'd sub nom. Marshall v. Allen*, 984 F.2d 787 (7th Cir. 1993) (plain statutory language rendered law clearly established). Such is the case here. As demonstrated above, *see supra* Part I.B., the TVPA by its plain language forbids municipal actors from forcing immigrant detainees to perform janitorial work.

In any event, it would be premature for the Court to dismiss the claims against the Individual Defendants on qualified immunity grounds. First, "[t]he plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000)). Moreover, "[b]ecause an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate." *Id.*; *see, e.g., McHenry County*, 2023 WL 130496, at *6 (ruling that the immunity inquiries would benefit from a more developed factual record into the types of labor the civilly-detained immigrations performed and how the individual defendants obtained their labor).

### III.    Plaintiffs Have Adequately Pled Claims Against The Individual Defendants.

Finally, Defendants argue that the Complaint contains no factual allegations relating to the Individual Defendants. Mot. at 29. That is clearly false. Plaintiffs have alleged the Jail's express policy of obtaining civilly-detained immigrants' forced janitorial labor under threat of cell lockdown and solitary confinement and alleged that the Individual Defendants established, implemented, and enforced this policy. This is sufficient to hold the Individual Defendants directly liable for their violations of the TVPA.

Specifically, Plaintiffs allege the Jail's "uniform policy" of subjecting detainees who refused to perform uncompensated janitorial labor to discipline, up to and including solitary confinement. Compl. ¶ 71. Moreover, Plaintiffs allege that this mandatory cleaning policy and

disciplinary system was memorialized in the Jail's handbook for civil immigration detainees. *Id.* ¶¶ 24–25. The Complaint alleges further that in response to Plaintiff Ruderman's grievance requesting that the Jail change its "mandatory cleaning policy" to conform to the TVPA, the Sheriff's Department sent him a letter dismissing his grievance and stating that the mandatory cleaning policy is set forth in the handbook. *Id.* ¶¶ 33–34. Additionally, Plaintiffs allege that Defendant David Beth "held the position of Kenosha County Sheriff" at all times relevant to the Complaint, "set policy for the Kenosha County Jail," and thereby "obtained Plaintiffs' forced labor." *Id.* ¶ 11. Plaintiffs also allege that Defendants Robert Hallisy, Larry Apker, Marc Levin, Justin Miller, and Bill Beth "oversaw the Kenosha County Jail" and "enforced rules requiring Plaintiffs to engage in forced labor." *Id.* ¶ 12.

Defendants cite two cases to support the uncontroversial proposition that "unsupported legal conclusions" are insufficient to state a claim. Mot. at 30. But these authorities are inapposite because the factual allegations discussed above plainly are not "unsupported legal conclusions" as Defendants contend. *Id.* Defendants cite no other authority for the proposition that these pleadings are insufficient to make out a claim under the TVPA. Instead, Defendants borrow concepts from Section 1983 cases where Plaintiffs seek to hold supervisors liable for constitutional violations carried out by their subordinates. But in this case, Plaintiffs are not seeking to hold the Individual Defendants liable for the conduct of subordinates—they are holding the Individual Defendants directly responsible for their own conduct of enacting or implementing the challenged policy. Even in the Section 1983 context, allegations of this nature are sufficient. *See Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988) (supervisors may be liable in their individual capacities if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see"); *Antonelli v. Sheaha*n,

81 F. 3d 1422, 1429 (7th Cir. 1996) (concluding that a sheriff and county director of corrections can be expected to know of or participate in creating a systemic situation); *Smith v. Dart*, 803 F.3d 304, 309 n.2 (7th Cir. 2015) ("[T]he personal involvement of senior jail officials . . . can be inferred at the motion to dismiss stage, where, as here, the plaintiff alleges 'potentially systemic,' as opposed to 'clearly localized,' constitutional violations."); *Terry v. Cook Cnty. Dep't of Corr.*, No. 09-CV-3093, 2010 WL 331720, at *3 (N.D. Ill. Jan. 22, 2010) (sustaining claim against sheriff based on allegation that he failed to correct an unlawful policy).

Even if the facts alleged in the Complaint were not adequate (they are), Plaintiffs are permitted to allege additional facts in this response brief, *Geinosky*, 675 F.3d at 745 n.1 (a party opposing a Rule 12(b)(6) motion may elaborate on their pleadings), which undoubtably state a claim against the Individual Defendants. To begin, David Beth, who served as the Kenosha County Sheriff at all times relevant to the Complaint, was responsible for the Kenosha County Sheriff's Department. He oversaw more than 360 full-time employees, commanded Kenosha County's detention system, and managed a budget of nearly $45 million. The remaining Individual Defendants served as Detentions Division Commanders during the following time periods: Robert Hallisy (Jan. 2013-Sept. 2014), Larry Apker (Sept. 2014-Dec. 2014), Marc Levin (Dec. 2014-Dec. 2016), Justin Miller (Jan. 2017-Jan. 2019), and Bill Beth (Jan. 2019-Apr. 2021). And, in addition to what was already alleged, their responsibilities included: (i) commanding the detentions division, (ii) supervising over 200 full time and part-time staff members, (iii) controlling the operations of the Jail, and (iv) providing safe and secure housing to all persons remanded to the custody of the Kenosha County Sheriff. These Defendants also know that Kenosha County relies on its ICE contract to raise revenue. Defendant Justin Miller specifically commented to reporters in October 2023 that the county continues to suffer from the loss of

36

millions of dollars in revenue after ICE suspended its contract with Kenosha County in 2020.[7] The Court should consider these additional allegations, if it deems them necessary, or, at a minimum, grant Plaintiffs leave to amend if it finds the allegations in the initial Complaint deficient.[8]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated:        December 18, 2023        By: /s/ *Margaret E. Truesdale*

Elizabeth N. Mazur
Margaret E. Truesdale
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com
mtruesdale@hsplegal.com

Raphael Janove
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Rafi@PollockCohen.com
*Attorneys for the Plaintiffs and the Proposed Class*

---

[7] Terry Flores, *Finance Committee Approves Sheriff's Budget, Provision to Evaluate Federal Inmate Contract Viability*, KENOSHA NEWS, Oct. 24, 2023, https://kenoshanews.com/news/local/government-politics/kenosha-county-federal-inmate-contract-review/article_085b6c4a-721a-11ee-b2ea-13c2520ba644.html.

[8] Plaintiffs concede that their claims against the Kenosha County Sheriff's Department (*i.e.*, the Kenosha County Sheriff in his official capacity) should be construed as claims against Kenosha County. As to Plaintiffs' claim for indemnification, Defendants state that Wis. Stat. § 895.46 will be automatically "triggered without any such claim being brought against Kenosha County should the individual defendants be found liable." Mot. at 4-5 n.2. Plaintiffs concede that the claim for indemnification is unnecessary given the automatic indemnification pursuant to § 895.46. Plaintiffs agree to dismissal of Plaintiffs' state law claims.

37