EXHIBIT

1

Nos. 19-416 & 19-453

# In the
# Supreme Court of the United States

———————————

Nestlé USA, Inc., *Petitioner*,
*v.*
John Doe I, et al., *Respondents.*

———————————

Cargill, Inc., *Petitioner*,
*v.*
John Doe I, et al., *Respondents.*

———————————

**On Writs of Certiorari to
the United States Court of Appeals for
the Ninth Circuit**

———————————

**BRIEF OF MEMBERS OF CONGRESS SENATOR
BLUMENTHAL, REPRESENTATIVE SMITH, ET
AL., AS *AMICI CURIAE* SUPPORTING
RESPONDENTS**

Martina E. Vandenberg
Sarah L. Bessell
Human Trafficking Legal
Center
1030 15th St. NW #104B
Washington, DC 20005

Agnieszka M. Fryszman
  *Counsel of Record*
Nicholas J. Jacques
Cohen Milstein Sellers
& Toll LLP
1100 New York Ave. NW
Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
afryszman@cohenmilstein.com
  *Counsel for Amici Curiae,*
*Additional counsel continued on inside cover*

Natasha Arnpriester
A. Azure Wheeler
Cecelia C. Chang
James A. Goldston
Open Society Policy Center
1730 Pennsylvania Ave NW
7th Floor
Washington, D.C. 20006

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT ...................................5

ARGUMENT.................................................................7

   I.   Combating Trafficking Around the Globe is a Top Congressional Priority Pursued Through Broad and Multifaceted Efforts ......................8

     A.  Congress spent years studying and developing a response to the global scourge of human trafficking. ....................................9

     B.  Congress carried out its antitrafficking policy through the numerous mutually reinforcing provisions of the Trafficking Victims Protection Act of 2000 and its subsequent reauthorizations and amendments. ............22

     C.  The TVPRA authorizes civil actions similar to the claims brought by the Malian children in this case...................................................26

  II.  The TVPRA is the Proper Guidepost for Assessing Congressional Choices...................30

CONCLUSION .........................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barrientos v. CoreCivic, Inc.*,
  951 F.3d 1269 (11th Cir. 2020)............................33

*Bistline v. Parker*,
  918 F.3d 849 (10th Cir. 2019).............................31

*Corley v. United States*,
  556 U.S. 303 (2009).............................................31

*Doe v. Nestle, S.A.*,
  906 F.3d 1120 (9th Cir. 2018).............................32

*Hibbs v. Winn*,
  542 U.S. 88 (2004)...............................................31

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018)............................29, 30, 32

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013).............................................29

*Ricchio v. McLean*,
  853 F.3d 553 (1st Cir. 2017) ...............................31

*Roe v. Howard*,
  917 F.3d 229 (4th Cir. 2019)....................30, 32, 33

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)...............................................8

STATUTES

1 U.S.C. § 1 .................................................................33

18 U.S.C. § 2 ................................................... 29, 30, 31

18 U.S.C. § 1589 ................................................... 31, 33

18 U.S.C. § 1590 ............................................................33

18 U.S.C. § 1593A............................................................31

18 U.S.C. § 1595 ................................................... 31, 33

18 U.S.C. § 1596 ........................................... 24, 32, 33

22 U.S.C. § 7101(b)................................... 8, 11, 15, 18

22 U.S.C. § 7107(b)......................................................26

22 U.S.C. § 7112(b)(2)(C)...........................................28

Trafficking Victims Protection
    Reauthorization Act of 2003, Pub. L.
    108-193, 117 Stat. 2875 .......................................23

Victims of Trafficking and Violence
    Protection Act of 2000, Div. A., Pub.
    L. No. 106-386, 114 Stat. 1464 ...........................22

William Wilberforce Trafficking Victims
    Protection Reauthorization Act of
    2008, Pub. L. No. 110-457, 122 Stat.
    5044 .......................................................................24

LEGISLATIVE MATERIALS

146 Cong. Rec. (daily ed. May 9, 2000)......................15

iv

146 Cong. Rec. (daily ed. Oct. 6, 2000) .....................21

146 Cong. Rec. (daily ed. Oct. 11, 2000) ..............16, 9

149 Cong. Rec. (daily ed. Nov. 4, 2003) ...............8, 23

151 Cong. Rec. (daily ed. Dec. 14, 2005).....................8

151 Cong. Rec. (daily ed. Dec. 21, 2005)..................17

153 Cong. Rec. (daily ed. Dec. 4, 2007)...........8, 17, 19

154 Cong. Rec. (daily ed. Dec. 10, 2008)....................8

154 Cong. Rec. (daily ed. May 22, 2008)..................24

*Enhancing the Global Fight to End
    Human Trafficking: Briefing and
    Hearing Before the H. Comm. on Int'l
    Rel.*, 109th Cong. (2006)......................................27

*Ending Modern Slavery: Hearing Before
    the S. Comm. on Foreign Rel.*, 114th
    Cong. (2015)...................................................21, 25

*Global Trends in Trafficking and the
    "Trafficking in Persons Report":
    Hearing Before the Subcomm. on
    Int'l Terrorism, Nonproliferation &
    Human Rights of the H. Comm on
    Int'l Rel.,* 108th Cong. (2003)............ 18, 20, 27, 28

H.R. Rep. No. 106-939 (2000) (Conf.
    Rep.).............................................................23, 32

H.R. Rep. No. 101-430, pt. 1 (2007) ...........................9

v

*International Trafficking in Persons:*
*Taking Action to Eliminate Modern*
*Day Slavery: Hearing Before the H.*
*Comm. on Foreign Aff.*, 110th Cong.
(2007) ...................................... 12, 13, 14, 16, 17, 18

*International Trafficking in Women and*
*Children: Hearing Before the*
*Subcomm. On Near E. & S. Asian*
*Aff. of the S. Comm. on Foreign Rel.*,
106th Cong. (2000) ....... 9, 10, 11, 12, 13, 15, 16, 20

*Legal Options to Stop Human*
*Trafficking: Hearing Before the*
*Subcomm. on Human Rights & the*
*Hearing Before the Subcomm. on*
*Human Rights & the Law of the S.*
*Comm. on the Judiciary*, 110th Cong.
(2007) ...................................................... 14, 20, 25

*Out of the Shadows: The Global Fight*
*Against Human Trafficking: Hearing*
*Before the H. Comm. On Foreign Aff.*,
111th Cong. (2010) ............................................... 20

*The Global Fight to End Modern*
*Slavery: Hearing Before the S.*
*Comm. on Foreign Rel.*, 115th Cong.
(2018) ................................................................. 19

