No. 18-15081

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

SHOAIB AHMED, et al.

Plaintiffs-Appellees,

v.

CORECIVIC, INC.,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Middle District of Georgia

_____

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
## IN SUPPORT OF NEITHER PARTY

_____

EXHIBIT

2

JOSEPH H. HUNT
  *Assistant Attorney General*

CHARLES E. PEELER
  *United States Attorney*

H. THOMAS BYRON III
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

*Ahmed v. CoreCivic, Inc.*, No. 18-15081

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, counsel for the United States of

America certify that the following have an interest in the outcome of this appeal:

Acedo, Nicholas D.

ACS Corrections of Texas, LLC

Ahmed, Shoaib

APM Ltd

Avalon Corpus Christi Transitional Center, LLC

Avalon Correctional Services, Inc.

Avalon Transitional Center Dallas, LLC

Avalon Tulsa, LLC

Barrientos, Wilhen Hill

Bhatt, Priyanka

Burns Charest LLP

Burns, Warren T.

Byron III, H. Thomas

Carver Transitional Center, LLC

CCA Health Services LLC

CCA International LLC

CCA South Texas, LLC

*Ahmed v. CoreCivic, Inc.*, No. 18-15081

CCA UK Ltd.

Charest, Daniel H.

CoreCivic, Inc. ("CXW")

CoreCivic Government Solutions LLC

CoreCivic, LLC

CoreCivic of Kansas Holdings LLC

CoreCivic of Kansas LLC

CoreCivic of Tallahassee, LLC

CoreCivic of Tennessee LLC

CoreCivic TRS LLC

Correctional Alternatives, LLC

Correctional Mgmt., Inc.

Curry Law Firm

Curry, Stephen E.

EP Horizon Management LLC

Fort Worth Transitional Center, LLC

Free, R. Andrew

Green Level Realty, LLC

Hesman, Ashlee B.

Hinshelwood, Brad

Land, Honorable Clay D.

*Ahmed v. CoreCivic, Inc.*, No. 18-15081

Law Office of R. Andrew Free

Lee, Jacob B.

Lopez, Bryan

Love, Rachel

National Offender Mgmt. Systems, LLC

Nelson, Korey Arthur

Prison Realty Mgmt., LLC

Project South

Rivera, Laura G.

Rocky Mountain Offender Mgt Systems, LLC

Shahshahani, Azadeh N.

Southern Corrections System of Wyoming, LLC

Southern Poverty Law Center

SSA Baltimore Holdings LLC

SSA Baltimore LLC

Stewart, Meredith Blake

Struck, Daniel P.

Struck Love Bojanowski & Acedo, PLC

Technical & Bus Inst. of America LLC

Time to Change, Inc.

TransCor America LLC

*Ahmed v. CoreCivic, Inc.*, No. 18-15081

TransCor Puerto Rico Inc.

Turley Residential Center, LLC

United States of America

Velazquez-Galacia, Margarito

Werner, Daniel

Wright, Lydia Anne.

C-4 of 4

## TABLE OF CONTENTS

<u>**Page**</u>

INTEREST OF THE UNITED STATES ........................................................................1

STATEMENT OF THE ISSUE .................................................................................1

STATUTORY AND REGULATORY BACKGROUND ................................................1

SUMMARY OF ARGUMENT ..................................................................................5

ARGUMENT .......................................................................................................6

I.    The TVPA Applies to Federal Contractors, Including Those Operating
      Immigration Detention Facilities. ............................................................6

II.   An Immigration Detention Facility That Operates in Accordance with
      Federal Detention Standards Generally Will Not Violate the TVPA. .................8

CONCLUSION ................................................................................................ 14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF CITATIONS

