UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALEKSEY RUDERMAN, ARTURO SALDIVAR
and CHRIS POCKNELL,

        Plaintiffs,

v.

        Case No. 23-cv-1336-bhl

KENOSHA COUNTY, et al,

        Defendants.

## ORDER GRANTING MOTION TO DISMISS

      Plaintiffs Aleksey Ruderman, Arturo Saldivar, and Chris Pocknell are non-citizens of the United States who were civilly detained by United States Immigration and Customs Enforcement while awaiting their potential removal from the country. The federal government placed all three at the Kenosha County Jail pursuant to an Intergovernmental Service Agreement with Kenosha County. In this lawsuit, Plaintiffs do ***not*** challenge the legality of their detention. Instead, they complain that, while lawfully detained, they, along with all other detainees and jail inmates, were required to clean up after themselves. More specifically, jail policy required them periodically to perform housekeeping chores in the common areas without compensation and with potential discipline if they refused. Kenosha's jail policy is hardly unique; prisons and jails have long required inmates to perform basic cleaning tasks without pay and subject to discipline if they refuse to pitch in. Plaintiffs nevertheless seek to take advantage of the federal Forced Labor statute, 18 U.S.C. § 1589, to claim they are entitled to compensation as "victims" of "illegal human trafficking." They have sued Defendants Kenosha County, the Kenosha County Sheriff's Department,[1] (former) Kenosha County Sheriff David Beth, and supervisory Jail employees

---

[1] As Plaintiffs concede, (ECF No. 38 at 45 n.8), the Kenosha County Sheriff's Department is not an entity that can be sued. Under Federal Rule of Civil Procedure 17(b), defendants in a federal lawsuit must have the capacity to be sued; this is a question of state law. *See Webb v. Franklin Cnty. Jail*, Case No. 16-cv-1284-NJR, 2017 WL 914736, at *2 (S.D. Ill. Mar. 8, 2017). Under Wisconsin law, a county sheriff's department "is not a legal entity separable from the county government which it serves." *See Whiting v. Marathon Cnty. Sheriff's Dept.*, 382 F.3d 700, 704 (7th Cir. 2004).

Robert Hallisy, Larry Apker, Marc Levin, Justin Miller, and Bill Beth for violations of the Forced Labor statute, enacted as part of the Trafficking Victims Protection Act (TVPA). They seek monetary damages under the civil remedy provisions of the TVPA, 18 U.S.C. § 1595, on behalf of themselves and a class of similarly situated detainees.

Defendants have moved to dismiss the complaint. Defendants insist that the enforcement of jail rules requiring Plaintiffs, like all other inmates, to periodically clean common areas does not violate Section 1589. Because the Court concludes that the Forced Labor statute does not apply in the context of the conduct alleged in the complaint, it will grant Defendants' motion and dismiss the complaint.

## BACKGROUND ALLEGATIONS[2]

From August 2000 until at least 2020, Kenosha County contracted with the federal government to house civil immigration detainees for U.S. Immigration and Customs Enforcement. (ECF No. 1 ¶¶17, 30.) The Kenosha County Jail housed over 100 civil detainees at any given time, for which Kenosha County received payment of $70.00 per day per detainee. (*Id.* ¶¶18–19.) While housed at the jail, detainees were forced to clean the common areas of the facility, including showers, hallways, and recreational areas. (*Id.* ¶21.) Each day, corrections officers would select four to six detainees and order them to perform janitorial duties. (*Id.* ¶22.) Detainees were not compensated for this work. (*Id.* ¶29.) Plaintiffs are all former civil immigration detainees housed in the Kenosha County Jail who were required to perform janitorial work during their detentions. (*Id.* ¶2.)