*The Ongoing Tragedy of International*
*Slavery and Human Trafficking: An*
*Overview: Hearing Before the*
*Subcomm. on Human Rights &*
*Wellness of the H. Comm. on Gov't*
*Reform*, 108th Cong. (2003) ........................... 12, 15

*Trafficking in Persons: The Fed. Gov't's
Approach to Eradicate this
Worldwide Problem: Hearing Before
the Subcomm. On Human Rights
and Wellness of the H. Comm. on
Gov't Reform*, 108th Cong. (2004)........................12

Trafficking Victims Protection Act of
2000, H.R. 3244, 106th Cong.
§ 7(b)(4) (2000)........................................................22

**INTERNATIONAL AGREEMENTS**

European Parliament Resolution on
Trafficking in Human Beings, art. 1,
1996 O.J. (C 32) (EC) ...........................................16

Protocol to Prevent, Suppress and
Punish Trafficking in Persons,
Especially Women and Children,
*opened for signature* Nov. 15, 2000,
2237 U.N.T.S. 319................................................16

Supplementary Convention on the
Abolition of Slavery, the Slave
Trade, and Institutions and
Practices Similar to Slavery, Sept. 7,
1956, 18 U.S.T. 3201, 266 U.N.T.S. 3.................17

**OTHER AUTHORITIES**

Alexander F. Levy, Federal Human
Trafficking Civil Litigation: 15 Years
of the Private Right of Action,
Human Trafficking Legal Center
(2018). ....................................................................34

## INTEREST OF *AMICI CURIAE*[*]

This brief is filed on behalf of the following members of Congress:

**Senator Richard Blumenthal** is the Co-Chair of the Senate Caucus to End Human Trafficking and a Member of the Senate Judiciary Committee.

**Senator Sherrod Brown** is the Ranking Member of the Senate Banking Committee and a Member of the Senate Finance Committee and its Subcommittee on International Trade, Customs, and Global Competitiveness.

**Senator Benjamin L. Cardin** is a Member of the Senate Foreign Relations Committee and the Ranking Member of the Subcommittee on Western Hemisphere, Transnational Crime, Civilian Security, Democracy, Human Rights, and Global Women's Issues.

**Senator Christopher A. Coons** is a Member of the Senate Appropriations, Foreign Relations, and Judiciary Committees and Vice Chairman of the Ethics Committee. He is Co-Founder and Co-Chair of the Senate Human Rights Caucus.

**Senator Richard J. Durbin** is the Senate Democratic Whip, Ranking Member of the Senate

---

[*] All parties have consented to this filing. No counsel for a party authored any part of this brief. No individual or entity except *amici*'s counsel contributed any funding toward the preparation or submission of this brief.

Immigration and Border Security Subcommittee, and a Member of the Senate Judiciary Committee.

**Senator Patrick Leahy** is the former Chairman and senior-most Member of the Senate Judiciary Committee.

**Senator Robert Menendez** is the Ranking Member of the Senate Foreign Relations Committee. He served as Chairman in the 113th Congress.

**Senator Jeffrey A. Merkley** is a Member of the Senate Foreign Relations Committee.

**Senator Ron Wyden** is a Member of the Senate Caucus to End Human Trafficking.

**Congressman Tony Cárdenas** is the Vice Chairman of the Consumer Protection and Commerce Subcommittee to the House Energy and Commerce Committee, and a Member of the Tom Lantos Human Rights Commission.

**Congressman Joaquin Castro** is the Vice Chairman of the House Foreign Affairs Committee, and Chairman of the Subcommittee on Oversight and Investigations. He is also Chairman of the Congressional Hispanic Caucus and a Member of the House Permanent Select Committee on Intelligence and the House Committee on Education and Labor.

**Congressman David N. Cicilline** is a Member of the House Foreign Affairs and Judiciary committees and the Tom Lantos Human Rights Commission.

**Congressman Steve Cohen** is a Member of the House Judiciary Committee and is the Chairman of

the Subcommittee on the Constitution, Civil Rights, and Civil Liberties and a Member of the Helsinki Commission on Security and Cooperation in Europe.

**Congresswoman Pramila Jayapal** is a Member of the House Judiciary Committee, the House Education and Labor Committee, and the Tom Lantos Human Rights Commission.

**Congressman Tom Malinowski** is a Member of the House Foreign Affairs Committee.

**Congresswoman Carolyn B. Maloney** is the Chairwoman of the House Committee on Oversight and Reform and the Co-Chair of the Congressional Caucus on Human Trafficking.

**Congressman Gregory Meeks** is a Senior Member of the House Committee on Financial Services and the House Foreign Affairs Committee, and Member of the Subcommittee on Western Hemisphere, Civilian Security and Trade. He is also a Member of the Congressional Black Caucus.

**Congressman Jerrold Nadler** is the Chairman of the House Judiciary Committee.

**Congressman Robert C. "Bobby" Scott** is the Chairman of the House Education and Labor Committee and the Co-Chair of the Congressional Human Trafficking Caucus. He previously served on the House Judiciary Committee, including as Chairman and Ranking Member of the Subcommittee on Crime, Terrorism, and Homeland Security.

**Congressman Christopher H. Smith** is a senior Member on the House Foreign Affairs Committee and is current Ranking Member and former Chairman of its Africa, Global Health, Global Human Rights and International Organizations Subcommittee. He is the Co-Chair of the Congressional Human Trafficking Caucus and the bipartisan Tom Lantos Human Rights Commission, and the author of the Trafficking Victims Protection Act.

**Congresswoman Nydia M. Velázquez** is the Chairwoman of the House Small Business Committee, a Member of the Tom Lantos Human Rights Commission, and the former Chairwoman of the Congressional Hispanic Caucus.

Over the last two decades, with virtually unanimous support, Congress has made extraordinary efforts to combat human trafficking and forced labor worldwide. *Amici* have all been engaged in this effort through committee work, legislation, advocacy, and other measures.

Because Petitioners' briefs fail to recognize Congress' efforts, *Amici* submit this brief. We wish to ensure, to the extent it is relevant to the Court's deliberations, that the Court has before it a history of Congress' efforts: through the last four presidential administrations and on a bipartisan basis, Congress has pursued an aggressive, multifaceted strategy to eliminate the worldwide scourge of this modern-day slavery. That strategy includes the enactment of a comprehensive statutory scheme, codified primarily

in Chapter 77, Title 18 (Peonage, Slavery, and Trafficking in Persons), that provides victims with the ability to bring a civil suit in the United States against the direct perpetrators, aiders and abettors, and those who benefit from participation in ventures that have engaged in human trafficking, forced labor, and other violations, whether committed in the United States or abroad.