**Cases:**                                                                **Page(s)**

*Bell v. Wolfish,*

   441 U.S. 520 (1979) ...........................................................................11

*Bijeol v. Nelson,*

   579 F.2d 423 (7th Cir. 1978)...........................................................13

*Danneskjold v. Hausrath,*

   82 F.3d 37 (2d Cir. 1996)...................................................................9

*Hause v. Vaught,*

   993 F.2d 1079 (4th Cir. 1993)..........................................................13

*Headley v. Church of Scientology Int'l,*

   687 F.3d 1173 (9th Cir. 2012)..........................................................12

*Pilgrim v. Luther,*

   571 F.3d 201 (2d Cir. 2009) ............................................................12

*Roman v. Tyco Simplex Grinnell,*

   732 F. App'x 813 (11th Cir. 2018) ..................................................10

*United States v. Calimlim,*

   538 F.3d 706 (7th Cir. 2008)..............................................................6

*Villarreal v. Woodham,*

   113 F.3d 202 (11th Cir. 1997)............................................................9

**Statutes:**

National Defense Authorization Act for Fiscal Year 2013,

Pub. L. No. 112-239, 126 Stat. 1632 ................................................................7

Trafficking Victims Protection Act:

    18 U.S.C. § 1589 ..........................................................................................1, 7

    18 U.S.C. § 1589(a) ................................................................................ 4, 5, 10

    18 U.S.C. § 1589(b) ..........................................................................................4

    18 U.S.C. § 1589(c)(2) ................................................................................ 5, 11

    18 U.S.C. § 1594(a) ..........................................................................................5

    18 U.S.C. § 1595 ...............................................................................................1

    18 U.S.C. § 1595(a) ..........................................................................................5

Trafficking Victims Protection Reauthorization Act of 2003,

    Pub. L. No. 108-193, 117 Stat. 2875 ..............................................................7

Trafficking Victims Protection Reauthorization Act of 2005,

    Pub. L. No. 109-164, 119 Stat. 3558 (2006) ...................................................7

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,

    Pub. L. No. 110-457, 122 Stat. 5044 ..............................................................7

8 U.S.C. § 1555(d) ................................................................................... 2, 5-6, 8

22 U.S.C. § 7101(b)(13) .............................................................................. 6, 6-7

**Other Authorities:**

ICE, *Performance-Based National Detention Standards 2011*,

    https://www.ice.gov/doclib/detention-standards/2011/

    pbnds2011r2016.pdf (last visited Apr. 1, 2019)...............................2, 3, 4, 9, 11, 12, 13

*Strengthening Protections Against Trafficking in Persons in Federal Contracts*,

    Exec. Order No. 13,627, 77 Fed. Reg. 60,029 (Sept. 25, 2012) .................................. 7-8

## INTEREST OF THE UNITED STATES

The United States criminally prosecutes violations of the Trafficking Victims Protection Act, and thus has significant interests in the proper interpretation of the scope of the statute. In addition, the United States oversees congressionally authorized voluntary work programs in immigration detention facilities nationwide, and has strong interests in ensuring that those programs are properly administered. The United States respectfully submits this amicus brief to express its views on the application of the forced labor provision of the Trafficking Victims Protection Act to voluntary work programs operated in private immigration detention facilities.

## STATEMENT OF THE ISSUE

Whether the forced labor provision of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, 1595, applies to work programs in federal immigration detention facilities operated by private contractors.

## STATUTORY AND REGULATORY BACKGROUND

**A.** U.S. Immigration and Customs Enforcement (ICE) detains certain aliens during the pendency of removal proceedings or for other reasons related to enforcement of the nation's immigration laws. Detained aliens are held in facilities around the country operated by a variety of providers, some of which are private contractors. All facilities in which detainees are held are subject to detention standards created by ICE. Stewart Detention Center, like many immigration detention facilities, is subject to the current version of ICE's Performance-Based

National Detention Standards (PBNDS).[1]  The PBNDS are designed to ensure a safe and secure detention environment that meets detainees' basic needs and is consistent with applicable legal requirements.

Since 1950, Congress has authorized ICE and its predecessor agencies to pay detained aliens "for work performed" "while held in custody under the immigration laws."  8 U.S.C. § 1555(d).  ICE currently implements this statutory authorization through the Voluntary Work Program.  As the PBNDS explain, the Program is designed to mitigate "[t]he negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents."  PBNDS § 5.8(II)(4).