Plaintiff Aleksey Ruderman was detained in the jail in or around 2020. (*Id.* ¶30.) Upon arrival, Ruderman was informed by a corrections officer that he would be subject to punishment if he refused cleaning duties. (*Id.* ¶¶31–32.) On February 12, 2020, Ruderman submitted a formal grievance to the Kenosha County Sheriff's Department, asserting that the jail's policy violated the TVPA. (*Id.* ¶33.) Ruderman's grievance was denied the same day. (*Id.* ¶34.) Following the grievance submittal, a jail officer warned Ruderman to not "rock the boat." (*Id.* ¶35.) Ruderman appealed the denial, but his appeal was similarly denied. (*Id.* ¶¶36–37.) About once every two weeks during his detention, Ruderman was forced to perform janitorial work, including sweeping, cleaning and disinfecting dining tables, and cleaning the showers, tables, phones, indoor recreation

---

[2] These facts are derived from Plaintiffs' class action complaint, (ECF No. 1), the allegations in which are presumed true when considering a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–56 (2007).

area, and multi-purpose room. (*Id.* ¶38.) Ruderman performed this work only because he faced the prospect of discipline if he refused. (*Id.* ¶39.)

Plaintiff Arturo Saldivar was detained in the jail for several months in or around 2016. (*Id.* ¶40.) Saldivar was forced to perform janitorial work two or three times per week during his detention, including cleaning the jail's outdoor recreation area, hallways, and gym. (*Id.* ¶41.) Saldivar witnessed other detainees being punished with solitary confinement when they refused orders to clean. (*Id.* ¶42.) Saldivar performed janitorial work only because he was faced with punishment if he failed to comply. (*Id.* ¶43.)

Plaintiff Chris Pocknell was detained in the jail from approximately 2014 to 2016. (*Id.* ¶44.) Pocknell was forced to perform janitorial work approximately twice a week during his detention, including cleaning the showers, dining tables, phones, indoor recreation area, and multi-purpose room, as well as sweeping the floors. (*Id.* ¶45.) Pocknell performed this work only because he was faced with potential punishment if he refused to comply. (*Id.* ¶46.) During a portion of his detention, Pocknell suffered from a knee injury and wore a prescribed knee brace. (*Id.* ¶47.) Because of his knee injury and otherwise poor health, Pocknell refused to perform janitorial labor on several occasions. (*Id.*) He was disciplined for refusing to clean in multiple ways. (*Id.*) On one occasion he was sent to solitary confinement. (*Id.*) On multiple others, he was locked in his cell for three days at a time and his commissary privileges were revoked. (*Id.*) Each time he was punished, Pocknell's phone privileges were also revoked. (*Id.*)

Defendant David Beth was, at all relevant times, Kenosha County Sheriff and responsible for setting policy at the jail. (*Id.* ¶11.) Defendants Robert Hallisy, Larry Apker, Marc Levin, Justin Miller, and Bill Beth oversaw the jail and enforced rules requiring Plaintiffs to perform janitorial work. (*Id.* ¶12.) The individual defendants are each sued in their individual capacities. (*Id.* ¶¶11–12.) Plaintiffs seeks to certify a class of all civil immigration detainees who were forced to perform uncompensated janitorial labor in Kenosha County Jail from October 10, 2013 onward. (*Id.* ¶50.)

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)). A complaint will survive if it "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ANALYSIS

Plaintiffs claim that Defendants violated the federal Forced Labor statute, 18 U.S.C. § 1589(a), by requiring Plaintiffs to perform periodic clean up tasks against a threat of potential discipline if they refused.[3] According to Plaintiffs, as civilly detained immigrants they were improperly forced to "perform janitorial labor" by cleaning the common areas of the jail, including dayrooms, showers, both indoor and outdoor recreation areas, hallways, and the gym. (ECF No. 1 ¶¶3, 21–23.) They contend that if they refused to perform these tasks, which are spelled out in the Kenosha Jail Handbook, they were potentially subject to various punishments, including the loss of privileges, being requiring to perform additional duties, and being held in detention. (*Id.* ¶¶24–25.) They insist this constitutes criminal Forced Labor in violation of 18 U.S.C. § 1589(a)(1), (a)(2), and (a)(4). (*Id.* ¶¶72–74.) Defendants argue that Plaintiffs' claim should be dismissed because the conduct alleged in the complaint does not violate the Forced Labor statute.

### I. The Forced Labor Statute Targets Human Trafficking, a "Modern Form of Slavery."

Section 1589, the Forced Labor statute, was enacted as part of the Trafficking Victims Protection Act of 2000. *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1030 (7th Cir. 2024). As its title suggests, the statute criminalizes the use of "forced labor:"

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

---

[3] The complaint also asserts three state law claims, but Plaintiffs have abandoned all three in their briefing. (ECF No. 38 at 45 n.8.)