As the People's elected representatives, *Amici* have an interest in ensuring that the Court is informed about the policy choices Congress has made to fight human trafficking. Human trafficking is one of the most significant human-rights challenges of the 21st Century. Combating it—wherever on the globe it occurs—is among Congress's highest foreign-relations priorities.

## SUMMARY OF ARGUMENT

Eradicating the scourge of human trafficking, forced child labor, and all forms of modern-day slavery is a bipartisan congressional priority of grave importance. Since the 1990s, Congress has consistently sought to eradicate this affront to human dignity. As Congress has learned through two decades of investigation and legislation, human trafficking is an international problem. Any attempts to address it must involve strong American leadership. To this end, Congress has pursued proactive and expansive measures to combat human trafficking, including measures to eradicate forced labor abroad and to hold American persons—both individuals and

corporations—accountable for participation in these despicable practices.

Petitioners and their *amici* argue that the Court must defer to the policy choices of Congress and the Executive Branch, but they fail to acknowledge the policy choices already made through Congress' landmark law addressing these violations.

Two decades ago, Congress enacted the Trafficking Victims Protection Act[1] of 2000, which we have repeatedly expanded and strengthened through successive reauthorizations. Among other provisions, as reauthorized, the TVPRA imposes criminal liability on individuals, corporations, and other legal persons who knowingly benefit from participating in ventures that use forced labor as well as on those who aid and abet these practices. The TVPRA also provides victims of human trafficking and forced labor a private cause of action coextensive with its criminal provisions. It applies extraterritorially as long as a defendant is an American citizen or resident, or is present in the United States. In addition, the TVPRA directs the State Department to identify and rank countries that fail to sufficiently combat trafficking and forced labor within their borders. Likewise, the Department of Labor is directed to publish a list of goods made by

---

[1] *Amici* refer to the Trafficking Victims Protection Act of 2000 along with its subsequent reauthorizations and amendments as the "TVPRA," except where specifically noted otherwise.

child labor and to identify the countries where those goods are produced.

Petitioners and their *amici* give scant attention to the TVPRA, focusing instead on the Torture Victims Protection Act. To the extent Petitioners and their *amici* mention the TVPRA, they do little justice to its scope. Nor do they acknowledge Congress' determination to provide victims a civil remedy against the chain of persons responsible for human trafficking, from the labor recruiter to those who profit from forced labor. The Ninth Circuit's decision to permit jurisdiction over the claims of the children from Mali who allege[2] they were trafficked into forced labor on Ivoirian cocoa plantations does not second-guess Congress' foreign policy choices because Congress has similarly extended jurisdiction over such civil claims in the TVPRA.

We do not, of course, opine on the merits of the allegations against the individual defendants or on the adequacy or strength of those allegations.

## ARGUMENT

Any consideration of congressional policy must begin with the TVPRA—the culmination of longstanding, bi-partisan congressional efforts to eradicate human trafficking and forced labor. The statute underscores Congress' determination that the

---

[2] The children allege they were trafficked between 1994 and 2001, before Congress enacted a TVPRA civil remedy. App. 332-36.

prohibition of these crimes is specific, universal, and obligatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 728, 731 (2004); *see also* 22 U.S.C. § 7101(b)(22)-(23) (finding human trafficking and slavery universally prohibited under international law). As Senator Leahy reiterated, "Nowhere on earth should it be acceptable to deceive, abuse, and force a person into a life of enslavement." 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008).

One of the chief sponsors of the legislation, Representative Chris Smith, describes the law as "numerous mutually reinforcing provisions" that have "helped transform the way governments and the private sector around the world respond to human trafficking." 149 Cong. Rec. H10284 (daily ed. Nov. 4, 2003); 151 Cong. Rec. H11574 (daily ed. Dec. 14, 2005 (statement of Rep. Smith); 154 Cong. Rec. H10902 (daily ed. Dec. 10, 2008) (statement of Rep. Smith).

## I.  Combating Trafficking Around the Globe is a Top Congressional Priority Pursued Through Broad and Multifaceted Efforts

Trafficking "is one of those issues where there has been no gap between us on either side of the aisle. It has united conservatives, moderates, and liberals in a grand fight to combat the scourge of modern-day slavery." *See Various Bills and Resolutions Before the H. Comm. on Foreign Aff.*, 110th Cong. 128 (2007) (statement of Rep. Smith); *see also* 153 Cong. Rec. H14115 (daily ed. Dec. 4, 2007) (statement of Rep.

Maloney) ("The fight against human trafficking has brought together Democrats and Republicans, liberals and conservatives, religious leaders and secular leaders."). The effort began in earnest in the 1990s, when a group of legislators began investigating a surge of global labor and sex trafficking that was then emerging as "the dark side of globalization." H. R. Rep. No. 101-430, pt. 1, at 33 (2007). Led in the Senate by Republican Sam Brownback and Democrat Paul Wellstone, and in the House of Representatives by Republican Chris Smith and Democrats Tom Lantos, Sam Gejdenson and Louise Slaughter, these legislators worked for years to gather information on the emerging crisis and learn how to best craft a response. As Senator Brownback explained, "The United States is the human rights leader. We are the ones, we have to stand up and make these things an issue." *International Trafficking in Women and Children: Hearing Before the Subcomm. On Near E. & S. Asian Aff. of the S. Comm. on Foreign Rel.*, 106th Cong. 56 (2000) [hereinafter, *Hr'g on Int'l Trafficking*] (statement of Sen. Brownback).

## A. Congress spent years studying and developing a response to the global scourge of human trafficking.

Early on, legislators recognized the magnitude of the problem before them. They recognized the need for drastic action and American leadership. In the first Senate hearing on the matter, Senator Brownback explained that he was inspired to work on

antitrafficking legislation by his travels to India, Pakistan, and Nepal, where he met with victims of human trafficking and learned about the elaborate trafficking networks in Burma, Thailand, Nepal, India, and the Middle East, describing his visit with child trafficking survivors in Nepal as "one of the most horrible things [he had] seen anywhere in the world." *Hr'g on Int'l Trafficking* at 2-3 (statement of Sen. Brownback). At that same hearing, Senator Brownback expressed his hope that addressing the global trafficking problem would be one of the Clinton Administration's "top total legislative priorities." *Id.* at 83. Senator Wellstone reiterated that trafficking, in women and children in particular, had grown over the past decade and was "one of the darkest aspects of globalization of the world economy." *Id.* at 3 (statement of Sen. Wellstone).