Under the PBNDS, participation in the Voluntary Work Program is entirely voluntary; detainees "shall not be required to work."  PBNDS § 5.8(II)(2).  The PBNDS regulates selection of detainees for the Program, the hours of work, the number of work assignments a detainee can perform, and the conditions under which that work occurs.  *Id.* § 5.8(V)(D)-(I), (N).  The PBNDS provides that detainees may

---

[1] All citations to the PBNDS in this brief are to the current version of those standards, promulgated in 2011 and revised in 2016.  Some immigration detention facilities are subject to older versions of ICE standards, including the 2000 National Detention Standards and the 2008 edition of the PBNDS.  Those standards have, at times, applied to Stewart, and plaintiffs' complaint here seeks to certify a class of individuals who have performed labor at Stewart in the past ten years.  *See* App. Tab 1, ¶ 94(a).  However, no class has been certified, and the named plaintiffs have all been at Stewart since the facility became subject to the current version of the PBNDS. *See id.* ¶¶ 9-11.  Plaintiffs also refer to the current PBNDS in their complaint.  *See id.* ¶ 28.  This brief thus addresses and refers to only the current version of the PBNDS. The full text of the current PBNDS is available at https://www.ice.gov/doclib/ detention-standards/2011/pbnds2011r2016.pdf (last visited April 1, 2019).

2

be removed from the Program for "unsatisfactory performance," "disruptive behavior," or as a "sanction . . . for an infraction of a facility rule, regulation, or policy," among other reasons. *Id.* § 5.8(V)(L). The PBNDS also specify that a "detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission." *Id.* § 5.8(V)(M). A "detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so." *Id.* The result of unsatisfactory performance in completing assigned Program tasks is removal from the Program. *See id.* § 5.8(V)(L).

Under the PBNDS, detention centers may require immigration detainees to complete "personal housekeeping" to "maintain their immediate living areas in a neat and orderly manner" through tasks such as "making their bunk beds daily," "stacking loose papers," and "keeping the floor free of debris." PBNDS § 5.8(V)(C). This requirement applies to "all detainees," regardless of their participation in the Voluntary Work Program. *Id.*

The PBNDS also set out the contours of the disciplinary system for detainees, setting forth a range of offenses of varying degrees of severity and a list of permissible punishments for each category of offense. *See generally* PBNDS § 3.1. The PBNDS's disciplinary provisions define "[e]ncouraging others to participate in a work stoppage or to refuse to work" as a "high" offense punishable by initiation of criminal proceedings, disciplinary transfer, disciplinary segregation of up to 30 days, loss of privileges, a change in housing, or loss of a job, among other sanctions. *Id.*

3

§ 3.1.A(II)(A), (B).  The PBNDS also contains specific offenses related to the personal housekeeping requirement.  "[F]ailing to keep self and living area in accordance with posted standards" is a "low moderate" offense punishable by a change in housing, loss of commissary privileges, and loss of job, among other sanctions.  *Id.* § 3.1.A(IV)(A), (B).  "Refusing to clean assigned living area" is designated a "high moderate" offense, which also carries as a potential penalty up to 72 hours of disciplinary segregation, among other sanctions.  *Id.* § 3.1.A(III)(A), (B). There is no offense prescribed in the PBNDS for a detainee who, after signing up for the Voluntary Work Program, refuses to complete his assigned tasks.

    **B.**  The Trafficking Victims Protection Act (TVPA) was originally enacted in 2000, and, as relevant here, its forced labor provision provides criminal liability for:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).  The statute also criminalizes "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture" that provides or

4

obtains labor by the proscribed means. *Id.* § 1589(b). The TVPA also contains a separate attempt provision. *Id.* § 1594(a).

The statute defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

The TVPA also provides a civil cause of action for any "victim" of a violation of its provisions, including § 1589. 18 U.S.C. § 1595(a).