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

In enacting the TVPA, Congress was specific about its purposes. As codified in 22 U.S.C. § 7101(a), the act is intended "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Congress also made twenty-four specific findings supporting that purpose and included these findings in the final legislation. 22 U.S.C. § 7101(b). These findings begin with a determination that "the degrading institution of slavery continues throughout the world" and characterizing the trafficking in persons as "a modern form of slavery." § 7101(b)(1). A number of the findings concern the sex trafficking and victimization of women and girls, *see* § 7101(b)(2), (4), (6), (9) & (11), but trafficking "is not limited to the sex industry," *see* § 7101(b)(3). Most of the findings concern the nature and seriousness of human traffickers and the tactics they employ, and the inadequacies of existing criminal laws to address trafficking. *See* § 7101(b)(4)–(15). Other findings focus on the vulnerability of the victims, and the harms that trafficking causes. *See* § 7101(b)(5)–(7), (9)–(11). None of the findings discuss targeting the authorized practices of federal or state government officials or suggest any need to impose additional protections for detainees lawfully held in state or federal prisons and jails.

Three years after enacting the TVPA, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003. Among other things, the 2003 enactment added 18 U.S.C. § 1595, creating a civil remedy for victims of human trafficking against perpetrators of TVPA violations, including violations of the Forced Labor statute. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 548 (7th Cir. 2023). It is this civil remedy that Plaintiffs now invoke.

## II. Defendants' Alleged Conduct Does Not Implicate the Forced Labor Statute.

Defendants insist that the Forced Labor statute does not apply to them or their actions as alleged in the complaint. They argue that county jails and their staff are not proper defendants under the Forced Labor statute, particularly in connection with the long-established practice of requiring inmates to perform basic cleaning duties in common living areas. (ECF No. 23 at 6–7.) Defendants contend that jail rules requiring civilly detained immigrants, along with other jail inmates, to clean up after themselves do not implicate criminal human trafficking, and they insist that the TVPA was not intended to address or end jail policies requiring inmates to participate in maintaining the hygiene of their group environment. (*Id.*) They note that to the extent inmates, including civil detainees, experience abusive or coercive treatment at a municipal jail, they have remedies under 42 U.S.C. § 1983. (*Id*. at 7–9.) And Defendants contend that even if the Forced Labor statute could be read to apply to them, requiring jail residents to clean common areas falls within the "civic duty" exception to involuntary servitude and forced labor liability. (*Id*. at 10–13.)

The Court agrees with Defendants' conclusion and adopts some of their arguments. Based on the Forced Labor statute's text, the context in which it was enacted, and the context in which Plaintiffs seek to apply it, the Court concludes that Plaintiffs' allegations do not state a claim for violation of the statute. More specifically, Defendants, a county jail and its employees, are not using "forced labor" or engaging in "human trafficking" within the meaning of Section 1589 and the TVPA by requiring inmates, including civil immigration detainees, to perform basic cleaning functions in common areas. Even if the Forced Labor statute has some potential for application in the carceral context (a questionable premise this Court need not resolve), Defendants' policies and actions in requiring Plaintiffs to help clean common areas do not constitute "obtain[ing] the labor or services of a person" by improper means as proscribed by Section 1589.

### A. The Forced Labor Statute Must Be Interpreted in Context.

It is a fundamental principal of statutory construction that the words of a statute must be interpreted and applied in context. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, *the specific context in which that language is used*, and the broader context of the statute as a whole.") (J. Thomas) (emphasis added.) And "[p]art of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Bond v. United*

*States*, 572 U.S. 844, 857 (2014) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). With these basic, commonsense points in mind, the Court concludes that Plaintiffs' allegations do not trigger liability under Section 1589. Congress enacted the Forced Labor statute as part of the TVPA, with the specific intent to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C. § 7101(a). This purpose and the overall context in which Section 1589 was enacted are far removed from Defendants' actions as alleged in the complaint.