Early congressional hearings addressed trafficking's global, diverse, and complex nature. Representatives of the State Department told the Senate Foreign Relations Committee of their efforts to negotiate an international protocol on human trafficking: "Because trafficking is a global problem, the nations of the world are linked as countries of origin, transit, and destination and inevitably will succeed or fail in combating it together." *Id.* at 14 (statement of Hon. Frank Loy, Undersec'y of State for Glob. Aff., Dep't of State).

Although Congress' interest initially focused on sex trafficking, legislators soon began to appreciate

the similar breadth and horror of international labor trafficking. *See* 22 U.S.C. § 7101(b)(3) ("Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide."). For example, Undersecretary Loy explained that the origins of trafficking "are economic," describing girls lured from villages and forced into domestic servitude or carpet weaving and that "the suffering of boys was evident from their mangled bodies, their growth stunted, spines bent almost in half from the oppressive weights they were forced to carry in the construction industry until they were rescued." *Hr'g on Int'l Trafficking* at 10-11. Loy advocated providing a civil remedy: "[t]o expand the possibility of redress, trafficked victims should be able to bring private civil lawsuits against traffickers." *Id*. at 15. The Committee also heard from the Justice Department, whose representative, William Yeomans, emphasized the diverse forms of coercion that constitute trafficking. The Justice Department advocated reaching individuals trafficked into domestic servitude, migrant labor or sweatshop labor, as well as prostitution and emphasized that Congress "must create the tools to prosecute those who knowingly profit from the forced labor of persons held in unlawfully exploited labor conditions." *Id*. at 78 (statement of William Yeomans, Chief of Staff, Civil Rights Division, Dep't of Justice). Through the TVPRA, Congress acted to address all of these issues.

Congress held many hearings on how to combat the global scope of human trafficking. *See, e.g.*, *The Ongoing Tragedy of International Slavery and Human Trafficking: An Overview: Hearing Before the Subcomm. on Human Rights & Wellness of the H. Comm. on Gov't Reform*, 108th Cong. 2 (2003) [hereinafter *Hr'g on the Ongoing Tragedy*] (Statement of Rep. Dan Burton) ("Sadly, human slavery and trafficking are booming businesses in the 21st century. According to figures released by the U.S. Department of State, it is estimated that human slaves contribute over $13 billion every year to the global economy . . . ."); *id.* at 16 (statement of John R. Miller, Dir. of the Office to Monitor and Combat Trafficking in Persons, Dep't of State) ("Thailand, in a shelter, I meet a teenage girl, Lured. She was taken from a Laotian village, promised a job, a better life; taken to Bangkok, put in an embroidery factory, sold, forced to work 12 to 14 hours a day. It was terrible conditions, no wages at all."); *Trafficking in Persons: The Fed. Gov't's Approach to Eradicate this Worldwide Problem: Hearing Before the Subcomm. On Human Rights and Wellness of the H. Comm. on Gov't Reform*, 108th Cong. 1-2 (2004) (statement of Rep. Burton) ("The subcommittee is convening today to once again examine the atrocious practices of human trafficking and slavery around the world and to discuss how the United States is attempting to combat these illicit practices both domestically and on an international basis."); *International Trafficking in Persons: Taking Action to Eliminate Modern Day Slavery: Hearing*

*Before the H. Comm. on Foreign Aff.*, 110th Cong. 1 (2007) [hereinafter, *Hr'g on Taking Action*] (statement of Rep. Lantos) (discussing children trafficked into Nigeria to work on plantations); *id.* at 53 (statement of Rep. Smith) (lamenting lagging prosecutions for labor trafficking); *id.* at 62 (statement of Rep. Jackson Lee) (discussing 12.3 million annual labor-trafficking victims[3] and highlighting agriculture industry as a source of particular concern).

As Congress' understanding of the problem evolved, concern arose about forced labor in the supply chain for goods sold in the United States. In a 2007 hearing, for example, Monsignor Franklyn Casale told the House Committee on Foreign Affairs about how forced labor in the Brazilian charcoal industry contributes to American steel production and how garments sold in the United States are made by workers held in slave-like conditions in Jordan. *Hr'g on Taking Action* at 38 (statement of Rev. Msgr. Franklyn Casale, President, St. Thomas Univ.). Another witness at that hearing reported on Kenyan children "forced to work on tea plantations that export products to the United States" and Burmese

---

[3] More recent estimates are even more shocking. In 2016, the International Labor Organization estimated 40.3 million people (approximately the population of Ukraine) were trapped in modern-day slavery, with 24.9 million of them in forced labor. *See* Int'l Labor Org., *Forced labour, modern slavery and human trafficking*, https://www.ilo.org/global/topics/forced-labour/lang--en/index.htm (last visited Sept. 25, 2020).

immigrants forced to work in a Thai plant processing shrimp for export to the United States. *Id.* at 12 (statement of Barbara Shailor, Dir., Int'l Dep't, AFL-CIO). As Monsignor Casale pointedly warned the Committee, "Without realizing it, Americans consume products that are tainted with slavery." *Id.* at 38; *see also, e.g.*, *Legal Options to Stop Human Trafficking: Hearing Before the Subcomm. on Human Rights & the Law of the S. Comm. on the Judiciary*, 110th Cong. 13 (2007) [hereinafter, *Hr'g on Legal Options*] (statement of Holly J. Burkhalter, V.P. for Gov't Rel., Int'l Justice Mission) (testifying that United States Trade Representative had not been effective at preventing importation of goods made from forced labor).

Indeed, Congress heard specifically about the problem of slavery at cocoa plantations:

> [T]he impacts of modernization and globalization on the economies of the developing world, has generated a bumper crop of people vulnerable to enslavement . . . . a host of slave-made raw materials and products flow into America.
>
> A few years ago, we asked a slave newly freed on a cocoa farm in West Africa if he knew what happened to the cocoa he harvested. "No," he said. Had he ever tasted chocolate? Again, he said, "No."

> So we asked him, what would you say to those millions of people who eat the chocolate made from the cocoa you have grown in slavery? "Tell them," he said, "when they eat chocolate, they are eating my flesh."

*Hr'g on the Ongoing Tragedy at* 108-109 (2003) (statement of Kevin Bales, President, Free the Slaves).

Through these hearings and its early experience with antitrafficking legislation, Congress came to learn certain important lessons about the nature of human trafficking, forced labor, and other forms of modern slavery, and the strategies needed to combat them.