## SUMMARY OF ARGUMENT

The TVPA imposes criminal liability on "[w]hoever" obtains the labor or services of another person through a variety of prohibited means. 18 U.S.C. § 1589(a). As the district court correctly recognized, there is no basis for reading this broad provision to categorically exclude from its coverage facilities operated by private entities that contract or subcontract to provide immigration detention services to the federal government, particularly in light of Congress's repeated efforts to ensure that federal contractors do not provide goods and services to the government through reliance on forced labor.

The TVPA, however, does not bar a facility from operating the work program that Congress has authorized for aliens held in immigration detention. *See* 8 U.S.C.

5

§ 1555(d). To the contrary, when operated in compliance with the PBNDS, the Voluntary Work Program is indeed voluntary, and does not result in obtaining the labor or services of a person through any of the proscribed means under the TVPA. Nor does the TVPA bar an immigration detention facility from taking basic steps to maintain order in the facility in accord with the PBNDS, including by forestalling work stoppages and requiring all detainees to complete basic personal housekeeping tasks. These basic steps are part and parcel of the operation of any federal immigration detention facility, and there is no indication that Congress intended to undermine a facility's basic functioning through the TVPA. Rather, for any forced labor claim, a court must carefully scrutinize the allegations in the complaint to determine whether the plaintiffs plausibly allege conduct that rises to the level of one of the means of obtaining labor or services proscribed in the statute.

## ARGUMENT

### I.    The TVPA Applies to Federal Contractors, Including Those Operating Immigration Detention Facilities.

The TVPA was enacted to create broad civil and criminal liability for anyone obtaining involuntary labor, covering a range of coercive "conduct that can have the same purpose and effect" as threats of physical harm. 22 U.S.C. § 7101(b)(13); *see United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008) (describing background of TVPA's enactment). In accord with Congress's goal to cover "cases in which persons are held in a condition of servitude through nonviolent coercion," 22 U.S.C.

6

§ 7101(b)(13), the TVPA broadly prohibits "[w]hoever" from "obtain[ing] the labor or services of a person" by specified prohibited means, 18 U.S.C. § 1589.

The text contains no exclusion for companies or individuals engaged in the provision of goods or services to the United States. Indeed, in reauthorizing the TVPA and in other statutes, Congress has repeatedly emphasized that it seeks to stamp out any use of forced labor by federal contractors. *See, e.g.*, Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 3(b), 117 Stat. 2875, 2876-77 (allowing termination of agreements with federal contractors who engage in forced labor practices); Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, § 2(10), 119 Stat. 3558, 3559 (2006) (recognizing the role of government employees and contractors in exploitive practices); *id.* § 103 (creating extraterritorial criminal jurisdiction over contractors who commit trafficking offenses, including violations of 18 U.S.C. § 1589, while performing work for the United States); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 231, 122 Stat. 5044, 5073 (requiring Attorney General to include in an annual trafficking report the federal government's efforts to enforce laws that prohibit federal employees or contractors from engaging in practices such as forced labor); National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, §§ 1701-1708, 126 Stat. 1632, 2092-98 (addressing trafficking in government contracting, including forced labor). The Executive Branch has likewise made combating forced labor by government contractors a priority. *See Strengthening*

7

*Protections Against Trafficking in Persons in Federal Contracts*, Exec. Order No. 13,627, 77 Fed. Reg. 60,029 (Sept. 25, 2012).

Given the text and purposes of the TVPA, and Congress's repeated emphasis on combating forced labor procured by federal contractors, the district court correctly concluded that the TVPA does not contain an implicit exception for private providers of immigration detention services. Plaintiffs thus are not categorically barred from bringing a TVPA suit based on the conduct of a contractor or subcontractor that provides immigration detention services to the United States.

## II. An Immigration Detention Facility That Operates in Accordance with Federal Detention Standards Generally Will Not Violate the TVPA.