Just last month, the Seventh Circuit affirmed the dismissal of Forced Labor claims by plaintiffs who were convicted criminal defendants required to live and work at a Salvation Army facility as part of their probation and parole. *Taylor*, 110 F.4th at 1021. The district court dismissed these plaintiffs' claims based on the *Rooker-Feldman* doctrine. *Id*. at 1023–24. The Seventh Circuit affirmed the dismissal but concluded that *Rooker-Feldman* was not an issue. *Id.* at 1021. Instead, a majority of the panel concluded that the plaintiffs had not plausibly alleged Forced Labor violations. *Id.* at 1029–32. The panel emphasized that as persons subject to a criminal sentence, the plaintiffs could not "expect to have the same freedom of choice with respect to their work and living conditions" as other individual citizens. *Id.* at 1032. And, while this did not leave them totally without protection from abusive behavior at the hands of their custodians, any application of the Forced Labor statute in this context needed to acknowledge that "the liberty interests it protects have been curtailed sharply in the case of those subject to the legitimate restraints of a criminal judgment." *Id.* Because the plaintiffs had not plausibly alleged how the Salvation Army's conduct was "incompatible with the legitimate constraints of the particular penal judgment[s]" against them, they had not stated valid Forced Labor claims. *Id.* In so concluding, Court of Appeals, noted that the plaintiffs had failed to "come to grips with the fact that [they] are in a very different situation from other participants who have not had their liberty restricted" and thus their claims were properly dismissed. *Id*.

In *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), the Sixth Circuit also offered helpful guidance in construing Section 1589. In *Toviave*, the Sixth Circuit reversed the criminal conviction of an immigrant from Togo on Forced Labor charges stemming from his having required his younger sister, two cousins, and a nephew to do their homework and perform household chores, subject to severe punishments, which the court acknowledged were

"reprehensible." *Id*. at 624–25. The Sixth Circuit explained that the Forced Labor statute needed to be interpreted against the well-understood backdrop that an "American parent has always had the right to make his child perform household chores." *Id*. at 625. Citing the Supreme Court's decision in *Bond*, which provided a contextual interpretation of the criminal chemical weapons statute, the Sixth Circuit concluded the government's expansive application of the Forced Labor statute was inappropriate absent "clear expression of Congressional intent" to "transform a statute passed to implement the Thirteenth Amendment . . . into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime." *Id*. at 627–29.

Both *Taylor* and *Toviave* support the conclusion that Section 1895 does not apply to Defendants' actions as alleged in the complaint. Plaintiffs are lawfully detained immigrants whose detention has been lawfully entrusted to Defendants by the federal government. While Plaintiffs are not convicted criminals like the plaintiffs in *Taylor*, at the time of the conduct alleged in the complaint they were in Defendants' custody pursuant to the valid authority and directive of the federal government. This is not human trafficking or a modern form of slavery. Plaintiffs' status as lawful detainees brings with it important consequences, including, as *Taylor* explains, necessary limitations on the rights and freedoms that they might have otherwise enjoyed outside the detention setting. And as *Toviave* teaches, the Forced Labor statute must be interpreted against the long-established practices in place when the statute was enacted. At the time Congress enacted the TVPA and Section 1895, jails and prisons (like many communal living arrangements) had long required those living inside to take part in cleaning duties. Indeed, cleaning up after oneself is a basic human responsibility. Just as a parent can require children to clean their rooms and help with household chores, jail administrators can hold inmates to participation in the same communal duties. Neither the parent nor the jail administrator is "obtain[ing] the labor or services" of the child or detainee by illegal means within the language and intent of Section 1589. This does not mean that the parent or jail personnel can be abusive; the parent's role is limited by state child abuse laws and the jailer's conduct is limited by the Constitution and Section 1983. But this is simply not human trafficking, modern slavery, or Forced Labor.