*First*, Congress learned trafficking is a transnational issue, which requires global solutions. *See* 22 U.S.C. § 7101(b)(24) ("Trafficking in persons is a transnational crime with national implications. . . . The United States must work bilaterally and multilaterally to abolish the trafficking industry by taking steps to promote cooperation among countries linked together by international trafficking routes."); *Hr'g on Int'l Trafficking* at 17 (statement of Theresa Loar, Dir., President's Interagency Council on Women, Dep't of State) (explaining that trafficking has increased due to increase of cross-border trade); 146 Cong. Rec. H2682 (daily ed. May 9, 2000) (statement of Rep. Gilman) ("[M]illions of people, primarily women and children, are trafficked every

year across the international borders."); 146 Cong. Rec. S10217 (daily ed. Oct. 11, 2000) (statement of Sen. Hutchinson) ("Traffickers use international borders to trap their victims in a foreign land without passports, without the ability to communicate in the local language, and without hope."). To this end, while Congress of course is especially concerned with trafficking in the United States and trafficking abroad perpetrated by Americans, its focus has been global. *See, e.g.*, *Hr'g on Int'l Trafficking* at 88-89 (hearing testimony from victim who was trafficked from Russia to Germany); *id.* at 89-90 (hearing testimony from victim who was trafficked from Russia to Israel); *Hr'g on Taking Action* at 5-7 (statement of Rep. Smith) (discussing the plight of trafficking victims in Nigeria, Italy, Romania, the Philippines, and Peru); *id.* at 55 (statement of Rep. Watson) ("The trafficking and exploitation of women and girls occur in both wealthy and poor countries. It is a serious problem in Dubai. It is as serious as it is a problem in Cambodia . . . .").[4]

---

[4] International agreements have long recognized the transnational character of trafficking and the slave trade. *See, e.g.*, Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, ("Palermo Protocol") preamble, *opened for signature* Nov. 15, 2000, 2237 U.N.T.S. 319 ("Declaring that effective action to prevent and combat trafficking in persons, especially women and children, requires a comprehensive international approach . . . ."); European Parliament Resolution on Trafficking in Human Beings, art. 1, 1996 O.J. (C 32) 88, 90 (EC) (defining trafficking in human beings as when someone "encourages a citizen from a third

*Second*, addressing the global trafficking problem requires strong American leadership. *See, e.g.*, *Global Trends in Trafficking and the "Trafficking in Persons Report": Hearing Before the Subcomm. on Int'l Terrorism, Nonproliferation & Human Rights of the H. Comm on Int'l Rel.,* 108th Cong. 4 (2003) [hereinafter, *Hr'g on Global Trends*] (statement of Hon. John R. Miller) (describing various foreign antitrafficking initiatives as evidence of "what can happen when the United States takes the lead"); 151 Cong. Rec. S14417 (daily ed. Dec. 21, 2005) (statement of Sen. Leahy) (discussing leading role of United States); 153 Cong. Rec. H14113 (daily ed. Dec. 4, 2007) (statement of Rep. Jackson Lee) (noting United States "leadership role in bringing about this supremely moral objective" "for Republicans and Democrats to work together to get something big and important done and to save lives"); *id*. at H14121 (statement of Rep. Pearce) (declaring antitrafficking legislation will "help America shine our light around the world"); *id*. at H14121 (statement of Rep. Sanchez) ("It is critical that the United States share its resources to combat trafficking with the rest of the world. All of the

---

country to enter or stay in another country in order to exploit that person by using deceit or any other form of coercion"); Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, art. 3, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3 (conveying slaves "from one country to another").

members of our world community must work together to fight human trafficking.").

When Congress began its fight against global trafficking, many foreign governments proved unable or unwilling—at least without support and encouragement—to combat trafficking within and across their borders. 22 U.S.C. § 7101(b)(16) (finding "[i]n some countries, enforcement against traffickers is also hindered by official indifference, by corruption, and sometimes even by official participation in trafficking."); *Hr'g on Taking Action* at 16 (statement of Sharon Cohn, Senior V.P. of Justice Operations, Int'l Justice Mission) (explaining that Cambodian authorities lack the capacity to combat trafficking, despite good intentions). Even certain close American allies and developed countries struggled with serious trafficking problems. *Hr'g on Global Trends* at 9 (statement of Hon. John R. Miller) (discussing "government complicity" with trafficking in Greece); *id.* at 13 (discussing how Israel "worked overtime" to improve its antitrafficking measures in response to American pressure). But as Congress also recognized, strong American leadership requires the United States to establish its moral authority on the matter. *Hr'g on Taking Action* at 3 (statement of Rep. Lantos) ("We cannot restore our moral leadership in the world . . . if we are not willing to deal frankly with friendly countries [on trafficking]."); *Hr'g on Global Trends* at 13 (statement of Rep. Smith) ("I think it is worth noting that this Administration had the courage to put

Israel, South Korea, Saudi Arabia on the list" of countries failing to meet minimum standards in the Trafficking in Persons report).

*Third*, trafficking and forced labor are highly lucrative, inherently economic crimes, that put ethical businesses and American workers at a disadvantage. *See* 146 Cong. Rec. S10167 (daily ed. Oct. 11, 2000) (statement of Sen. Wellstone) ("[P]rofit in the trade can be staggering."); *The Global Fight to End Modern Slavery: Hearing Before the S. Comm. on Foreign Rel.*, 115th Cong. 3 (2018) [hereinafter, *Hr'g on Fight to End Modern Slavery*] (statement of Sen. Menendez, Member, S. Comm. on Foreign Rel.) ("It is estimated that forced labor alone generates over $150 billion in profits annually . . . ."). Thus, Congress discovered that effective antitrafficking efforts require a heavy emphasis on reducing the profitability of forced labor. 146 Cong. Rec. S10167 (daily ed. Oct. 11, 2000) (statement of Sen. Wellstone) ("Traffickers have also taken advantage of the demand in our country and others for cheap, unprotected labor."); 153 Cong. Rec. H14119 (daily ed. Dec. 4, 2007) (statement of Rep. Smith) ("Too much demand, enabled by crass indifference, unbridled hedonism and misogynistic attitudes has turned people, especially women, into objects, only valued for their utility in the brothel or in the sweatshop.").