Although a privately run immigration detention facility is not exempt from the TVPA merely by virtue of being a federal contractor or subcontractor, the TVPA does not prohibit labor in immigration detention—including both the Voluntary Work Program and some detainee tasks that a facility may require consistent with the PBNDS. Congress has long authorized paid labor by immigration detainees, *see* 8 U.S.C. § 1555(d), and compliance with the requirements of the PBNDS ensures that work performed through the Voluntary Work Program is indeed voluntary and not the result of punishment or coercion. Similarly, in the interest of maintaining order in the facility, the PBNDS authorize punishments for detainees who refuse to complete basic personal housekeeping tasks or organize strikes or work stoppages in the facility. These basic disciplinary measures, on their own, likewise do not give rise to TVPA

8

liability, as there is no basis for concluding that Congress intended to prevent detention facilities from taking basic steps to ensure order and discipline.

**A.**  Voluntary labor by detainees, as authorized by Congress, serves to promote order in a facility by reducing idleness and improving detainee morale, as well as minimizing disciplinary issues.  *See Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) (noting that "work occupies prisoners' time that might otherwise be filled by mischief" (quoting *Danneskjold v. Hausrath*, 82 F.3d 37, 43 (2d Cir. 1996)).  Paid labor through the Voluntary Work Program also provides detainees, some of whom may be indigent, with money for commissary goods and phone calls.

Labor performed in the Voluntary Work Program is by definition voluntary, so long as the Program is administered in accordance with the PBNDS.  The PBNDS specify that "[d]etainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping."  PBNDS § 5.8(II)(2).  The PBNDS likewise provide a host of protections for detainees who choose to participate, including limitations on the permissible hours of work and compliance with work safety laws and regulations.  In addition, a detainee who fails to satisfactorily perform his or her duties in the Program is not punished; the only sanction for such a detainee is removal from the Program.  *See id.* § 5.8(V)(L).

Participation in a properly administered Voluntary Work Program therefore does not result in forced labor under the statute.  Under the TVPA, the "labor or services of a person" must be procured through specified unlawful "means," none of

9

which would apply to the Program when operated in a manner consistent with the PBNDS. 18 U.S.C. § 1589(a). Nor would it be sufficient to demonstrate statutorily prohibited forced labor by merely asserting that conditions for detainees who participate in the Program are better than conditions for those who do not participate. It is of course true that an individual who works is generally materially better off than someone who does not, and that disparity alone cannot give rise to liability. *Cf. Roman v. Tyco Simplex Grinnell*, 732 F. App'x 813, 817 (11th Cir. 2018) (per curiam) (employer's threat to terminate plaintiff insufficient for § 1589 liability where plaintiff did "not explain how the potential financial harm he might have suffered would be any more serious than the financial harm any employee encounters when faced with termination"). And an employer or other party may surely encourage an employee to work by providing other benefits without rising to the level of coercion prohibited by the statute.

Applying these principles to the context of immigration detention, a court evaluating a forced labor claim under the TVPA must examine whether the consequences of not working rise to the level of "serious harm" or some other forbidden means of obtaining labor enumerated in the statute. 18 U.S.C. § 1589(a). Thus, a generalized assertion that housing and other conditions for detainees who participate in the Program are better than conditions for detainees who do not would not state a claim absent plausible allegations showing that living conditions for those who do not participate in the Program qualify as "serious harm" as a prohibited

10

means of obtaining labor or services, or qualify as one of the other prohibited means, under the statute.  And what constitutes "serious harm" in the context of immigration detention must respect the range of conditions of confinement and treatment that are permissible in such facilities under the PBNDS.  *See id.* § 1589(c)(2) (defining "serious harm" as harm that is "sufficiently serious, *under all the surrounding circumstances*" (emphasis added)).  Such harm would not be found where the facility is in substantial compliance with the relevant provisions of the PBNDS, at least absent exceptional circumstances.[2]

**B.**  Immigration detention, like any other detention setting, requires that a facility be able to maintain order and discipline among the detainee population.  *See generally Bell v. Wolfish*, 441 U.S. 520, 540 (1979) (observing that there are "legitimate interests" in "tak[ing] steps to maintain security and order" in a detention facility).  The PBNDS reflect this basic reality.  They provide, for example, that detainees may be required to perform basic personal housekeeping tasks.  *See* PBNDS § 5.8(V)(C).  They also specify that detainees may be subject to punishment for efforts to organize a strike or work stoppage in the facility.  *See id.* §§ 3.1.A(II), 5.8(V)(M).  In enacting the TVPA, Congress did not undermine the ability of detention facilities to take basic measures designed to ensure order.