Stretching the Forced Labor statute to apply to Defendants ignores the situation in which Defendants acted. Pursuant to the Intergovernmental Service Agreement between Kenosha County and the federal government, Defendants were authorized to exercise custody over

Plaintiffs. They were obligated to detain the Plaintiffs securely and safely, along with all the others who were committed to their care. Beyond these contractual obligations, Defendants, like all jails, prisons, and administrators, had a duty to preserve and safeguard the health and welfare of Plaintiffs and all other inmates and staff. *See Minix v. Canarecci*, 597 F.3d 824, 830–31 (7th Cir. 2010). To perform these duties, Defendants followed longstanding and common-sense practices in requiring inmates, including Plaintiffs, to clean common living areas. The Forced Labor statute was enacted to address human trafficking. It was not enacted to regulate legitimate authorities in their performance of their duties in housing lawfully held detainees. The management of jails and prisons by lawful government authorities and their agencies is not human trafficking, and the longstanding practice of jails and prisons in requiring inmates to perform basic community functions, like cleaning common areas, is not the extraction of "forced labor." Nothing in the statute's purpose or the Congressional findings supporting its enactment suggests any intention that it address these practices. In the context of the actions alleged in the complaint, Defendants did not "obtain the labor or services of a person" by improper means as proscribed in Section 1589. *Cf. Vanskike v. Peters*, 974 F.2d 806, 808–12 (7th Cir. 1992) (interpreting Fair Labor Standards Act to be inapplicable in the prison context despite intentionally broad definitions of "employer" and "employee," given economic reality of prison life and work assignments).

The Court's conclusion is also supported by *Bijeol v. Nelson*, 579 F.2d 423 (7th Cir. 1978). In *Bijeol*, the Seventh Circuit rejected a pretrial detainee's claims that his First, Fifth, Eighth, and Thirteenth Amendment rights were violated when he was required to perform "general housekeeping duties without pay and, when refusing to do so, he was placed in segregation." *Id.* at 424. The Court of Appeals noted that the "very nature of confinement" includes restrictions on both convicted prisoners and pretrial detainees and that pretrial detainees had "no constitutional right to order from a menu or have maid service." *Id*. It further explained that "general housekeeping responsibilities are not punitive in nature" and emphasized such duties must be "routinely observed in a multiple living unit" to maintain "health and safety." *Id.* Because the plaintiff had not alleged that any of the disciplinary proceedings were conducted in an unfair manner, his claims were rejected. *Id.* While *Bijeol* involved constitutional claims, not the Forced Labor statute, it highlights the unique context that must be accounted for in adjudicating claims concerning restrictions on the liberty of persons in lawful custody.

Other courts of appeal decisions have similarly recognized the legitimate right of institutions to require detainees to perform communal work in the Thirteenth Amendment context. In *Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997), the Fifth Circuit affirmed the dismissal of Thirteenth Amendment claims by an Immigration and Naturalization Service (INS) detainee who complained that he was forced to work in a prison food service department, subject to the threat of segregation. The Court of Appeals rejected his claim, concluding that "the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks," and the plaintiff's kitchen service (for which he was paid some amount), even if done under threat of punishment, did not offend the Thirteenth Amendment. *Id*. at 219. In *McGarry v. Pallito*, 687 F.3d 505 (2d Cir. 2012), the Second Circuit recognized that while inmates might have a Thirteenth Amendment claim if forced to work in a prison laundry, a correctional institution could require inmates to perform "personally related housekeeping chores" like "cleaning the areas in an around their cells without violating the Thirteenth Amendment." *Id.* at 511, 514. These cases support this Court's conclusion that Defendants had a right to require Plaintiffs to help in cleaning the common areas at the Kenosha County Jail and the enforcement of that duty does not constitute criminal forced labor or human trafficking.

### B. Plaintiffs' Efforts to Justify an Expansive Application of the Forced Labor Statute Are Unavailing.

In response, Plaintiffs primarily just point to the statutory text and insist they have the right to invoke the statute because of the broad language used, which creates criminal liability for "[w]hoever knowingly provides or obtains the labor or services of a person" by the prohibited means listed. Plaintiffs cite the Dictionary Act, which provides that "the words 'person' or 'whoever' include corporations, companies, associations, firms, partnerships, societies and joint stock companies as well as individuals." 1 U.S.C. § 1. This argument ignores the context in which the Forced Labor statute is used and the context in which Plaintiffs seek to apply it.