*Fourth*, it is not enough to target the traffickers themselves. Effective antitrafficking policy requires disincentives directed toward those who would benefit

from trafficking—including corporate actors who knowingly profit from trafficking in their supply chains. As a Justice Department witness explained to Congress, it was important to enact appropriate tools so the law does not "provide a liability shield between the direct oppressor and the economic beneficiary of the slave labor." *Hr'g on Int'l Trafficking* at 78 (statement of Hon. William R. Yeomans). Likewise, Congress recognized how myriad actors besides the principal traffickers indirectly facilitate the victims' terror. *E.g.*, *Hr'g on Global Trends* at 76 (statement of Mohamed Y. Mattar, Co-Dir., The Protection Project, Johns Hopkins Univ.) (advising that effective antitrafficking enforcement requires going "after the travel agency, the employment agency, the adoption agency and so on").

*Fifth*, Congress came to understand that protecting victims requires monetary relief through restitution and civil damages. *Hr'g on Int'l Trafficking* at 15 (statement of Hon. Frank E. Loy) (recommending Congress create a private right of action for trafficking victims); *Hr'g on Legal Options* at 5 (Testimony of Grace Chung Becker, Deputy Assistant Att'y Gen., Civil Rights Div., Dep't of Justice) (discussing trafficking victim who planned to use restitution to go to college); *Out of the Shadows: The Global Fight Against Human Trafficking: Hearing Before the H. Comm. On Foreign Aff.*, 111th Cong. 73-75 (2010) (statement of Neha Misra, Senior Specialist, Migration & Human Trafficking, Solidarity

Center, AFL-CIO) ("Trafficking victims toil in factories that produce products that are exported to the United States. They harvest vegetables and process food that ends up on our dining room tables. . . . We need to ensure that victims of labor trafficking not only participate in criminal prosecutions, but are also given access to civil suits where they can get withheld or back wages.").

Members of Congress have retained these lessons and have sought to ensure the tools Congress created have been used vigorously to hold accountable those who enable and benefit from trafficking as well as to provide a remedy for its victims. *E.g.*, *Hr'g on Fight to End Modern Slavery* at 4 (statement of Sen. Menendez) ("We have to hold businesses accountable when forced labor is discovered in their supply chains. . . . We owe it to American workers and the victims still toiling in slavery to eradicate abusive labor practices and remove any incentives that encourage forced labor."); *Ending Modern Slavery: Hearing Before the S. Comm. on Foreign Rel.*, 114th Cong. 27 (2015) [hereinafter, *Hr'g on Ending Modern Slavery*] (statement of Sen. Cardin) (questioning the efficacy of voluntary corporate initiatives to combat supply-chain trafficking); 146 Cong. Rec. H9044 (daily ed. Oct. 6, 2000) (statement of Rep. Millender-McDonald) (throughout the world "slave-like conditions in jobs as domestic workers, factory workers, sex workers, nannies, waitresses, and service workers mire trafficked women and children

at the bottom, lock them into the most insecure occupations, and leave victims open to ongoing exploitation and isolation").

### B. Congress carried out its antitrafficking policy through the numerous mutually reinforcing provisions of the Trafficking Victims Protection Act of 2000 and its subsequent reauthorizations and amendments.

With these and other considerations in mind, Congress fulfilled its promise to take meaningful action through the historic, near-unanimous[5] Trafficking Victims Protection Act of 2000 and its subsequent reauthorizations and amendments (collectively, the "TVPRA"). In each reauthorization, Congress has chosen to expand the available remedies and the reach of the statute, not constrict them. The original statute marked the opening volley in a multifront assault on the scourge of global trafficking. *See* Victims of Trafficking and Violence Protection Act of 2000, Div. A., Pub. L. No. 106-386, 114 Stat. 1464. Among other accomplishments, the Act defined and expanded criminal penalties for human trafficking, forced labor, and other modern-slavery practices at

---

[5] The Trafficking Victims Protection Act of 2000 passed 95–0 in the Senate and 371–1 in the House. *See* H.R. 3244—106th Congress (1999-2000), Congress.gov, https://www.congress.gov/bill/106th-congress/house-bill/3244/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D (last visited Oct. 4, 2020).

the federal level. *Id.* § 112. It also established the United States' leadership role in the international fight against trafficking, relying in part on a carrot-and-stick approach. It established minimum standards for combating trafficking and provided assistance to foreign governments to enhance their capacities to combat trafficking. *Id.* §§ 108-09. But it also established a tiered system to rank countries' compliance with the minimum standards with the threat of sanctions against those that failed to make improvements. *Id.* § 110. The 2000 TVPRA also created programs to assist victims of trafficking, perhaps most notably the T-visa. *Id.* § 107. Congress did not include a private right of action in the 2000 TVPRA, although the House-passed bill included one. *See* Trafficking Victims Protection Act of 2000, H.R. 3244, 106th Cong. § 7(b)(4) (2000). The Conference Report emphasized that trafficking victims had access to "applicable State, local or other Federal laws in seeking compensatory or other damages and relief in any civil proceeding." H.R. Rep. No. 106-939, at 93 (2000) (Conf. Rep.).

In 2003, Congress reauthorized and amended the TVPRA. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108-193, 117 Stat. 2875. As Representative Smith explained, the amendments were intended to incorporate "lessons" Congress learned in the three years since the 2000 statute went into effect. 149 Cong. Rec. H10285 (daily ed. Nov. 4, 2003) (statement of Rep. Smith). Among

the amendments were stronger protections for victims, this time including through a new private civil action coterminous with the specific criminal prohibitions established by the TVPRA—including trafficking and forced labor—that provided for the recovery of damages and reasonable attorney fees. Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193 § 4(a)(4)(A). The 2003 amendments also took aim at American citizens who travel abroad to sexually exploit children. *Id.* § 3(a)(2).

Congress reauthorized the TVPRA again in 2006 and 2008. The 2008 reauthorizations also came with significant amendments. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044. Congress broadened the scope of criminal and civil liability for trafficking and forced labor to "[w]hoever knowingly benefits . . . from participation in a venture which has engaged in" forced labor. *Id.* §§ 222(b)(3); 221(2)(A).

In 2008, Congress also clarified that the TVPRA was intended to reach extraterritorial conduct. The new § 1596 specified that "[i]n addition to any domestic or extra-territorial jurisdiction otherwise provided by law," federal courts have jurisdiction to hear criminal and civil allegations of extra-territorial forced labor and other TVPRA violations committed by (1) U.S. nationals; (2) permanent resident aliens; or (3) anyone present in the United States. *Id.* § 223(a); *see also* 154 Cong. Rec. S4799-800 (daily ed. May 22, 2008) (statement of Sen. Biden) (on

introduction of TVPRA reauthorization by Senators Biden and Brownback: "we establish some powerful new legal tools, including increasing the jurisdiction of the courts" to include "any trafficking case . . . even if the conduct occurred in a different country").

Congress has continued to pursue these policies, reauthorizing the TVPRA again in 2013 and 2019. Members of Congress have inquired and received updates on how the tools Congress created to combat trafficking were being put to use. Congress has not been concerned that there are too many suits by victims. To the contrary, at one oversight hearing, Senator Richard Durbin asked why there were "so few civil lawsuits?" *Hr'g on Legal Options* at 18 (statement of Sen. Durbin); *see also Labor Trafficking in Troubled Economic Times: Protecting American Jobs and Migrant Human Rights: Hearing Before the Comm'n on Sec. & Cooperation in Eur.*, 112th Cong. 18 (2011) (statement of Ambassador Luis CdeBaca, Dir., Office to Monitor & Combat Trafficking in Persons, Dep't of State) (discussing liability under TVPRA for "those who profit from human trafficking" and noting "there's also civil liability under the trafficking act"); *Hr'g on Ending Modern Slavery* at 6 (statement of Gary Haugen, President, Int'l Justice Mission) ("The first half of the abolition agenda—outlawing the crime of slavery has been accomplished. The second half of the abolition agenda—making these laws meaningful to slavery's victims—has barely been attempted."). Congress is also well aware that corporations are

defendants in these suits. *Human Trafficking and Transnational Organized Crime: Assessing Trends and Combat Strategies: Hearing Before the Comm'n on Sec. & Cooperation in Eur.*, 112th Cong. 26 (2011) (statement Martina E. Vandenberg, Pro Bono Counsel, The Freedom Network USA) (reporting that "there are a number of companies that are now facing civil lawsuits" under the TVPRA).

### C. The TVPRA authorizes civil actions similar to the claims brought by the Malian children in this case.

The above history demonstrates that the Petitioners' warnings about Respondents' lawsuit interfering with Congressional prerogatives are misplaced. Recognizing that a United States court can entertain claims asserting aiding and abetting child slavery abroad does not interfere with Congress' global approach to combating the scourge of human trafficking and forced labor. As detailed above, Congress has recognized that these violations are transnational and that our efforts to protect trafficking victims must likewise extend well beyond the territorial United States. Petitioners and their *amici* warn of the embarrassment such liability might create for foreign countries. But as it is, Congress already mandates the State Department to identify, rank, and publish a list of countries that do not meet minimum antitrafficking requirements. *See* 22 U.S.C. § 7107(b). And Congress has been clear that competing foreign policy considerations should not

influence these determinations. *See Hr'g on Global Trends* at 13 (statement of Rep. Smith). Congress has consistently exercised its oversight authority to ensure that the State Department publishes rankings that are effective, accurate, and not swayed by diplomatic pressure, even when allies must be listed in the lowest category, Tier 3. *E.g. Enhancing the Global Fight to End Human Trafficking: Briefing and Hearing Before the H. Comm. on Int'l Rel.*, 109th Cong. 3, 33 (2006) (statement by Rep. Smith) (expressing concern that executive branch delay "sends the wrong message to these tier 3 countries as to the urgency with which this serious human rights violation needs to be addressed"); *id.* at 4-5 (statement of Rep. Ros-Lehtinen).

In fact, the State Department's TVPRA-mandated 2020 Trafficking in Persons Report lists Côte d'Ivoire in Tier 2 of trafficking responses, which Congress designated for countries that do not fully meet the TVPRA's minimum standards but are making efforts to do so. U.S. Dep't of State, Trafficking in Persons Report 55 (2020). The report's Côte d'Ivoire country narrative specifically discusses the issue of traffickers forcing West African children to work on Ivoirian cocoa plantations. *Id.* at 171. Mali, Respondents' origin country, is on the Tier 2 Watch List, meaning severe trafficking is very significant or there is insufficient evidence of increasing efforts to meet the minimum standards. The country narrative for Mali stated that, according to NGO reports, "Malian

children endure forced labor on cotton and cocoa farms in Cote d'Ivôire" and that the Malian government "maintained weak efforts to prevent trafficking." *Id.* at 336-37. Both countries were listed on Tier 2 in 2005, when Respondents filed these actions. U.S. Dep't of State, Trafficking in Persons Report 42 (2005). Similarly, the TVPRA directs the Department of Labor to maintain a list of goods believed to be created with forced or child labor and to identify the countries where those goods are produced. *See* 22 U.S.C. § 7112(b)(2)(C). The 2020 list includes Ivoirian cocoa, and it traces how cocoa harvested with West African child labor ends up in chocolate and other cocoa products sold in the United States. U.S. Dep't of Labor, 2020 List of Goods Produced by Child Labor or Forced Labor 21, 43. Thus, permitting the exercise of jurisdiction in this case would not communicate anything to the Ivoirian or Malian governments that the State Department and the Department of Labor— as authorized by the TVPRA—have not already communicated.

Likewise, the United States' efforts to promote antitrafficking and other human-rights values abroad are compromised if it does not protect its moral authority to speak on these issues. Shielding American corporations from liability for aiding and abetting trafficking abroad would undermine Congress' efforts to establish the United States' leadership on this critical issue. The United States would be powerless to tell countries like Côte d'Ivoire

and Mali to improve their antitrafficking efforts if the courts of this country declined jurisdiction over suits alleging that American persons had aided and abetted child trafficking and forced labor in those very countries. We are confident that an American court will provide a fair forum to test these allegations.

Moreover, recognizing aiding and abetting liability for child slavery claims under the ATS is entirely consistent with Congressional policy choices as expressed in the statutory text. The TVPRA expressly permits aiding and abetting liability. 18 U.S.C. § 2(a).

Thus, the concerns the Court has expressed about lower courts intruding upon Congress' policymaking authority are ameliorated here. *E.g.*, *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1399 (2018). Congressional policy already supports civil redress to victims of trafficking abroad and holding American corporations accountable for their complicity in global trafficking. Moreover, the transnational nature of human trafficking makes it even more necessary and appropriate for the United States to provide a forum for victims of trafficking by U.S. defendants. And "the danger of unwarranted judicial interference in the conduct of foreign policy," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013), is not present here.

## II. The TVPRA is the Proper Guidepost for Assessing Congressional Choices.

Petitioners argue the Torture Victims Protection Act is "the most logical ATS analogue" to provide guidance on Respondents' child trafficking and forced-labor claims. Opening Brief of Petitioner Nestle USA, Inc. 43; *see also Jesner*, 138 S. Ct. at 1403 ("[T]he Court looks to analogous statutes for guidance on the appropriate boundaries of judge-made causes of action."). But here the TVPRA is the most logical statutory guidepost for determining Congress' views on human trafficking and forced labor, not the TVPA, which covers the very different claims of torture and extrajudicial killing. *Cf. Jesner*, 138 S. Ct. at 1405 (plurality op.) (citing § 1595, TVPRA civil liability provision).

As the Fourth Circuit held, "[v]iewed as a whole, the TVP[R]A represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019).

*First*, the TVPRA creates a larger universe of defendants. The Court of Appeals recognized that under customary international law, those who aid and abet human trafficking and forced labor may be held liable along with the principal trafficker. App. 253. Principals and aiders and abettors are also liable under the TVPRA. *See* 18 U.S.C. § 2(a). But Congress

intended to cast a wide net and created venture liability, which extends to anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" prohibited conduct. 18 U.S.C. § 1595(a); *accord id.* § 1589(b); *id.* § 1593A. Courts have recognized that Congress intended a broad reading. *See Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019); *Ricchio v. McLean*, 853 F.3d 553, 556-57 (1st Cir. 2017) (Souter, J.).

Moreover, the TVPRA's venture liability is necessarily broader than aiding and abetting. Because federal law treats aiders and abettors as principals, 18 U.S.C. § 2, the TVPRA's venture liability provisions would have been superfluous if they did not create liability broader than aiding and abetting. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) (stating "one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (alteration and omission in original) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).

The legislative history further shows that Congress intended extensive liability for those who benefit from trafficking and forced labor. As originally enacted in 2000, the TVPRA established venture liability for child sex trafficking, but not for forced labor or trafficking of adults. *See* Victims of

Trafficking and Violence Protection Act of 2000 § 112(a)(2). The Conference Committee report explained this was a conscious omission because Congress at the time was wary that such a provision was too broad. H.R. Rep. No. 106-939, at 101-02 (2000) (Conf. Rep.). But informed by the lessons Congress learned during the early years of the TVPRA, Congress decided such broad liability was appropriate, so in the 2008 amendments, it established civil and criminal venture liability for trafficking and forced labor. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 §§ 221(2)(A), 222(b)(3).

*Second*, the TVPRA, including its private right of action, applies to extraterritorial conduct provided that a defendant is a U.S. national or permanent resident, or is present in the United States. *See Howard*, 917 F.3d at 243; *see also Jesner*, 138 S. Ct. at 1405 (plurality op.). In recognizing Respondents' ATS claim, the Court of Appeals applied *Kiobel*'s "touch and concern" test and held Respondents must show that Petitioners aided and abetted the overseas violations through domestic conduct. *See Doe v. Nestle, S.A.*, 906 F.3d 1120, 1126 (9th Cir. 2018), *as amended by* 929 F.3d 623 (9th Cir. 2019). By contrast, the TVPRA contains no such limitation. It expressly provides "the courts of the United States have extraterritorial jurisdiction" over all TVPRA violations, without any requirement that the offending conduct itself occur in the territorial United States when, as

noted above, a defendant is a U.S. national, permanent resident, or present in the United States. 18 U.S.C. § 1596(a).

*Third*, the TVPRA applies to both domestic and foreign corporations. The TVPRA expressly covers corporate actors. Sections 1589 and 1590 create liability for "[w]hoever" engages in forced labor or trafficking. The Dictionary Act, in turn, specifies "the words 'person' and 'whoever' include corporations." 1 U.S.C. § 1; *see also Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1276-77 (11th Cir. 2020) (noting that it is "clear and unambiguous" that "[t]he use of the general terms '[w]hoever' and 'person' evinces no intent on the part of Congress to restrict the application of the statute to particular actors" and expressly includes corporations (second alteration in original)). And as mentioned above, § 1596(a) gives federal courts extraterritorial jurisdiction over TVPRA defendants present in the United States, "irrespective of the nationality of the alleged offender." Nor is there anything in § 1595 that limits the private right of action to domestic corporations or to natural persons. To the contrary, § 1595 establishes civil liability coterminous with the TVPRA's criminal provisions. *See* § 1595(a) ("An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . ."); *Barrientos*, 951 F.3d at 1276 ("[T]he TVPA creates a cause of action—both criminal and civil—against '[w]hoever knowingly provides or obtains the labor or services of a person'

by various illegal coercive means." (second alteration in original) (quoting §§ 1589(a), 1595)); *Howard*, 917 F.3d at 243 ("[T]he text of § 1595 shows that it applies coextensively with its predicate offenses, omitting any qualifying or modifying language . . . .").[6]

In sum, there is nothing in the TVPRA that would preclude recognition of a civil action for aiding and abetting child slavery under the ATS. The TVPRA's broad civil liability provision is one of Congress' many chosen tools in its battle against the global scourge of human trafficking, which Congress has zealously sought to combat.

## CONCLUSION

United States courts are an appropriate forum to hear claims that United States citizens, whether individuals or corporations, have aided and abetted child slavery. Such conduct is no less horrendous and no less deserving of redress when the enslaved children are forced to labor outside our shores.

Respectfully submitted.

---

[6] Not surprisingly given the TVPRA's textual clarity on this matter, lower courts have routinely heard civil actions against corporate defendants under the TVPRA. Indeed, 66% of the lawsuits trafficking victims have filed under the TVPRA have named corporate or organizational defendants. *See* Alexander F. Levy, Federal Human Trafficking Civil Litigation: 15 Years of the Private Right of Action, Human Trafficking Legal Center 18 fig. 12 (2018).

MARTINA E. VANDENBERG
SARAH L. BESSELL
HUMAN TRAFFICKING LEGAL
CENTER
1030 15TH ST. NW #104B
WASHINGTON, DC 20005

NATASHA ARNPRIESTER
A. AZURE WHEELER
JAMES A. GOLDSTON
CECELIA C. CHANG
OPEN SOCIETY POLICY CENTER
1730 PENNSYLVANIA AVE NW
7TH FLOOR
WASHINGTON, D.C. 20006

AGNIESZKA M. FRYSZMAN
*Counsel of Record*
NICHOLAS J. JACQUES
COHEN MILSTEIN SELLERS &
TOLL LLP
1100 New York Ave. NW
Fifth Floor
Washington, DC 20005
TEL: (202) 408-4600
afryszman@cohenmilstein.com

*Counsel for Amici Curiae*

OCTOBER 21, 2020