---

[2] As the district court has not had the opportunity to assess whether plaintiffs' allegations regarding living conditions rise to the level of "serious harm" or another prohibited means under the statute, the United States takes no position on whether the allegations in the complaint state a claim on this basis.

11

At times, plaintiffs' complaint appears to allege that the existence of punishments for detainees who organize a work stoppage is enough to give rise to liability under the TVPA.  For example, one plaintiff asserts that he was twice threatened with solitary confinement when facility staff "thought he and other kitchen workers were organizing a work stoppage."  App. Tab 1, ¶ 72; *see id.* ¶ 89 (similar). But in light of the serious threat to facility order that a strike or work stoppage entails, the PBNDS specifically classify "[e]ncouraging others to participate in a work stoppage" as a disciplinary infraction subject to punishment by "[d]isciplinary segregation [of] up to 30 days."  PBNDS § 3.1.A(II)(A), (B); *see Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (noting that "[w]ork stoppages are deliberate disruptions of the regular order of [a] prison" and "are plainly inconsistent with legitimate objectives of prison organization").  Indeed, this prohibition applies to all detainees, regardless of their participation in the Voluntary Work Program.  The mere fact that a facility has taken steps to preserve order in compliance with the PBNDS, without allegations of more, should not by itself give rise to TVPA liability.  *See generally Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (noting that "legitimate warning[s]" of "legitimate consequence[s]" are not improper means under the TVPA, as opposed to "improper threats or coercion").  To conclude otherwise would make discipline related to order and security in the facility difficult to enforce where the misconduct relates to a potential work stoppage.

Indeed, an approach to TVPA liability that disregards the disciplinary needs of detention facilities threatens to undermine even the most basic personal housekeeping requirements. The PBNDS specify that detainees may be required to perform "personal housekeeping" such as "making their bunk beds daily" and "keeping the floor free of debris and dividers free of clutter." PBNDS § 5.8(V)(C). These basic responsibilities "must be routinely observed in any multiple living unit" for the "health and safety" of detainees, *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) (per curiam), and courts have long recognized that such requirements are permissible and non-punitive in custodial settings, *see, e.g.*, *Hause v. Vaught*, 993 F.2d 1079, 1085-86 (4th Cir. 1993) (rejecting pretrial detainee's claim that housekeeping requirements amounted to punishment). An overly sweeping theory of liability under the TVPA could apply equally to those requirements; after all, a detainee who refuses to clean his assigned living area is subject to punishments including up to 72 hours of disciplinary segregation, loss of commissary privileges, or loss of job. *See* PBNDS § 3.1.A(III)(A), (B); *Bijeol*, 579 F.2d at 423-25 (rejecting pretrial detainee's claim that punishment of "segregation" for refusal to complete housekeeping tasks violated his constitutional rights, noting that "pretrial detention centers must maintain some stability and discipline").

Nothing supports reading the TVPA to preclude such basic disciplinary measures for all detainees. A facility may take legitimate steps consistent with the PBNDS to maintain order in the facility, and those steps do not give rise to liability

13

under the TVPA, even if they relate to labor performed by detainees. In this context, too, courts should carefully scrutinize the allegations in a complaint to determine whether a plaintiff plausibly alleges conduct inconsistent with the PBNDS as one of the means of obtaining labor or services proscribed in the statute.

## CONCLUSION

For the foregoing reasons, the district court's order should be affirmed to allow the district court to conduct further proceedings under the standards set forth here.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

CHARLES E. PEELER
  *United States Attorney*

H. THOMAS BYRON III

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

April 2019

14

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,432 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Brad Hinshelwood*
Brad Hinshelwood