Section 1589 was enacted to combat criminal human trafficking. Congress stated this purpose expressly in the statute. 22 U.S.C. § 7101(a). Nothing in the statute, its express purpose, or the Congressional findings accompanying its passage suggests any intent to disrupt established practices by legitimate federal, state, and municipal authorities lawfully entrusted with incarcerated persons, including civil detainees like Plaintiffs. As the Seventh Circuit recognized in *Taylor*, courts interpreting and applying the Forced Labor statute must account for the

circumstances of those legitimately detained. 110 F.4th at 1028–30. Indeed, the Dictionary Act recognizes this fundamental point. Before defining "person" and "whoever," the statute instructs that its general definitions apply "unless the context indicates otherwise." 1 U.S.C. § 1. Plaintiffs ask the Court to ignore this context (and common sense).

Plaintiffs also urge the Court to adopt an expansive interpretation of Section 1895 because, as they correctly observe, Congress passed the TVPA at least partially in response to the Supreme Court's narrow construction of the term "involuntary servitude" in 18 U.S.C. § 1584, a prior, parallel criminal prohibition on the use of forced labor. (ECF No. 38 at 19–20.) In *United States v. Kozminski*, 487 U.S. 931 (1988), the Supreme Court affirmed the *en banc* Sixth Circuit's reversal of a jury conviction under Section 1584, concluding that the history of the Thirteenth Amendment and subsequent caselaw showed that a violation of the statute required proof of "physical or legal" coercion and not mere psychological coercion. *Id*. at 948. One of the Congressional findings included in the TVPA refers to *Kozminski* and Congress's intent to reach "nonviolent coercion" contrary to the "narrow[] interpret[ation]" adopted by the Supreme Court. 22 U.S.C. § 7101(b)(13). Nothing in *Kozminski* or Congress's response to it, however, leads to the conclusion that the Forced Labor statute must be applied to prohibit Defendants' conduct as alleged in the complaint. The Court's interpretation does not narrow the alleged means used, which Congress defined in the statute. The Court concludes that Defendant's conduct does not constitute "forced labor" or human trafficking as described by Congress. Accordingly, the allegations in the complaint do not describe the "obtain[ing of] the labor or services of a person" by a prohibited means within the meaning of the Forced Labor statute.

Plaintiffs also cite to a number of district court decisions applying the Forced Labor statute to civil detainees who were required to perform work while being housed pursuant to the authority of U.S. Immigration and Customs Enforcement. Plaintiffs lead with a citation to another case filed by Ruderman, Pocknell, and others, *Ruderman v. McHenry County*, No. 3:22-cv-50115, 2023 WL130496 (N.D. Ill. Jan. 9, 2023), in which plaintiffs made similar claims based on their refusal to perform janitorial work while being detained at an Illinois jail. In that case, the district court denied a similar motion to dismiss based on its interpretation of the plain language of Section 1589. *Id*. at *4–5. But the court did not have the benefit of the Seventh Circuit's teaching in *Taylor* and did not address in detail the unique context of the facts alleged, a key point emphasized in *Taylor*. Again, nothing in Congress's targeting of criminal human trafficking and forced labor suggests an

intention to open jail and prison officials to criminal or civil liability for continuing to engage in the long-accepted practice of requiring lawfully detained inmates to help maintain the cleanliness of their living environment. Plaintiffs' other authorities, *Ruelas v. County of Alameda*, 519 F. Supp. 3d 636 (N.D. Cal. 2021); *Owino v. CoreCivic, Inc.*, No. 17-cv-1112, 2018 WL 2193644 (S.D. Cal. May 14, 2018); and *Menocal v. GEO Group, Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015), suffer from similar deficits and are unpersuasive. Plaintiffs also cite the Eleventh Circuit's decision in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277–78 (11th Cir. 2020), allowing Forced Labor claims to proceed against a private prison alleged to have used illegal coercive means to force immigrant detainees to perform kitchen labor. But even there, the court of appeals took pains to note that its decision should not be read "to call into question longstanding requirements that detainees or names be required to perform basic housekeeping tasks." *Id*. *Barrientos* supports the Court's conclusion here.

## CONCLUSION

Because the Court concludes that the Forced Labor statute does not apply in the context of the conduct alleged in the complaint, Defendants' motion to dismiss is granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, ECF No. 17, is **GRANTED** and the case **DISMISSED** for failure to state a claim. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on September 30, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge